**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **OCLC, Inc.,** | **Case No. 2:22-cv-2470** |
| **Plaintiff,** | **Judge** |
| **v.** | **Magistrate Judge** |
| **CLARIVATE, PLC; CLARIVATE ANALYTICS (US) LLC; PROQUEST LLC; and EX LIBRIS (USA), INC.,** | **DEMAND FOR JURY TRIAL** |
| **Defendants.** | |

---

### COMPLAINT FOR TEMPORARY RESTRAINING ORDER, INJUNCTIVE RELIEF, AND DAMAGES

---

OCLC, Inc., ("OCLC"), by and through counsel, files this Complaint for a temporary restraining order, injunctive relief, and damages against Clarivate, Plc, Clarivate Analytics (US) LLC, ProQuest LLC, and Ex Libris (USA), Inc., ("Defendants") and in support thereof, states the following:

### NATURE OF ACTION

1.     OCLC is an Ohio non-profit organization originally founded in 1967 that provides shared technology services, original research, and community programs for its membership and the library community at large.

2.     OCLC has spent 55 years and made substantial investments, including approximately 68 million dollars over the past two years and 162 million dollars over the past five years, developing and enhancing its library of bibliographic records and associated metadata, which OCLC markets as WorldCat®.  WorldCat® is the authoritative source of library bibliographic records.  WorldCat® is integrated into and is an important part of OCLC's other

product and service offerings to libraries and academic institutions around the world. WorldCat® is an essential part of OCLC's business as a whole, making up an average of 40% of OCLC's revenue over the past 5 years.

3. OCLC provides the infrastructure for libraries to collaborate, create and share bibliographic records, thus providing efficiencies and lowering overall costs for record creation.

4. In order to support all libraries, OCLC works neutrally with all integrated library systems ("ILS") and library service platform ("LSP") providers. OCLC offers an LSP, which is built around WorldCat data.[1] ILS/LSPs can interoperate with OCLC cataloging services so that individual libraries can copy a WorldCat record into their local ILS/LSP instance for those individual libraries' use and contribute new or updated records to WorldCat.

5. Clarivate, Plc ("Clarivate") is a multi-billion dollar global information, analytics, and workflow solutions company that is publicly traded on the New York Stock Exchange. Clarivate focuses on serving the Academia & Government, Life Sciences & Healthcare, Professional Services, and Consumer Goods, Manufacturing & Technology end-markets.

6. Clarivate and its defendant subsidiaries named in this action provide, among other things, products and services that directly compete with those offered by OCLC and others within the ILS/LSP market. Indeed, Clarivate's share of the ILS/LSP market dwarfs all other competitors, including OCLC, and Clarivate (and its subsidiaries) has established this dominant market position over the past several years through a series of targeted acquisitions.

7. Despite these acquisitions and their own internal efforts, Defendants have never been able to develop or offer customers a library bibliographic record product with the same quality, coverage, and popularity as OCLC's WorldCat®.

---

[1] While there are some differences between ILSs and LSPs, this terminology is often used interchangeably and for the purposes of this Complaint, will be hereinafter referred to collectively as, "ILS/LSP."

8.      In March 2022, OCLC became aware that Defendants are working on a platform called MetaDoor, which Defendants have publicly acknowledged will directly compete with OCLC's WorldCat®.  Instead of devoting the time and other substantial resources that OCLC has invested to create its industry-leading WorldCat®, Defendants have chosen to take shortcuts by using the MetaDoor platform to misappropriate catalog records and metadata created by OCLC, its members, and others.

9.      Defendants have been contacting OCLC customers and encouraging them to contribute the bibliographic records from WorldCat®, and provide access to those records from the MetaDoor platform, all of which is in direct breach of those customers' contractual obligations to OCLC.  In addition to tortiously interfering with OCLC's contractual relationships with its customers, Defendants are also tortiously interfering with OCLC's prospective business relationships by providing OCLC's WorldCat® records to MetaDoor users without requiring those users to subscribe to use WorldCat® or otherwise pay OCLC for those records.

10.     Defendants have also conspired with each other to tortiously interfere with OCLC's contractual relationships and prospective business relationships.

11.     Defendants have publicly stated that they plan to offer MetaDoor to current and future customers for free, which would include access and use of the WorldCat® bibliographic records that are being uploaded, linked to, and/or otherwise transferred into MetaDoor. Defendants' actions are not purely altruistic, however.  Instead, this is just Defendants' latest attempt to further consolidate their dominant position in the ILS/LSP market.  Defendants are engaging in profit-sacrificing behavior to ultimately drive OCLC (and potentially its other competitors) from the ILS/LSP market.  And given the importance of WorldCat® to OCLC's

continued operations, Defendants are likely to succeed unless they are stopped from pursuing their current course of wrongful actions.

12.     Defendants know that without being able to steal valuable WorldCat® records, MetaDoor will not survive.  MetaDoor's entire structure is built on the back of WorldCat® and the more than five decades worth of work and hundreds of millions of dollars invested by OCLC to create it.

## THE PARTIES

13.     OCLC, Inc. ("OCLC") is an Ohio nonprofit corporation with its principal place of business in Dublin, Ohio.

14.     Clarivate, Plc ("Clarivate") is a Jersey, Channel Islands corporation with its principal place of business in London, United Kingdom.  Clarivate is publicly traded on the New York Stock Exchange, and it owns and oversees defendants Clarivate Analytics (US) LLC, ProQuest LLC, and Ex Libris (USA), Inc.

15.     Clarivate Analytics (US) LLC ("Clarivate Analytics") is a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania.  Clarivate Analytics is a subsidiary of Clarivate Plc.  On information and belief, Clarivate Plc operates in the United States through Clarivate Analytics.

16.     ProQuest LLC ("ProQuest") is a Delaware corporation with its principal place of business in Ann Arbor, Michigan.  ProQuest is a subsidiary of Clarivate.

17.     Ex Libris (USA), Inc. ("Ex Libris") is a New York corporation with its principal place of business in Chicago, Illinois.  On information and belief, it is part of the Ex Libris Group, an Israeli corporation with its principal place of business in Jerusalem, Israel. Ex Libris is a subsidiary of ProQuest.

## JURISDICTION AND VENUE

18.     This is a complaint for declaratory relief, injunctive relief, and damages under Ohio law for tortious interference of contract, tortious interference of prospective business relationships, and conspiracy to do the same.  Jurisdiction is conferred by 28 U.S.C. § 1332 and § 2201.  The amount in controversy exceeds the value of $75,000, exclusive of interest and costs, and an actual controversy exists between the parties.

19.     Defendants themselves and through their subsidiaries and affiliates transacted business in Ohio; caused tortious injury by an act or omission in Ohio; caused tortious injury in Ohio by an act or omission outside Ohio and regularly do or solicit business, engage in a persistent course of conduct, and derive substantial revenue from services rendered in Ohio; and/or caused tortious injury in Ohio to OCLC by an act outside Ohio committed with the purpose of injuring OCLC, when they reasonably knew OCLC would be injured in Ohio.  Ohio Rev. Code § 2307.382(A)(1), (3), (4), (6).

20.     Venue is appropriate in this district under 28 U.S.C. § 1391.

## STATEMENT OF FACTS

**I.      About OCLC**

21.     OCLC is headquartered in Dublin, Ohio, and is a tax-exempt, non-profit, membership, computer library service and research organization dedicated to the public purposes of furthering access to the world's information and reducing the rate of the rise in library costs.

22.     OCLC employs approximately 1,177 people in the United States, Canada, Europe, and Asia Pacific, 713 of which are based in Ohio.

23.     More than 32,000 libraries in 170 countries and territories around the world have used OCLC services to locate, acquire, catalog, lend, preserve, and manage library materials.

24. OCLC's services to the library community include: Management Services, Metadata Services, Discovery and Reference Services, and Resource Sharing Services (collectively, "OCLC's Services").

25. Now more than ever, libraries are faced with a rapidly changing environment, evolving user needs, and increasing pressure to measure and communicate impact. Each of OCLC's Services provide a range of products that address these challenges by sharing data, streamlining workflows, and connecting people to the knowledge held in the world's library collections.

### A. WorldCat®

26. At the core of OCLC's Services, is its most valuable offering—WorldCat®. WorldCat® is the world's most comprehensive database of information about library collections and is utilized in almost all of OCLC's Services.

27. For example, products within OCLC's Discovery and Reference Services search WorldCat® to allow libraries (OCLC customers) and their users to find and get access to the materials they need from their library and from other libraries around the world. There are four products in Discovery and Reference Services, each dependent on WorldCat®: World.Cat.org; WorldCat® Discovery; FirstSearch; and Web visibility.

28. Likewise, products within OCLC's Resource Sharing Services search WorldCat® to help libraries and users find items to borrow from libraries worldwide. There are seven products in Resource Sharing Services, each which can be heavily dependent on WorldCat®: Discovery to Delivery (D2D); ILLiad resource sharing management software; Relais ILL; Tipasa; UnityUK resource sharing service; WorldShare Interlibrary Loan service; and ZFL-Servier resource sharing service.

29.    OCLC has spent more than 55 years creating the WorldCat® database into what it is today and it is singularly OCLC's most valuable asset.

30.    OCLC has invested significant resources into developing, maintaining, improving, and enhancing WorldCat®.

31.    For example, OCLC employs 235 employees (approximately 20% of its total workforce) whose job function is dedicated to the development, procurement, maintenance, improvement, and enhancement of OCLC WorldCat® records.

32.    These employees have position titles like product managers, developers, product analysts, database specialists, metadata specialists, software engineers, data scientists, metadata operations, quality engineers, performance test engineers, information developers, software architects, technical managers, data scientists, business development managers, trainers, community managers, and platform engineers.

33.    The reason so much money is invested into WorldCat® is because it is the core of OCLC's business and accounts directly for 40% of OCLC's revenue and indirectly accounts for 83% of OCLC's revenue when looking at the impact on OCLC's Services and downstream products.

**B.    What is WorldCat®?**

34.    WorldCat® contains more than 522 million bibliographic records.  When you combine these records with the more than 3,100 collections from leading publishers, it provides access to its subscribers of more than 4 billion items from a variety of resources.

35.    WorldCat® is a collection of OCLC member-contributed records, publisher records and OCLC created records that give libraries a greater web-scale presence. The more libraries that participate, the better and more useful WorldCat® becomes to libraries, their end users, and other organizations that want to interact with libraries on the Web.

36.    WorldCat® also is the following:

a.    A bibliographic record supply.    WorldCat automatically supplies records to libraries, to provide comprehensive coverage.    Its high-quality, consistent records facilitate operational efficiency in member libraries.

b.    A registry of library holdings.    Bibliographic data tied to library locations creates a network which supports research, local discovery, and resource sharing.

c.    A discovery environment.    The library network can be accessed as a unit, enhancing convenience and reach.    This network can be delivered into other discovery environments.

d.    An infrastructure for knowledge organization.    A common infrastructure supports shared approaches to description, authority control (through NACO, CONSER, etc.), and subject analysis and classification.

e.    An infrastructure for system-wide maintenance of metadata. Shared infrastructure supports system-wide revisions (*e.g.*, MARC updates, heading changes); data mining for enriched structure (*e.g.*, FRBR, WorldCat® Identities); and syndication into other environments.

f.    A source of intelligence about the system-wide "collective collection."    The aggregation of holdings data at the network level supports policy and service decisions about the management of collections within and across institutions.

g.    A repository of data available in multiple ways, including via WorldCat® Application Programming Interfaces, or APIs, that allow people to combine WorldCat® data with their own applications.

37. The WorldCat® database is a union of national and other union catalogs from around the world, as well as the closest approximation of a national union catalog of library holdings in the United States. This means that WorldCat® is the fullest single source of worldwide library holdings available, access to which improves the efficiency with which items can be located in—and requested from—library collections.

### C. How are WorldCat® records created?

38. WorldCat® records are bibliographic data regarding the work, including, among other things, title, author, publisher, and number of pages, obtained from OCLC member libraries, publishers, vendors, and national libraries.

39. OCLC merges, de-duplicates, arranges, and adds metadata to enhance these records to support discovery of, exploration of, and access to the records.

40. This includes adding OCLC's own unique identifying number, the "OCN," which creates more effective queries and serves as an authoritative index for identifying and referring to specific titles or works. OCLC also adds Dewey Decimal Classification numbers and Faceted Application of Subject Terminology headings.

41. OCLC has also designed record enhancements that recognize connections between works and then links and merges the records together.

42. These additions further enrich the records and support enhanced discovery.

43. Of the entire WorldCat® collection, more than 93% of the records have been modified, improved, and/or enhanced by OCLC.

44. The value of WorldCat® are these modifications, improvements, and/or enhancements by OCLC.

### D.     How does WorldCat® work?

45.     When a library receives a new title, it searches for that work in WorldCat®.  If there is a record, the library can download the record, add additional information, and then add the record to their local library catalog or ILS/LPS).  Often, WorldCat® already has a record for a title.  This is due to its longstanding relationships with national libraries, libraries across the world, publishers, and other vendors who provide these records.  WorldCat® thus saves libraries hundreds of hours of cataloging work.

46.     Many publisher and vendor records are immediately added to WorldCat because OCLC has diligently worked over decades to develop relationships with publishers so that there are established electronic feeds of the records to WorldCat® of their published titles.

47.     If a library receives a new title that does not already have a WorldCat® record, the library creates a record, which is then added to WorldCat® for other users to utilize.

48.     Algorithms look for duplicates and provide other data control to maintain the high quality of WorldCat records.

49.     Customers must have a paid subscription to use WorldCat®.

50.     WorldCat® is integrated into and supports nearly all of OCLC's other products and services.

### E.     WorldCat® Customers

51.     Almost 8,000 libraries have subscriptions to use WorldCat® ("WorldCat® Customers").

52.     Of all of OCLC's customers, approximately 43% are WorldCat® Customers (collectively, "OCLC Metadata Customers").  These WorldCat® Customers represent:

> a.     Academic libraries—including Harvard, Yale, The Ohio State University, Drexel University, Saddlebrook College, etc.

b. Community colleges—including City College of San Francisco, Harford Community College Library (MD), Chattanooga State Community College (TN), Columbus State Community College (OH), etc.

c. Public libraries—including Columbus Metropolitan Library, Los Angeles Public Library, Lakewood Public Library, etc.

d. State and Government libraries—including the Nevada State Library, Library of Congress, Federal Reserve Bank of Cleveland, Space Intelligence Center, etc.

e. Special Libraries—including Sladen Library, Henry Ford Hospital, Gateway Seminary, The Getty Research Institute, Ashridge Executive Education, The National Gallery (UK), Wellcome Library (UK), etc.

f. Library Consortia—including California Digital Library (CDL), OhioLink, etc.

53. Even OCLC Member Subscribers that use non-OCLC services or platforms rely on WorldCat® for their record cataloging needs.

54. Significant costs are involved in the ongoing provision of the high-quality database on which OCLC WorldCat® Customers rely.

55. This requires WorldCat Customers to share the benefits and costs of WorldCat® as part of the overall OCLC Cooperative.

56. Because there is a practical need to sustain the economic viability and value of WorldCat® over the long term, all WorldCat® Customers must agree to OCLC's contractual requirements, including WorldCat®'s Rights and Responsibilities, to be part of the OCLC Cooperative.

**II.     Clarivate and Its Affiliates Are the Most Dominant Player in the ILS/LSP Market.**

57. OCLC is one of several entities that provides cataloging, discovery, and resource sharing services to libraries and academic institutions around the world, but it is neither the largest

nor most dominant player within the broader ILS/LSP market in which these services are offered. That distinction currently belongs to defendant Clarivate, as a result of its acquisition of ProQuest in December of 2021.

58.     ProQuest, now a subsidiary of Clarivate, provides content and research technology and services to researchers and librarians around the world.  ProQuest first began as a producer of microfilm products for libraries and academic institutions and later shifted its operations to the electronic publishing of journals, eBooks, primary sources, dissertations, news, and video.

59.     In December of 2015, ProQuest made a major push into the ILS/LSP market by acquiring Ex Libris Group, an Israeli company with product and service offerings focused on technology-based workflow and resource management tools for libraries, researchers, and students in higher education and academic institutions.  After the acquisition, Ex Libris became a business unit within ProQuest.

60.     In acquiring Ex Libris, ProQuest obtained a number of products and services within the ILS/LSP space, including two integrated library systems, Aleph and Voyager, and a cloud-based library services platform, Alma.  Each of these products/services is provided to customers on a subscription basis.

61.     Alma, Voyager, and Aleph all directly compete with OCLC's ILS/LSP services, including WorldShare Management Services, Sunrise, LBS and Olib.

62.     At the time of the 2015 acquisition, Ex Libris was the leading company in the ILS/LSP market, enjoying approximately 53% of the market share among Association of Research

Library ("ARL")[2] institutions.[3] In comparison, Ex Libris' next closest competitor at the time, Innovative Interfaces, Inc. ("Innovative"), held a 28% share, and OCLC had only a 2.4% share.[4]

63. While ProQuest-Ex Libris became the largest player within the broader ILS/LSP market in 2015, they did not offer any products or services in the library bibliographic record and metadata space that were as popular or widely-used as OCLC's WorldCat®.

64. In late 2019, ProQuest-Ex Libris sought to further consolidate its ILS/LSP market position by acquiring its largest competitor, Innovative. ProQuest completed its acquisition of Innovative on or around January 16, 2020.

65. With the acquisition of Innovative, ProQuest-Ex Libris acquired, among other products and services, Innovative's separate record cataloging utility named SkyRiver, which directly competes with OCLC's WorldCat. Like Alma, Voyager, and Aleph, SkyRiver is provided to customers on a subscription basis.

66. ProQuest's acquisition of Innovative further collapsed competition within the ILS/LSP market, as ProQuest (through Ex Libris and Innovative) now owned over 84% of the market among ARL institutions, 72% among all academic institutions, and 54% among public libraries.[5] In contrast, OCLC, now Clarivate's second largest competitor in the ILS/LSP market, held only a 4% market share among ARL institutions, 10% among academic institutions, and 10% among public libraries.[6]

---

[2] The Association of Research Libraries is a membership organization of libraries and archives in major public and private universities, federal government agencies, and large public institutions in Canada and the United States. *See* Association of Research Libraries, https://www.arl.org/ (last visited June 13, 2022).
[3] Letter from the Scholarly Publishing and Academic Resources Coalition ("SPARC"), at 8 (Oct. 22, 2021), https://sparcopen.org/wp-content/uploads/2021/10/SPARC-FTC-Letter-in-Opposition-to-the-Clarivate-ProQuest-Merger.pdf (last visited June 13, 2022).
[4] *Id.* at 9.
[5] *Id.* at 2, 9; Roger C. Schonfeld, *What are the Larger Implications of Ex Libris Buying Innovative?*, ITHAKA S+R Blog, (Dec. 5, 2019), https://sr.ithaka.org/blog/what-are-the-larger-implications-of-ex-libris-buying-innovative/.
[6] SPARC Letter, *supra* note 2, at 9; Schonfeld, *supra* note 5.

67.     With the acquisition of Innovative in 2020, ProQuest's combined position within the ILS/LSP market dwarfed all other market participants, including OCLC.

68.     On or around May 17, 2021, Clarivate, Plc, a multibillion-dollar, publicly-traded, global information, analytics and workflow solutions company, announced a definitive agreement to acquire ProQuest and its subsidiaries.

69.     Clarivate's announcement of the proposed acquisition was met with sharp criticism and concern from some libraries and academic institutions.  SPARC, an alliance of over 200 academic and research libraries working to make research and education open and equitable, submitted a letter opposing the acquisition based on, among other reasons, the monopoly Clarivate-ProQuest would have over the ILS/LSP market for libraries.[7]

70.     Clarivate completed its acquisition of ProQuest on or around December 1, 2021.

71.     Clarivate acquired ProQuest in 2021, in part, due to ProQuest's massive share of the ISL/LSP market, which enabled Clarivate to offer these services to current and potential customers and round out its Academia & Government Product Line.

72.     On information and belief, since the ProQuest acquisition, Clarivate Analytics oversees and is responsible for Clarivate's U.S. operations and the Academia & Government Product Line, which includes those products and services offered by ProQuest and Ex Libris.

73.     On information and belief, since the ProQuest acquisition, Defendant Ex Libris (USA), Inc. oversees and is responsible for the Ex Libris Group's U.S. operations and the development and marketing of ILS/LSP products and services, including MetaDoor.

74.     When Clarivate acquired ProQuest, it also acquired the cataloging utilities and resources within ProQuest's (and Ex Libris' and Innovative's) product/services portfolio,

---

[7] SPARC Letter, *supra* note 3, at 2-3.

including SkyRiver. However, SkyRiver and ProQuest's other offerings have never been as popular or successful as OCLC's WorldCat®, and WorldCat® remains the industry standard among libraries and academic institutions for cataloging resources. While Defendants claim that SkyRiver has over 70 million records within its catalog, WorldCat® has over 500 million records, and SkyRiver has not been able to successfully create the same high-quality records available through WorldCat.

75.     Given the deficiencies of SkyRiver and Defendants' other cataloging resources, Defendants began developing a separate cataloging resource called MetaDoor to directly compete with WorldCat®. On information and belief, MetaDoor is part of Defendants' strategy to target OCLC and further consolidate its dominant position in the ILS/LSP market.

### III.     Defendants create and promote MetaDoor, a bibliographic record "index" as a direct competitor to OCLC's WorldCat® cataloging database.

76.     Since at least March 2022, Defendants have been promoting the launch of MetaDoor, a cataloging resource platform offered by Ex Libris. During a virtual sales presentation on May 18, 2022, an Ex Libris product manager based in Cleveland, Ohio characterized MetaDoor as "an alternative to OCLC WorldCat" or another "choice into [sic] the marketplace." Defendants have positioned MetaDoor to compete directly with OCLC's WorldCat®.

77.     MetaDoor is being marketed as an open source cataloging platform through which any library, even if it does not have a subscription to Defendants' ILS/LSP products, such as Alma or Voyager, can access MetaDoor records, use bibliographic metadata tools, and other bibliographic record services. This includes libraries that subscribe to OCLC's and other competitors' cataloging and ILS/LSP products.

78.     Like WorldCat®, MetaDoor is a cataloging resource tool that can integrate with other companies' ILS/LSP products and that aims to streamline libraries' cataloging workflows.

79.     MetaDoor is designed to have its bibliographic records populated by users.  In fact, Defendants described MetaDoor in the May 18, 2022 presentation as "a free metadata sharing platform" based on "peer-to-peer sharing of bibliographic records."  According to the same presentation, MetaDoor users download their bibliographic records and then upload those records to MetaDoor to make them available to all MetaDoor users.  MetaDoor, once launched, will therefore rely on the user community to provide the necessary bibliographic records and metadata.

80.     After the "open" MetaDoor platform is initially populated with records, or metadata from records, a library cataloger can search for new titles or records in MetaDoor.  Based on the title, the cataloger is able to see which libraries and institutions have records for that title or resource, and the cataloger selects the record(s) she wishes to create for her institution's library management system.

81.     Upon information and belief, once the cataloger selects the desired record, or metadata from that record, MetaDoor uses the Alma cataloging functionality to create a record for the cataloger's institution's library management system.  At this point, the cataloger imports the metadata from the selected record, *i.e.*, the title, author, etc., copies it, overlays it on their new record, and merges the selected record's metadata into the new record.  Users can also schedule automatic bibliographic record enrichment or updates from MetaDoor as new records become available on MetaDoor.

82.     To effectively compete with WorldCat®, MetaDoor must somehow obtain robust, high-quality bibliographic records for users to rely on when they are cataloging a new title or resource for their library.  Innovative's SkyRiver service cannot serve as an adequate source of such records, however, due to the lesser quality and lower number of records compared to WorldCat® and other competing services.

83.     Defendants have designed MetaDoor to bypass investing the otherwise significant time and resources that are necessary to develop and create the records and metadata for a world-class cataloging resource like WorldCat®.  Instead, Defendants are intentionally and actively encouraging libraries and other research and academic institutions, many of which are OCLC customers, to download, link to, upload, and/or transfer their bibliographic records and associated metadata, including WorldCat bibliographic records, to MetaDoor.

## IV.     Defendants are actively inducing WorldCat® Customers to violate their contractual agreements with OCLC.

84.     All OCLC Member Subscribers who receive OCLC products or services must agree to the terms of OCLC's Framework Agreement and the accompanying "Schedule(s)" that apply to the products or services they receive from OCLC (collectively, the "Framework Agreement").  The Framework Agreement is attached as Exhibit A and is available on OCLC's website.

85.     Section 5.1 of the Framework Agreement states that "OCLC and/or its licensors or suppliers are the exclusive owners of and retain all right, title, and interest (including all copyrights, trademarks, patents, and any other proprietary rights) to the Products, Services, WorldCat, and all other materials produced or provided by OCLC."  OCLC Member Subscribers are granted a license to use OCLC products or services "solely for the noncommercial purposes described in the Product Description and the applicable Schedule."

86.     All WorldCat® Customers—i.e. OCLC Member Subscribers who have subscriptions under which they can use WorldCat®—agree to the responsibilities outlined in Section 3 of Schedule 2 to the Framework Agreement.

87.     Among the stated responsibilities, WorldCat® Customers agree "that the use and transfer by the Institution of WorldCat Data is subject to the [WorldCat Rights and Responsibilities for the OCLC Cooperative]" (the "WorldCat® Policy").  The WorldCat® Policy sets forth

WorldCat® Customer's and OCLC's rights and responsibilities "associated with the stewardship of the WorldCat . . . bibliographic and holdings database . . . including the use and exchange of OCLC member-contributed data comprising that database." The WorldCat® Policy is available on OCLC's website and attached hereto as Exhibit B.

88.     The WorldCat® Policy defines WorldCat® as offering a "club good," "member good," or "collective good," meaning that WorldCat® derives its value through the efforts and investments of OCLC and its members. Unauthorized use "by those who do not contribute toward the cost of the providing the good" diminishes the ability of members who contribute to enjoy the benefits of the good. As the WorldCat® Policy explains, "OCLC's public purposes include promoting the evolution of library use, of libraries themselves, and providing processes and products for the benefit of libraries and their users." OCLC seeks to protect its customers' investments, as well as its own substantial financial contribution to maintain, enrich, and improve the quality of WorldCat® bibliographic records and metadata.

89.     WorldCat® Customers are required to "[a]bide by this policy, [to] ensure awareness of it both within their institutions and on the part of their agents, their cooperatives, and other organizations to which they make their data available," and to "[m]ake reasonable efforts to ensure that the subsequent re-use and transfer of their WorldCat data by non-members is consistent with this policy and OCLC's public purposes and supports the long-term viability and utility of WorldCat."

90.     Under Section 3(B) of the WorldCat® Policy, WorldCat® Customers are prohibited from "engaging in mass downloading from WorldCat without OCLC's prior written consent," "engaging in mass distribution of data directly from WorldCat to non-members without

OCLC's prior consent," or "engaging in other activities that diminish the value of WorldCat to the OCLC cooperative."

91.     The WorldCat® Policy does not grant WorldCat® Customers the right to share or transfer WorldCat data to another ILS/LSP company for that company's use.  Indeed, such a right would conflict with the aforementioned provisions and the purpose and obligations under the WorldCat® Policy because it would result in unauthorized, *i.e.*, non-contributing use, of the WorldCat metadata.  Similarly, mass downloading WorldCat® files and distributing those files to ILS/LSP services for use by non-WorldCat® Customers violates the WorldCat® Policy and the Framework Agreement.

92.     On information and belief, one or more OCLC WorldCat® Customers have breached the Framework Agreement and WorldCat® Policy by uploading, downloading, linking to, and/or transferring WorldCat® records to MetaDoor.

93.     In March 2022, OCLC first learned that Defendants were contacting its customers and non-customers to promote MetaDoor and encouraging them to share their bibliographic records to MetaDoor.  It was brought up in a presentation to U.K. academic libraries on bibliographic metadata.  OCLC staff were asked by Liam Sullivan, Resource Discovery Officer, Liverpool John Moores University, if it would be worthwhile loading their bibliographic data into MetaDoor by Ex Libris.  Although neither Mr. Sullivan nor OCLC fully understood at the time what MetaDoor was or how the bibliographic data would be used, OCLC has previously warned customers that it is against the Framework Agreement and WorldCat® Policy to upload bibliographic records to other services (such as Alma Community Zone) that make those records available to institutions that do not have subscriptions to use WorldCat®.

94.     On May 5, 2022, OCLC learned that the Defendants had contacted Charlie Barlow, Executive Director of the Boston Library Consortium ("BLC"), to ask if they would be an early adopter of MetaDoor.  Defendants also highlighted that Brandeis University, a BLC member and OCLC subscriber, had agreed to be an early adopter.  Mr. Barlow was also told by the Defendants that they could load all of their records into MetaDoor and they would not need any other service going forward.

95.     A March 10, 2022 email chain among the Washington Community and Technical College Library Consortium Alma group, which is publicly available online, further confirms that Defendants' representatives have been contacting libraries, including WorldCat® Customers, on a large scale, and marketing MetaDoor to OCLC's WorldCat® Customers.[8]  These efforts include encouraging libraries to upload their records to MetaDoor and sign Consent Forms for MetaDoor to use their uploaded records.  Defendants' outreach to WorldCat® Customers to request that they upload their bibliographic records to MetaDoor necessarily implicates the uploading of WorldCat® records into MetaDoor.  As one individual on the March 10, 2022 email chain noted, the overwhelming majority of the titles her institution purchases every year are WorldCat® records—of the 5,000 titles purchased annually, only two or three of the records were not WorldCat® records, *i.e.*, original bibliographic records created by the library itself.

96.     From Ex Libris' May 18, 2022 virtual sales presentation, OCLC also learned that all of MetaDoor's "Development Partners" are OCLC WorldCat® Customers and OCLC members.  Upon information and belief, these Development Partners are working with Ex Libris to develop the MetaDoor platform and have agreed to link to, upload, download, and/or otherwise transfer their bibliographic records, including WorldCat® records, to MetaDoor.

---

[8] Email (Mar. 10, 2022), https://lists.ctc.edu/pipermail/wactclc-alma_lists.ctc.edu/2022-March/010806.html (last visited June 13, 2022).

97.     This presentation also featured a demonstration of the MetaDoor platform where the product manager brought up a WorldCat® record, detectable through its OCN (OCLC Control Number) on every OCLC record.  This record with the OCLC identifying number was presented as a sample of a "top rated record" from which the MetaDoor user could "download" the record and the metadata, and then overlay, copy, and merge the WorldCat® metadata into a new MetaDoor record.  This demonstration shows that Defendants know and intend for WorldCat® records to populate MetaDoor and serve as its "top rated records" for its platform. And because OCLC would not permit Defendants to have direct access to WorldCat®, it also shows that at least one OCLC customer has provided a WorldCat® record to Defendants in breach of the Framework Agreement and WorldCat® Policy.

98.     Upon information and belief, Defendants know that they are actively encouraging OCLC's WorldCat® Customers to breach the Framework Agreement and WorldCat® Policy by downloading large numbers of WorldCat® records and then uploading them to MetaDoor.

99.     Most libraries and academic institutions are WorldCat® Customers, even amongst Ex Libris Alma, Aleph, and/or Voyager users; Innovative's Millennium, Sierra and Polaris users; EBSCO's/Index Data's Folio users; and Sirsi Dynix's Horizon and Symphony users.  Accordingly, upon information and brief, Defendants know that by encouraging MetaDoor users to link to, download, upload, and/or otherwise transfer their records, they are encouraging many WorldCat® Customers to link to, download, upload, and/or otherwise transfer WorldCat® records and data.

100.    Upon information and belief, Defendants are also aware that if the Development Partners and prospective MetaDoor users that are WorldCat® Customers download mass quantities of their WorldCat® records and then link to, upload, and/or otherwise transfer them to

MetaDoor so that the records' metadata can be collected, those Development Partners customers violate the Framework Agreement and WorldCat® Policy.

101.    Since at least 2020, Defendants have been aware of OCLC's Framework Agreement and WorldCat® Policy and that when WorldCat® Customers upload WorldCat® records to competitor ILS/LSP products and services for use by non-WorldCat® Customers, WorldCat® Customers violate the Framework Agreement and WorldCat® Policy.  On April 10, 2020, the Plaintiff's General Counsel sent a letter to counsel for Defendants (ProQuest) regarding the implementation of Alma for the Florida Academic Library Services Cooperative ("FALSC") libraries.  Its first paragraph stated, "I am writing to address a matter involving the use of OCLC WorldCat records in Ex Libris systems and to put Ex Libris on notice to cease and desist any activities which interfere with the contractual obligations between OCLC and its member libraries. We have learned that the project plan for FALSC's implementation of Ex Libris Alma calls for the loading of WorldCat records to the Alma Network Zone, where those records would be made available to WorldCat subscribers and non-subscribers alike.  This action would create a situation where FALSC institutions would be violating their contractual obligations to OCLC."

102.    Defendants also have notice when they are in possession of WorldCat® and other OCLC records and metadata because OCLC's Control Number (identified by OCN) also appears on every OCLC record.

103.    Upon information and belief, Defendants also know that by linking to, uploading to and/or otherwise transferring WorldCat® records to MetaDoor and then offering those WorldCat® records and metadata to MetaDoor customers for free, Defendants are interfering with potential future WorldCat® Customers.  Indeed, any potential WorldCat® Customers are unlikely

to pay (or continue to pay) for access to WorldCat® if the same WorldCat® metadata and records are available for free on MetaDoor.

104. On May 19, 2022, OCLC notified Clarivate's Chief Legal Officer and General Counsel that Clarivate and its subsidiaries must immediately cease and desist their tortious interference and anticompetitive conduct in relation to MetaDoor.

105. On May 27, 2022, OCLC's outside counsel sent a follow-up letter to Clarivate's Chief Legal Officer and General Counsel to reiterate OCLC's demand that Clarivate and its subsidiaries cease and desist their tortious interference and anticompetitive conduct in relation to MetaDoor and to put Defendants on notice of their legal obligation to preserve all evidence and materials related to this matter.

106. Even after Defendants were made aware of their illegal conduct, they have continued to conduct MetaDoor presentations and encourage attendees to indiscriminately upload their library records to MetaDoor. For instance, on May 25, 2022, Defendants hosted its Ex Libris Users of North America 2022 annual meeting, which included a session promoting MetaDoor and inviting participants to sign up and link to, upload and/or otherwise transfer their library records to MetaDoor. Defendants also made a similar presentation titled "MetaDoor—The Open Metadata Platform" at the South Africa Information Online Conference on June 8, 2022.

107. Ex Libris also announced that it will be hosting a presentation at the 2022 American Library Association Annual Conference on June 25, 2022 titled "Ex Libris Breakfast: Collaborating and Working Better Together—Resource Sharing, MetaDoor, and More," during which "special attention will focus on MetaDoor—a new community-based, open and free metadata platform."

108.    Defendants have also succeeded in their efforts to induce OCLC's current WorldCat® Customers to breach their contractual obligations under the Framework Agreement and WorldCat® Policy through gaining access to our customer records for the purpose of sharing them in the MetaDoor platform.

## V.    The current and future harm to OCLC from Defendants' predatory behavior is devastating.

109.    Upon information and belief, Defendants' development and marketing of MetaDoor as a free catalog resource service is a direct attack on OCLC's WorldCat® and OCLC's ability to continue to compete in the broader ILS/LSP market.  MetaDoor is Defendants' next step in their decade-long efforts to consolidate their dominant position in the ILS/LSP market by eliminating potential competition, through acquisition or other means.  Indeed, given WorldCat®'s importance to OCLC's operations and its other product and service offerings, the unlawful incorporation of OCLC's WorldCat® records into Defendants' free MetaDoor service would destroy OCLC's current and future customer base for WorldCat® and fundamentally threaten OCLC's ability to continue to operate.  The harm to OCLC is immediate and far-reaching because Defendants have access to WorldCat® records and can use them in MetaDoor or other products and services, and it could be difficult for OCLC to trace Defendants' use of those records and associated metadata, to the extent the records and associated metadata are incorporated in any of Defendants' other products and services.

110.    Defendants' free distribution of WorldCat® records through MetaDoor poses a vital threat to OCLC membership and participation in WorldCat® generally.  The more libraries that participate in WorldCat® and catalog their records with OCLC, the more records that are available through WorldCat® and the more valuable that WorldCat® becomes to OCLC's members.  Any loss in OCLC membership and WorldCat® participation has a direct, negative

impact on members/customers that remain.  And MetaDoor's distribution of WorldCat® records and metadata for free will contract OCLC membership and WorldCat® participation.

111.    WorldCat® is also one of OCLC's most financially important offerings to its members, making up an average of 40% of OCLC's revenue over the past 5 years.

112.    WorldCat® also sits at the center of OCLC's family of products and services. OCLC's cataloging, resource sharing, discovery, OCLC publisher, and OCLC data services all benefit from WorldCat® records.  OCLC's other products and services that would be effected by a successful attack by Defendants on WorldCat® include: WorldShare Management Services, WorldShare Metadata/OCLC Cataloging, Group Cataloging, WorldCat® Discovery Services/First Search, WorldShare License Manager, WorldShare Collection Evaluation, WorldShare Interlibrary Loan, Tipasa, WorldCat.org, ILLiad, and GreenGlass.

113.    Providing WorldCat® records through MetaDoor for free thus not only undermines the strength and value of WorldCat® in the market, it also decreases its value to OCLC's other products and services, which further devalues OCLC's other products and services to current and potential customers.  The negative impact of MetaDoor's use of WorldCat® records would have catastrophic consequences for every aspect of OCLC's operations.

114.    Defendants know of the aforementioned importance of WorldCat® to OCLC's operations and its ability to continue to compete in the ILS/LSP market.

115.    By offering MetaDoor for free, Defendants are overtly engaging in predatory market behavior, aimed at driving OCLC and other ILS/LSP competitors from the market. Defendants have directly advertised MetaDoor to any and all libraries—even those that are not Defendants' current customers.  Relatedly, Defendants have advertised that libraries can use

application programming interfaces to embed MetaDoor within any non-Ex-Libris system that they already have, such as an OCLC's or other competitors' ILS/LSP products.

116.    Resource cataloging platforms are cost intensive, and it is counter to Defendants' self-interest to offer such a platform for free.  Even by relying on the user community to upload the records, Defendants must still incur other costs to maintain and provide MetaDoor to customers.   For example, MetaDoor must maintain the metadata and implement sharing technology that is compatible with MetaDoor.  Additionally, offering any service for free, even at a low internal cost, risks cannibalizing the margins of Defendants own paid catalog services, such as SkyRiver.  This sort of profit-sacrificing behavior is only reasonable from a business perspective (and justifiable to Clarivate shareholders) if it is a short-term tactic designed to eliminate OCLC and other competitors from the overall ILS/LSP market.

117.    For these reasons, and upon information and belief, Defendants' intentional predatory conduct overtly targets OCLC's WorldCat® and is willful, malicious, and demonstrates at least a conscious disregard of OCLC's rights.  If allowed to continue unchecked, Defendants' unauthorized use of WorldCat® records in MetaDoor will destroy one of OCLC's most important offerings and cripple OCLC's ability to provide its other products and services, including those that compete directly with Defendants' products and services in the ILS/LSP market.  For these reasons, OCLC has been and will be injured in Ohio and elsewhere.

## VI.    Defendants have entered into a conspiracy to tortiously interfere with OCLC's contractual and prospective business relationships.

118.    Upon information and belief, after completing its acquisition of ProQuest in December 2021, Clarivate and its subsidiary and affiliated Defendants Clarivate Analytics, ProQuest, and Ex Libris have sought to further cement their dominant position in the ILS/LSP market.

119. As part of those efforts, Defendants have specifically chosen to directly target OCLC's WorldCat®, one of the most critical investments and sources of revenue for Defendants' second largest competitor in the ILS/LSP market. Accordingly, Defendants acted, and continue to act, in concert in furtherance of a plan or agreement to tortiously interfere with OCLC's contractual and prospective business relationships in relation to OCLC's WorldCat® service.

120. Specifically, representatives from multiple Defendants, including Ex Libris and ProQuest, have contacted OCLC's WorldCat® Customers and encouraged them to download WorldCat® records and link to, upload, and/or otherwise transfer those records to MetaDoor, all of which is in direct violation of those OCLC customers'/members' obligations under the Framework Agreement and WorldCat® Policy. As part of this plan, Defendants' representatives have reached out to OCLC customers in Ohio and all over the world, including in Europe, where Clarivate has a significant presence.

121. Based on these same actions, Defendants are acting pursuant to a common plan to interfere with OCLC's prospective customers by giving them free access to WorldCat® records through MetaDoor.

122. Upon information and belief, as a result of Defendants' plan, one or more OCLC WorldCat® Customers have breached the Framework Agreement and WorldCat® Policy by downloading WorldCat® records and linking to, uploading, and/or otherwise transferring them to MetaDoor.

123. Upon information and belief, Defendants' coordinated and intentional predatory and tortious targeting of OCLC's WorldCat® is willful and malicious, and it has caused, and will continue to cause, significant injury to WorldCat® and OCLC in Ohio and elsewhere, as discussed in further in detail *supra*, ¶¶ 109-17.

**COUNT ONE**
**Tortious interference with contractual relationships**

124.    OCLC incorporates the foregoing paragraphs above by reference as if fully restated herein.

125.    OCLC and WorldCat® Customers entered into contractual agreements, the Framework Agreement and WorldCat®'s Rights and Responsibilities for the OCLC Cooperative, or the WorldCat® Policy.

126.    Defendants know that WorldCat® Customers have a contractual relationship with OCLC.

127.    Defendants have intentionally, deliberately, willfully, maliciously, and without justification solicited WorldCat® Customers to download records and metadata and then link to, upload, and/or otherwise transfer that information to MetaDoor, which violates the Framework Agreement and WorldCat® Policy and materially interferes with OCLC's contractual relationships with its customers.

128.    As a direct and proximate result of Defendants' tortious interference with OCLC's contractual agreements with its customers, OCLC has and/or will suffer immediate and irreparable injury, loss, or damage in Ohio and elsewhere for which there is no adequate remedy at law, including irreparable injury to its business and loss of customer good will, and other intangible assets, and additional damages and expenses that are not readily calculable.

129.    Alternatively, the actions as described above will and/or have caused OCLC to be damaged in an amount to be determined at trial.

**COUNT TWO**
**Conspiracy to tortiously interfere with contractual relationships**

130.    OCLC incorporates the foregoing paragraphs above by reference as if fully restated herein.

28

131.    Defendants conspired to tortiously interfere with OCLC's contractual relationships with its WorldCat® Customers.

132.    Defendants formed a malicious combination, or a tacit understanding or design, to create MetaDoor and encourage WorldCat® Customers to download WorldCat® metadata records and link to, upload, and/or otherwise transfer that information to MetaDoor, which Defendants know violates the WorldCat® Policy.

133.    Defendants did so intentionally, deliberately, willfully, maliciously, and without justification to injure OCLC in Ohio and elsewhere.

134.    Pursuant to this malicious combination, Defendants have induced or will induce WorldCat® Customers to violate their agreements with OCLC.

135.    These underlying unlawful acts committed pursuant to the formed conspiracy will and/or have directly and proximately caused OCLC to suffer immediate and irreparable injury, loss, or damage in Ohio and elsewhere for which there is no adequate remedy at law, including irreparable injury to its business and loss of customer good will, and other intangible assets, and additional damages and expenses that are not readily calculable.

136.    Alternatively, the actions as described above will and/or have caused OCLC to be damaged in an amount to be determined at trial.

## COUNT THREE
### Tortious interference with prospective business relationships

137.    OCLC incorporates the foregoing paragraphs above by reference as if fully restated herein.

138.    OCLC, as the owner of the world's preeminent cataloging record service, WorldCat®, has had or will have prospective business relationships with potential customers seeking a cataloging record service as part of their ILS/LSP platforms.

139. Defendants know OCLC has these prospective business relationships, which is why it created MetaDoor to compete with WorldCat® while offering WorldCat®'s own metadata to MetaDoor customers for free.

140. Defendants have intentionally, deliberately, willfully, maliciously, and without justification caused or will cause these prospective WorldCat® Customers to not enter into a business relationship with OCLC for WorldCat® by offering the WorldCat®'s metadata to MetaDoor customers for free.

141. As a direct and proximate result of Defendants' tortious interference with OCLC's prospective business relationships with future WorldCat® Customers, OCLC will suffer immediate and irreparable injury, loss, or damage in Ohio and elsewhere for which there is no adequate remedy at law, including irreparable injury to its business and loss of customer good will, and other intangible assets, and additional damages and expenses that are not readily calculable.

142. Alternatively, the actions as described above will and/or have caused OCLC to be damaged in an amount to be determined at trial.

## COUNT FOUR
### Conspiracy to tortiously interfere with prospective business relationships

143. OCLC incorporates the foregoing paragraphs above by reference as if fully restated herein.

144. Defendants conspired to tortiously interfere with OCLC's prospective business relationships with future WorldCat® Customers.

145. Defendants formed a malicious combination, or a tacit understanding or design, to create MetaDoor to lure future WorldCat® Customers from OCLC by offering WorldCat®'s high-quality records and metadata to MetaDoor customers for free, even if MetaDoor customers are not WorldCat® Customers and have thus not paid for a subscription to use WorldCat®.

30

146.    Defendants did so intentionally, deliberately, willfully, maliciously, and without justification to injure OCLC in Ohio and elsewhere.

147.    Pursuant to this malicious combination, Defendants have induced or will induce future WorldCat® Customers to decline to enter into a business relationship with OCLC because MetaDoor offers, in effect, the same catalog resource service for free.

148.    These underlying unlawful acts committed pursuant to the formed conspiracy will and/or have directly and proximately caused OCLC to suffer immediate and irreparable injury, loss, or damage in Ohio and elsewhere for which there is no adequate remedy at law, including irreparable injury to its business and loss of customer good will, and other intangible assets, and additional damages and expenses that are not readily calculable.

149.    Alternatively, the actions as described above will and/or have caused OCLC to be damaged in an amount to be determined at trial.

**PRAYER FOR RELIEF**

**WHEREFORE**, OCLC, Inc. requests that the Court enter judgment in its favor and against Defendants as follows:

(a)    a declaration that Defendants' conduct in relation to its MetaDoor product, in its present state of design and plan, constitutes tortious interference, and conspiracy to do the same, with OCLC's contractual relationships and prospective business relationships;

(b)    a temporary restraining order and preliminary and permanent injunctive relief prohibiting Defendants from taking any action that interferes with OCLC's contractual relationships and with OCLC's prospective business relationships;

(c)    an award of compensatory damages in favor of OCLC against Defendants in an amount to be determined at trial in excess of $75,000;

(d)    an award of punitive damages;

(e)     an award of attorney fees, pre-judgment interest, costs, and expenses, incurred in

connection with this action; and/or

(f)     for such other and further relief as the court deems just.

## JURY DEMAND

Plaintiff respectfully demands a trial by jury of the maximum number permitted by law.


Dated: June 13, 2022

Respectfully submitted,

/s/ *Traci L. Martinez*
Traci L. Martinez (0083989), Trial Attorney
Jeffrey M. Walker (0096567)
Kathryn M. Brown (0100426)
SQUIRE PATTON BOGGS (US) LLP
2000 Huntington Center
41 South High Street
Columbus, Ohio  43215
Telephone: +1 614 365 2700
Facsimile: +1 614 365 2499
traci.martinez@squirepb.com
jeffrey.walker@squirepb.com
kathryn.brown@squirepb.com

Attorneys for Plaintiff, OCLC, Inc.