**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **OCLC, Inc.,** | **Case No. 2:22-cv-2470-JLG-KAJ** |
| **Plaintiff,** | **Judge James L. Graham** |
| **v.** | **Magistrate Judge Kimberly A. Jolson** |
| **CLARIVATE, PLC; CLARIVATE ANALYTICS (US) LLC; PROQUEST LLC; and EX LIBRIS (USA), INC.,** | |
| **Defendants.** | |

---

**PLAINTIFF OCLC, INC.'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

---

Pursuant to Federal Rule of Civil Procedure 65(a), Plaintiff OCLC, Inc. ("OCLC") hereby moves for a temporary restraining order and preliminary injunction enjoining Defendants Clarivate, Plc, Clarivate Analytics (US) LLC, ProQuest LLC, and Ex Libris (USA), Inc. ("Defendants"), and affiliates of the Defendants, from:

1.    further developing and/or marketing MetaDoor or any product or service that relies on utilizing the metadata and records developed, enhanced, and/or maintained by another entity such as OCLC's WorldCat® records and metadata;

2.    contacting or communicating with OCLC WorldCat® customers about MetaDoor, including about:

   a.    downloading, uploading, linking to, transferring and/or otherwise sharing records or metadata for MetaDoor (including any record which has a unique identifier of OCN);

   b.    participating in or signing up for MetaDoor; and

        c. partnering or assisting Defendants in any way with developing MetaDoor;

3.      requesting any OCLC WorldCat® records and metadata or records and metadata derived from the same; and

4.      retaining, using, or making available to the public and/or MetaDoor customers any OCLC WorldCat® records and metadata or records and metadata derived from the same.

Absent injunctive relief to preserve the status quo pending resolution of this action and to prevent Defendants from disrupting or terminating the franchise relationships, OCLC will suffer substantial irreparable harm.

The basis for this Motion is set forth in more detail in the Memorandum in Support and Complaint filed simultaneously in this action.

Respectfully submitted,

/s/ *Traci L. Martinez*
Traci L. Martinez (0083989), Trial Attorney
Jeffrey M. Walker (0096567)
Kathryn M. Brown (0100426)
SQUIRE PATTON BOGGS (US) LLP
41 South High Street, Suite 2000
Columbus, Ohio 43215
Telephone: (614) 365-2700
Facsimile: (614) 365-2499
traci.martinez@squirepb.com
jeffrey.walker@squirepb.com
kathryn.brown@squirepb.com

Attorneys for Plaintiff OCLC, Inc.

**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **OCLC, Inc.,** | **Case No. 2:22-cv-2470-JLG-KAJ** |
| **Plaintiff,** | **Judge James L. Graham** |
| **v.** | **Magistrate Judge Kimberly A. Jolson** |
| **CLARIVATE, PLC; CLARIVATE ANALYTICS (US) LLC; PROQUEST LLC; and EX LIBRIS (USA), INC.,** | |
| **Defendants.** | |

---

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

---

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................ 1

II.    STATEMENT OF FACTS ......................................................................... 2

     A.    OCLC Offers a Suite of Products and Services to Libraries, Including WorldCat®, the World's Foremost Bibliographic Database. ............................... 2

     B.    All WorldCat® Subscribers Are Bound by the Terms of OCLC's Framework Agreement and WorldCat® Policy. .................................................... 4

     C.    Clarivate and Its Affiliates Have Strategically Eliminated Competitors through Targeted Acquisitions, Rendering Clarivate the Dominant Player in the ILS/LSP Market. ...................................................................................... 5

     D.    Defendants Have Created MetaDoor, a Free Cataloging Resource Platform that Depends on User-Contributed WorldCat® Records. ...................................... 6

     E.    Defendants are Encouraging WorldCat® Customers to Upload their WorldCat® Records in Violation of their Agreements with OCLC and Inducing Prospective WorldCat® Customers to use MetaDoor Instead. ............. 7

     F.    Defendants' Unfair Predatory Conduct Will Devastate WorldCat® and by Extension OCLC. ................................................................................................. 9

III.    LAW AND ARGUMENT ......................................................................... 10

All four factors of the Sixth Circuit's balancing test demonstrate that the Court should enter a temporary restraining order and a preliminary injunction against Defendants, prohibiting them from, among other things, developing MetaDoor, communicating with OCLC customers about MetaDoor, requesting WorldCat® records from OCLC customers, and using WorldCat® records.

     A.    OCLC Will Prevail on the Merits of Its Tortious Interference and Civil Conspiracy Claims. ............................................................................................. 12

OCLC will succeed on the merits of its claims because here, it "raise[s] questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007)); *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 848 (6th Cir. 2017).

        1.    Defendants' conduct concerning MetaDoor Constitutes Tortious Interference of Contract and of Prospective Business Relationships................................................................... 12

OCLC will be able to show a likelihood of success on the merits of its tortious interference with contractual relationship claim, demonstrating that Defendants wrongfully interfered with OCLC's contractual relationships with its customers by inducing the OCLC customers to breach the Framework Agreement and WorldCat® Policy. *NCR Corp. v. Korala*

# TABLE OF CONTENTS
(continued)

Page

*Assocs. Ltd.*, 512 F.3d 807, 817 (6th Cir. 2008). OCLC will also be able to show a likelihood of success on the merits of its tortious interference with prospective business relationships, demonstrating that Defendants "without privilege to do so, induce[d] or otherwise purposely cause[d] " prospective OCLC customers "not to enter into . . . a business relation with" OCLC for WorldCat® by offering WorldCat® records for free. *Havensure, LLC v. Prudential Ins. Co. of Am.*, 595 F.3d 312, 315 (6th Cir. 2010).

2. Defendants' MetaDoor Communications and Market Behavior Demonstrate a Civil Conspiracy to Tortiously Interfere with OCLC's Contract and Business Relationships.................................................................... 18

OCLC demonstrates a likelihood of success on its civil conspiracy claims. Defendants formed a common design to interfere with OCLC's contractual relationships to induce WorldCat® Customers to breach the WorldCat® Policy, as incorporated into the Framework Agreement, and successfully induced such breaches. Defendants also formed a common design to interfere with OCLC's business relationships by obtaining WorldCat®'s records and metadata and offering them for free, despite the cost to Defendants. *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 534 (6th Cir. 2000).

B. OCLC Will Suffer Irreparable Injury Without a Preliminary Injunction. ........... 19

OCLC will suffer irreparable injury, an injury "not 'fully compensable by monetary damages.'" *S. Glazer's Distribs.*, 860 F.3d at 852. These injuries include the loss of customer goodwill," which are especially unique here due to the nature of WorldCat®, *id.* at 854 (quoting *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)); *Certified Restoration*, 511 F.3d at 550; the inherent harm in tortious interference with contractual relationships and the "loss of fair competition. " *Certified Restoration*, 511 F.3d at 550.

C. Issuing the injunction would not cause substantial harm to others...................... 21

The injunctive relief requested by OCLC will have little to no detrimental effect on Defendants because MetaDoor has not yet officially launched, MetaDoor is a free public platform without revenue, and Defendants would not be required to incur additional costs for MetaDoor. Moreover, any harm would be of Defendants' own making, which does not counsel against injunctive relief. *Avery Dennison Corp. v. Kitsonas*, 118 F. Supp. 2d 848, 855 (S.D. Ohio 2000); *Concentrix CVG Customer Mgmt. Grp., Inc. v. Daoust*, No. 1:21-cv-131, 2021 U.S. Dist. LEXIS 83830, at *44 (S.D. Ohio May 3, 2021). Similarly, any potential MetaDoor customers will still have access to similar services. *Certified Restoration*, 511 F.3d at 551.

D. Issuing Injunctive Relief Will Advance the Public Interest................................. 23

Injunctive relief will advance the public interest by preventing significant injury to OCLC's employees, including those in Ohio; by preventing injury to OCLC's non-profit, government, academic, and library customers; and by "[p]reserving the sanctity of contractual

**TABLE OF CONTENTS**
(continued)

**Page**

relations and preventing unfair competition have traditionally been in the public interest." *Total Quality Logistics, LLC v. Riffe*, No. 1:19-cv-23, 2019 U.S. Dist. LEXIS 185866, at *23 (S.D. Ohio Oct. 28, 2019) (citations omitted); *S. Glazer's*, 860 F.3d at 853; *Prosonic Corp. v. Stafford*, 539 F. Supp. 2d 999, 1008 (S.D. Ohio 2008); *Avery Dennison*, 118 F. Supp. 2d at 855.

E.     The Court Should Order That A Nominal Bond Be Posted................................. 25

A nominal bond is consistent with Federal Rule of Civil Procedure 65(c) because Defendants will not suffer any potential loss in revenue as a result of a preliminary injunction given that they intend to provide MetaDoor for free to all users and will not incur additional costs for MetaDoor while an injunction is in place.

IV.     CONCLUSION............................................................................................................... 26

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*,
219 F.3d 519 (6th Cir. 2000) ................................................................18

*Atricure, Inc. v. Meng*,
12 F.4th 516 (6th Cir. 2021) ................................................................16

*Avery Dennison Corp. v. Kitsonas*,
118 F. Supp. 2d 848 (S.D. Ohio 2000) ..........................................22, 25

*Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*,
511 F.3d 535 (6th Cir. 2007) ...............................................12, 19, 21, 23

*Concentrix CVG Customer Mgmt. Grp., Inc. v. Daoust*,
No. 1:21-cv-131, 2021 U.S. Dist. LEXIS 83830 (S.D. Ohio May 3, 2021)...........................22

*Fred Siegel Co., L.P.A. v. Arter & Hadden*,
707 N.E.2d 853 (Ohio 1999)..............................................................14, 16

*Georgia-Pacific Consumer Prods. LP v. Four-U-Packaging, Inc.*,
701 F.3d 1093 (6th Cir. 2012) ................................................................12

*Gray-Jones v. Jones*,
738 N.E.2d 64 (Ohio Ct. App. 2000) ....................................................17

*Havensure, LLC v. Prudential Ins. Co. of Am.*,
595 F.3d 312 (6th Cir. 2010) ................................................................16

*Jedson Eng'g, Inc. v. Spirit Constr. Servs., Inc.*,
720 F. Supp. 2d 904 (S.D. Ohio 2010) ................................................16

*Martin-Marietta Corp. v. Bendix Corp.*,
690 F.2d 558 (6th Cir. 1982) ................................................................21

*McNeilly v. Terri Lynn Land*,
684 F.3d 611 (6th Cir. 2012) ...........................................................11, 21

*MPW Indus. Servs., Inc. v. Pollution Control Sys., Inc.*,
No. 2:02-CV-95, 2006 U.S. Dist. LEXIS 9360 (S.D. Ohio Mar. 9, 2006)...........................15

*Nat'l Viatical, Inc. v. Universal Settlements, Int'l, Inc.*,
716 F.3d 952 (6th Cir. 2013) ................................................................11

*NCR Corp. v. Korala Assocs. Ltd.*,
    512 F.3d 807 (6th Cir. 2008) ........................................................................................12

*Ne. Ohio Coal. for the Homeless v. Husted*,
    696 F.3d 580 (6th Cir. 2012) ........................................................................................11

*Ohio Republican Party v. Brunner*,
    543 F.3d 357 (6th Cir. 2008) (TRO) ..............................................................................11

*Performance Unlimited, Inc. v. Questar Publishers, Inc.*,
    52 F.3d 1373 (6th Cir. 1995) ........................................................................................11

*Prosonic Corp. v. Stafford*,
    539 F. Supp. 2d 999 (S.D. Ohio 2008) ........................................................................25

*PUI Audio, Inc. v. Van Den Broek*,
    No. 3:21-cv-284, 2021 U.S. Dist. LEXIS 213207 (S.D. Ohio Nov. 4, 2021) ........................13

*S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*,
    860 F.3d 844 (6th Cir. 2017) .............................................................................. *passim*

*Total Quality Logistics, LLC v. Riffe*,
    No. 1:19-cv-23, 2019 U.S. Dist. LEXIS 185866 (S.D. Ohio Oct. 28, 2019) ........................25

*Total Quality Logistics, LLC v. Riffe*,
    No. 1:19-cv-23, 2022 U.S. Dist. LEXIS 53209 (S.D. Ohio Mar. 24, 2022)...........................14

*Union of Needletrades, Indus. & Textile Emps. AFL-CIO v. Am. Cap. Strategies, Ltd.*,
    546 F. Supp. 2d 546 (S.D. Ohio Mar. 27, 2008)...............................................................14

*Vitolo v. Guzman*,
    999 F.3d 353 (6th Cir. 2021) ........................................................................................11

*Woodward Constr., Inc. v. FOR 1031 Summit Woods I, LLC*,
    30 N.E.3d 237 (Ohio Ct. App. 2015) ............................................................................18

**Other Authorities**

Federal Rule of Civil Procedure 65 ........................................................................11, 25

## I.      INTRODUCTION

OCLC, Inc., ("OCLC") has spent over five decades and invested hundreds of millions of dollars in developing and enhancing its bibliographic records and associated metadata, which OCLC markets as WorldCat®.  Today, WorldCat® is the industry-leading bibliographic cataloging database used by thousands of libraries and academic institutions around the world. WorldCat® is also the cornerstone of all of OCLC's other products and services, as well as one of OCLC's most important offerings financially.

Rather than attempt to fairly compete with WorldCat®, Defendant Clarivate, Plc ("Clarivate") and its subsidiaries are encouraging WorldCat® customers to upload WorldCat® records en masse to their MetaDoor platform so that Defendants can reap the benefits of OCLC's superior WorldCat® records.  In doing so, Defendants are inducing WorldCat® customers to breach their contractual obligations to OCLC.  This scheme gives Defendants access to WorldCat® records and thus the ability to offer a bibliographic cataloging database based on WorldCat® records for free and in direct competition to WorldCat®.  Defendants tout MetaDoor as an open, free platform for bibliographic record sharing, but this is not an altruistic gesture by Defendants to promote open source information.  It is a targeted strategy to gut WorldCat®, and thus OCLC, by tortiously interfering with OCLC's contractual relationships with its customers and OCLC's prospective business relationships by repackaging WorldCat® records as MetaDoor records and then offering them to the public at no cost.  This allows Defendants to further consolidate their dominating share of the integrated library system ("ILS") and library services platform ("LSP") market.

A temporary restraining order ("TRO") and a preliminary injunction are therefore necessary to protect OCLC and its members and customers.  If a preliminary injunction is not issued, OCLC will lose not only present and future WorldCat® revenue, but also goodwill and

other intangible assets related to WorldCat® and its other products and services that it has spent substantial time and resources to develop. This irreparable harm threatens the operations and customer relationships of OCLC and the jobs of its employees in Ohio and around the world. What is more, the public interest weighs strongly in favor of enjoining Defendants' actions pending a final decision on the merits.

## II.   STATEMENT OF FACTS

### A.   OCLC Offers a Suite of Products and Services to Libraries, Including WorldCat®, the World's Foremost Bibliographic Database.

OCLC is an Ohio non-profit membership, computer library service and research organization dedicated to the public purposes of furthering access to the world's information and reducing the rate of the rise in library costs. (Declaration of William Rozek ("Rozek Decl.") ¶ 6, filed concurrently with this Motion). At the core of OCLC's services is WorldCat®. (*Id.* ¶ 10). WorldCat® is the world's most comprehensive database of information about library collections and the authoritative source of library bibliographic records. (*Id.*). WorldCat® contains more than 522 million bibliographic records and provides subscribers with access to more than 4 billion items around the world. (*Id.* ¶ 11). It is a collection of OCLC member-contributed records, publisher records, and OCLC-created records that give libraries a greater web-scale presence. (*Id.* ¶ 10). The more libraries that participate, the better and more useful WorldCat® becomes to libraries, their end users, and other organizations that want to interact with libraries on the Web. (*Id.*).

WorldCat® records contain bibliographic data regarding the work, such as the title, author, and number of pages, obtained from OCLC member libraries, publishers, national libraries, etc. (*Id.* ¶ 15). OCLC selects, arranges, and adds metadata to enhance these records to improve the discovery of the records, such as adding OCLC's unique identifying number, the

"OCN," and enhancements that recognize connections between works and then links and/or merges the records together. (*Id.* ¶ 16). OCLC has improved and enhanced more than 93% of WorldCat® records. (*Id.* at ¶ 17). The value of WorldCat® are these improvements and/or enhancements. (*Id.*).

Over the last 55 years, OCLC has made substantial investments in developing, maintaining, and enhancing the library bibliographic records and associated metadata that OCLC markets as WorldCat®. (*Id.* ¶ 13). OCLC has spent approximately 68 million dollars over the past two years and 162 million dollars over the past five years alone developing and enhancing WorldCat®. (*Id.*). OCLC has 235 employees (approximately 20% of its total workforce) whose job function is dedicated to WorldCat®. (*Id.* ¶ 14).

Because significant costs are involved in supporting the high-quality database on which WorldCat® customers rely, customers are asked to share the benefits and costs of WorldCat® as part of the overall OCLC Cooperative. As a result, customers must have a paid subscription to use WorldCat®. (*Id.* ¶ 19). Over 8,000 libraries have subscriptions to use WorldCat® ("WorldCat® Customers"). (*Id.* ¶ 20). About 43% of all of OCLC's customers are WorldCat® Customers (collectively "OCLC Member Subscribers"). (*Id.*). Even OCLC Member Subscribers that use non-OCLC services or platforms, such as those provided by Defendants, rely on WorldCat® for their record cataloging needs. (*Id.* ¶ 21).

WorldCat® is one of OCLC's most financially important offerings, making up an average of 40% of OCLC's revenue over the past 5 years. (*Id.* ¶ 18). WorldCat® is integrated into almost all of OCLC's other products and services. (*Id.* ¶ 22). For example, four products within OCLC's Discovery and Reference Services search WorldCat® to allow OCLC customers and their users to get the materials they need from their library and from other libraries around

the world. (*Id.* ¶ 23). Because of this integration, WorldCat® indirectly accounts for 83% of OCLC's revenue. (*Id.* ¶ 24).

> **B.     All WorldCat® Subscribers Are Bound by the Terms of OCLC's Framework Agreement and WorldCat® Policy.**

All OCLC Member Subscribers who receive OCLC products or services must agree to the terms of OCLC's Framework Agreement and the accompanying "Schedule(s)" that apply to the products or services they receive from OCLC (collectively, the "Framework Agreement"). (Rozek Decl., Ex. A). Section 5.1 of the Framework Agreement states that "OCLC and/or its licensors or suppliers are the exclusive owners of and retain all right, title, and interest (including all copyrights, trademarks, patents, and any other proprietary rights) to the Products, Services, WorldCat®, and all other materials produced or provided by OCLC." (*Id.*) OCLC Member Subscribers are granted a license to use OCLC products or services "solely for the noncommercial purposes described in the Product Description and the applicable Schedule." (*Id.* § 5.2(a)). All WorldCat® Customers—*i.e.* OCLC Member Subscribers who have subscriptions for services under which they can use WorldCat®—agree to the responsibilities outlined in Section 3 of Schedule 2 to the Framework Agreement, including that "the use and transfer by the Institution of WorldCat Data is subject to the [WorldCat Rights and Responsibilities for the OCLC Cooperative]" (the "WorldCat® Policy"). (*Id.* at 10).

The WorldCat® Policy defines WorldCat® as offering a "club good" because WorldCat® derives its value through the efforts and investments of OCLC and its members. (Rozek Decl., Ex. B, Glossary). Unauthorized use "by those that do not contribute toward the cost of the providing the good" diminishes the ability of members who contribute to enjoy the benefits of the good. (*Id.*) WorldCat® Customers are prohibited from "engaging in mass downloading from WorldCat without OCLC's prior written consent," "engaging in mass

4

distribution of data directly from WorldCat to non-members without OCLC's prior consent," and "engaging in other activities that diminish the value of WorldCat to the OCLC cooperative." (*Id.* § 3(B)(6)(b)-(d)) The WorldCat® Policy also does not grant WorldCat® Customers the right to share or transfer WorldCat data to another ILS/LSP company for that company's use. (Rozek Decl. ¶ 32).

> ### C. Clarivate and Its Affiliates Have Strategically Eliminated Competitors through Targeted Acquisitions, Rendering Clarivate the Dominant Player in the ILS/LSP Market.

OCLC is one of several entities that provides cataloging, discovery, and resource sharing services to libraries and academic institutions. Defendant Clarivate, through its subsidiaries and affiliates, including Clarivate Analytics (US) LLC ("Clarivate Analytics"), ProQuest LLC ("ProQuest"), and Ex Libris (USA) Inc. ("Ex Libris"), is currently the largest, most dominant player within the broader ILS/LSP market in which these services are offered. (*Id.* ¶¶ 33).

In December 2021, Clarivate acquired ProQuest, which provides content and research technology and services to researchers and librarians around the world. (*Id.* ¶ 35). Clarivate acquired ProQuest's massive share of the ISL/LSP market, which ProQuest had amassed over several years through a series of targeted acquisitions, including acquiring the two largest players in the ISL/LSP market, Ex Libris Group and Innovative Interfaces, Inc. ("Innovative"). (*Id.* ¶¶ 36-42). When Clarivate acquired ProQuest, ProQuest owned over 84% of the ISL/LSP market among Association of Research Library ("ARL") institutions, 72% among all academic institutions, and 54% among public libraries. (*Id.* ¶ 42). In contrast, OCLC, now Clarivate's second largest competitor, held only a 4% market share among ARL institutions, 10% among academic institutions, and 10% among public libraries. (*Id.*). Defendants continue to enjoy a similarly dominant position in the ISL/LSP market today, and they are now seeking to further

5

consolidate their market position by directly targeting OCLC's WorldCat® and thereby driving OCLC from the broader ISL/LSP market.

**D.      Defendants Have Created MetaDoor, a Free Cataloging Resource Platform that Depends on User-Contributed WorldCat® Records.**

Clarivate acquired the cataloging utilities and resources within ProQuest's product/services portfolio, including a subscription service called SkyRiver—a direct competitor of WorldCat®. (*Id.* ¶ 41). However, SkyRiver has never been as popular or successful as OCLC's WorldCat®, and WorldCat® remains the industry standard among libraries and academic institutions for cataloging resources. (*Id.* ¶ 48). To better compete with WorldCat®, Defendants began developing a new cataloging resource, MetaDoor. (*Id.* ¶ 49).

Since at least March 2022, Defendants have been developing and promoting the launch of MetaDoor. (*Id.*). MetaDoor is a free open source cataloging platform through which any library, even if it does not subscribe to Defendants' ILS/LSP products, can access MetaDoor records and other related services. (*Id.* ¶ 53). This includes libraries that subscribe to OCLC's and other competitors' cataloging and ILS/LSP products. (*Id.*). Defendants have confirmed that MetaDoor is intended to directly compete with OCLC's WorldCat® as "an alternative to OCLC WorldCat." (*Id.* ¶ 52).

MetaDoor is designed to have its bibliographic records populated by users. (*Id.* ¶ 55). Ex Libris described MetaDoor in a May 18, 2022 presentation as "a free metadata sharing platform" relying on the user community to provide the necessary bibliographic records and metadata. MetaDoor users download their current bibliographic records and then upload those records to MetaDoor to make them available to all MetaDoor users. (*Id.*). After the MetaDoor platform is initially populated with records or metadata from records, any library cataloger using MetaDoor can search for titles or records. (*Id.* ¶ 56). Based on the title, the cataloger is able to

see which libraries and institutions have records for that title or resource, and the cataloger can then select the record(s) she wishes to create for her institution's library management system using the record and information available on MetaDoor.  (*Id.*).

To effectively compete with WorldCat®, MetaDoor will need a robust, high-quality bibliographic record population.  (*Id.* ¶ 57).  However, SkyRiver and Defendants' other cataloging resources cannot serve as an adequate source of such records given their lesser quality and lower number of records compared to WorldCat® and other competing services.  (*Id.*).  As evidenced by OCLC's WorldCat®, developing and creating the records and metadata for a world-class cataloging service requires significant time and resources.  Instead of making a similar investment, Defendants are actively encouraging libraries and other research and academic institutions, many of which are OCLC customers, to upload their records and associated metadata, including WorldCat® bibliographic records, to MetaDoor.  (*Id.* ¶ 58).

**E.     Defendants are Encouraging WorldCat® Customers to Upload their WorldCat® Records in Violation of their Agreements with OCLC and Inducing Prospective WorldCat® Customers to use MetaDoor Instead.**

Since at least March 2022, Defendants have been contacting OCLC's current and potential customers to promote MetaDoor and encourage them to share their bibliographic records to MetaDoor.  (*Id.* ¶ 59).  One OCLC Member and WorldCat® Customer reached out to OCLC in March 2022 after attending a presentation to U.K. academic libraries on bibliographic metadata, during which Defendants presented on MetaDoor and invited them, and others in attendance, to upload all their bibliographic records into MetaDoor.  (*Id.* ¶ 60).  OCLC is aware of other presentations to libraries and other institutions, many of which are WorldCat® Customers, where Defendants have promoted MetaDoor, invited those institutions to upload their bibliographic records to the MetaDoor system, and represented that MetaDoor will be a free alternative to WorldCat®.  (*Id.* ¶¶ 63-64, 70).  Defendants have also contacted OCLC Member

Subscribers and WorldCat® customers directly to encourage them to participate in MetaDoor and upload their records. (*Id.* at ¶¶ 61-62, 72).

It is commonly-known within the industry that most libraries and academic institutions are WorldCat® customers, even amongst Defendants' customers. (*Id.* ¶ 65). Accordingly, Defendants know that by encouraging MetaDoor users to download, upload, and otherwise transfer their records, they are encouraging many WorldCat® customers to do so in violation of the Framework Agreement and WorldCat® Policy—as Defendants were informed for similar, but non-MetaDoor related conduct in 2020. (*Id.* ¶ 67). Indeed, OCLC has warned Defendants on two separate occasions in the past 2 months that their conduct is encouraging WorldCat® customers to violate the WorldCat® Policy. (*Id.* ¶¶ 68-69). Despite OCLC's repeated warnings, Defendants' behavior has not changed. (*Id.* ¶¶ 70-71).

Defendants' wrongful actions extend beyond simply knowingly and actively encouraging WorldCat® customers to violate the Framework Agreement and WorldCat® Policy by encouraging them to download WorldCat® records and link to, upload, and/or otherwise transfer those records to MetaDoor. Defendants have also enlisted 10 institutions that are OCLC WorldCat® Customers and OCLC members to serve as MetaDoor's "Development Partners." (*Id.* ¶ 63). While it is unclear from publicly-available information what role these Development Partners play in creating MetaDoor, there is a reasonable inference that these Development Partners are actively working with Defendants to develop the MetaDoor platform and have agreed to upload, or have uploaded, their bibliographic records, including WorldCat® records, to MetaDoor. Any such activity by these OCLC WorldCat® customers breaches the Framework Agreement and WorldCat® Policy.

8

Defendants have also demonstrated publicly that they intend for WorldCat® records to populate MetaDoor.  During a May 18, 2022 presentation, an Ex Libris product manager brought up a WorldCat® record during a demonstration of the system, which was detectable through its OCN that is included on every OCLC WorldCat® record.  (*Id.* ¶ 64).  This record was presented as a sample of a "top rated record" from which the MetaDoor user could "download" the record and the metadata, and then copy and merge the WorldCat® metadata into a new MetaDoor record.  This demonstration shows that Defendants know and intend for WorldCat® records to populate MetaDoor and serve as its "top rated records" for the platform.  It also shows that at least one OCLC customer has provided WorldCat® records to Defendants in breach of the Framework Agreement and WorldCat® Policy.  (*Id.*).

### F. Defendants' Unfair Predatory Conduct Will Devastate WorldCat® and by Extension OCLC.

By collecting and using WorldCat® records from WorldCat® Customers and then offering those WorldCat® records and metadata to MetaDoor customers for free, Defendants are interfering with current and potential future WorldCat® Customers.  (*Id.* ¶¶ 63, 66).  Indeed, any current or potential WorldCat® Customers are unlikely to pay (or continue to pay) for access to WorldCat® if the same WorldCat® metadata and records are available for free on MetaDoor.  (*Id.* ¶ 66).  If Defendants are permitted to continue to intentionally interfere with OCLC's current and potential WorldCat® Customers, the negative impact of MetaDoor's use of WorldCat® records would have catastrophic consequences on OCLC's customer good will and every aspect of OCLC's operations.

Defendants' wrongful incorporation of OCLC's WorldCat® records into Defendants' free MetaDoor service will destroy OCLC's customer good will in three main ways.  First, Defendants' free distribution of WorldCat® records through MetaDoor will shrink OCLC

9

membership and participation in WorldCat®, devaluing it as a "club good."  (*Id.* ¶¶ 29, 75). Second, Defendants' actions directly destroy OCLC's current and future customer good will for WorldCat®, which accounts for an average of 40% of OCLC's revenue over the past 5 years. (*Id.* ¶ 76).  Third, Defendants' conduct also directly impacts the customer good will for OCLC's other cataloging, resource sharing, discovery, OCLC publisher, and OCLC data services, which all depend on WorldCat® records.  (*Id.* at ¶¶ 77-78).

The harm to OCLC's products and customer good will also cause significant injury to many of OCLC's 1,177 employees.  (*Id.* ¶ 79).  As a result of Defendants' actions, OCLC would likely have to reduce its workforce, particularly the 20% of OCLC's total workforce devoted to the development, procurement, maintenance, improvement, and enhancement of OCLC WorldCat® records.  (*Id.*).  OCLC would also likely have to reduce portions of its workforce devoted to OCLC's other products and services given the financial importance of WorldCat® to OCLC's other products and its overall operations.  (*Id.*).

## III.    LAW AND ARGUMENT

OCLC seeks immediate relief from the Court to ensure that Defendants are prohibited from irreparably harming OCLC by tortiously interfering with OCLC's contractual and prospective business relationships and conspiring to do the same.  A TRO and preliminary injunction are appropriate here to protect the status quo, specifically to halt any further WorldCat® Customers from uploading, downloading, linking to, and otherwise transferring WorldCat® records and metadata to MetaDoor and to prevent MetaDoor from publicly sharing improperly obtained WorldCat® records and data.  After granting a TRO and permitting limited emergency discovery, the Court can fully review the issues at a hearing on Plaintiff's request for a preliminary injunction.

When determining whether to issue a TRO or a preliminary injunction under Federal Rule of Civil Procedure 65, courts balance four factors:  (1) the likelihood that the plaintiff will succeed on the merits of its claim at trial, (2) whether the movant would suffer irreparable harm without the injunction, (3) whether issuing the injunction would cause substantial harm to others, and (4) whether issuing the injunction would serve the public interest.  *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021) (preliminary injunction); *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008) (TRO).  These four considerations are "factors to be balanced and not prerequisites that must be satisfied."  *Nat'l Viatical, Inc. v. Universal Settlements, Int'l, Inc.*, 716 F.3d 952, 956 (6th Cir. 2013) (quoting *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992)).  In other words, these factors "simply guide the discretion of the court." *McNeilly v. Terri Lynn Land*, 684 F.3d 611, 615 (6th Cir. 2012) (quoting *In re Eagle Picher*, 963 F.2d at 859).  For example, the movant "must show a strong likelihood of success on the merits if all other factors militate against granting a preliminary injunction" or TRO, but the movant may "show less likelihood of success on the merits if the other [factors] indicate that the Court should issue a preliminary injunction" or TRO.  *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1385 (6th Cir. 1995)).

At the TRO or preliminary injunction stage, a plaintiff does not need to "prove his case in full."  *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 591 (6th Cir. 2012) (quoting *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007)).  This is because the adjudication of motions for TRO and preliminary injunctions "necessarily happen[s] before the parties have had an opportunity to fully develop the record." *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 848 (6th Cir. 2017).  Ordinarily, a plaintiff must only "raise[] questions going to the merits so serious,

substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Certified Restoration*, 511 F.3d at 543 (quoting *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997)); *S. Glazer's*, 860 F.3 at 848.

All four factors counsel in favor of granting OCLC a TRO and preliminary injunction.

**A.    OCLC Will Prevail on the Merits of Its Tortious Interference and Civil Conspiracy Claims.**

OCLC is likely to prevail on the merits of its tortious interference of contract, tortious interference of business relationships, and civil conspiracy claims. Defendants' efforts to induce WorldCat® customers to upload, download, link to, and otherwise transfer their bibliographic records and then offer those records and metadata for free on their open-source MetaDoor platform raise questions that are "serious, substantial, difficult, and doubtful," meaning these claims are "fair ground for litigation" and thus investigation. *Certified Restoration*, 511 F.3d at 543 (citation omitted).

**1.    Defendants' conduct concerning MetaDoor Constitutes Tortious Interference of Contract and of Prospective Business Relationships.**

Under Ohio law, the elements of a tortious interference of contract claim are "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." *NCR Corp. v. Korala Assocs. Ltd.*, 512 F.3d 807, 817 (6th Cir. 2008) (quoting *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999)). The elements of a tortious interference with prospective business relationship claim "are almost identical, the main distinction being 'that interference with a business relationship includes intentional interference with prospective contractual relations, not yet reduced to a contract.'" *Georgia-Pacific Consumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1102 (6th Cir. 2012) (quoting *Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc.*, 852 F. Supp. 2d 925, 942

(S.D. Ohio 2012)).  OCLC is likely to succeed on the merits at trial for its tortious interference of contract and prospective business relationship claims.

***Tortious Interference of Contract Relationships.***  First, an enforceable contract exists between OCLC's WorldCat® Customers and OCLC.  When customers subscribe to WorldCat®, they agree to the Framework Agreement and WorldCat® Policy.  (Rozek Decl. ¶ 25).

Second, Defendants are aware of the WorldCat® Policy, which is incorporated into the Framework Agreement.  Defendants know of the WorldCat® Policy because OCLC notified Defendants by three letters, dated April 10, 2020, May 19, 2022, and May 27, 2022, that their conduct is encouraging WorldCat® Customers to violate their agreements with OCLC.  (*Id.* ¶¶ 67-69).  *See PUI Audio, Inc. v. Van Den Broek*, No. 3:21-cv-284, 2021 U.S. Dist. LEXIS 213207, at *22 (S.D. Ohio Nov. 4, 2021) (holding that letters from attorneys notifying a defendant of a contract is sufficient).

Third, Defendants procured WorldCat® Customers' breach of the agreements.  By encouraging WorldCat® Customers to download, upload, link to, and otherwise transfer their records to MetaDoor, Defendants are inducing customers to breach the Framework Agreement and the provisions in the WorldCat® Policy that prohibit (1) mass downloads of records, (2) mass distribution of records, and (3) engagement in activities that diminish the value of WorldCat®, *i.e.*, sharing and transferring WorldCat® records and metadata to a non-contributing user and direct competitor of OCLC.  (Rozek Decl. ¶¶ 31-32; Rozek Decl. Exs. A & B § 3(B)).  WorldCat® Customers are permitted to share and transfer records within their own libraries and among other academic institutions that are WorldCat® Customers, but certainly not with non-WorldCat® Customers or direct commercial competitors to OCLC.  (Rozek Decl. ¶ 32; Rozek Decl. Ex. B § 3(A)-(B)).

Defendants also procured these breaches intentionally and improperly under these circumstances. *See Fred Siegel*, 707 N.E.2d at 858; *Union of Needletrades, Indus. & Textile Emps. AFL-CIO v. Am. Cap. Strategies, Ltd.*, 546 F. Supp. 2d 546, 561 (S.D. Ohio Mar. 27, 2008). A defendant intentionally procures a breach when the defendant "want[ed] the breach of contract, or [knew] that a breach of contract is substantially certain to result from the interference." *Total Quality Logistics, LLC v. Riffe*, No. 1:19-cv-23, 2022 U.S. Dist. LEXIS 53209, at *40 (S.D. Ohio Mar. 24, 2022) (alterations in original) (quoting *Union of Needletrades*, 546 F. Supp. 2d at 561). It is well-known that most libraries and academic institutions are WorldCat® customers, including Ex Libris and ProQuest customers. (Rozek Decl. ¶ 65). It is also common knowledge that WorldCat® supplies the vast majority of bibliographic records; WorldCat® offers more than 500 million records to SkyRiver's 70 million. (*Id.* ¶ 48). Defendants have also known since at least 2020 that this type of solicitation of WorldCat® records interferes with the contractual obligations between OCLC and its WorldCat® Customers. (*Id.* ¶ 67). Considering the ubiquity of WorldCat® Customers and records and their previous knowledge, Defendants at the very least knew that by encouraging possible MetaDoor users to upload download, link to, and otherwise transfer their bibliographic records, it was substantially certain that they would be encouraging WorldCat® Customers to improperly use WorldCat® records.

But OCLC would also likely succeed at trial in showing that Defendants wanted the breach of the WorldCat® Policy because MetaDoor was designed, at its core, to operate from WorldCat® records and metadata. (*Id.* ¶ 55). Indeed, Defendants flaunt this reality in their own presentation using a WorldCat® record, as noted in the "Identifier" section and under the ISBN numbers:



(Rozek Decl. Ex. K).

Fourth, Defendants' interference with the Framework Agreement and WorldCat® Policy is not privileged and has no justification. Defendants' contractual interference permits them to benefit from bibliographic records that they know that they should not have access to on a large scale because they are not OCLC subscribers; they are competitors to OCLC who do not pay for or contribute to WorldCat®. (*Id.* ¶¶ 29, 32, 64). Defendants then are offering these records to the public on their MetaDoor platform, knowing that such records are only accessible to WorldCat® subscribers (as is the case with SkyRiver). (*Id.* ¶¶ 41, 66). Even more suspect is that they are offering this metadata to users on an open platform for free, despite the substantial costs to Defendants of maintaining the platform (as is the case with WorldCat®). (*Id.* ¶ 13). Defendants know that WorldCat® is the core of OCLC's suite of products and services and that offering WorldCat® records for free would be devastating to OCLC. (*Id.* ¶¶ 74-80).

Under circumstances where a defendant has purposefully directed its contractual interference against the "most lucrative" aspect of the plaintiff's business, *see MPW Indus.*

15

*Servs., Inc. v. Pollution Control Sys., Inc.*, No. 2:02-CV-95, 2006 U.S. Dist. LEXIS 9360, at *24-25 (S.D. Ohio Mar. 9, 2006), and when the defendant has no apparent direct economic interest in the interference, *see Jedson Eng'g, Inc. v. Spirit Constr. Servs., Inc.*, 720 F. Supp. 2d 904, 924 (S.D. Ohio 2010) (prospective business relationship), courts have concluded that there is no privileged, fair competition. Indeed, this is not a typical case of contractual interference as a result of fair competition, *i.e.*, where a competitor has "take[n] action to attract business," leading a customer to switch to a different product or service, which then "results in an interference with another's existing contract" for the initial product or service. *Fred Siegel*, 707 N.E.2d at 860. This is a case where Defendants are improperly acquiring OCLC's WorldCat® records and data protected by contract, repackaging the records and data in Defendants' platform designed to directly compete with WorldCat®, and then offering the records and data to all users for free. *See also Atricure, Inc. v. Meng*, 12 F.4th 516, 528 (6th Cir. 2021) (recognizing, in an estoppel analysis, a tortious interference of contract claim where a defendant induced a third party to breach a contract with a plaintiff that protected plaintiff's proprietary information).

Finally, as is relevant on a motion for a TRO or preliminary injunction, OCLC is irreparably harmed by Defendants' conduct. *See infra* Part III.B. OCLC will also demonstrate at trial other resulting damages, which are significant given the investment and revenues from WorldCat®, but money damages cannot fully compensate OCLC for the injury caused by Defendants' wrongdoing. (Rozek Decl. ¶ 80).

***Tortious Interference of Prospective Business Relationships.*** "Under Ohio law, a claim for tortious interference with a business relationship arises when a person, without privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another." *Havensure, LLC v. Prudential Ins. Co. of Am.*, 595 F.3d 312,

315 (6th Cir. 2010) (citing *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1294 (Ohio 1995)).  OCLC will also likely succeed on the merits of its tortious interference of prospective business relationships claim.

Defendants are intentionally interfering in OCLC's prospective business relationships for WorldCat® by improperly obtaining WorldCat® records from WorldCat® Customers and then offering those records and metadata for free to the public in Defendants' new platform, MetaDoor.  OCLC's WorldCat® is the authoritative source of library bibliographic records, and so any library seeking these services will inevitably consider WorldCat® as a possible service. (*See* Rozek Decl. ¶ 10).  Defendants know that these customers are almost certainly contemplating subscribing to WorldCat®, given the fact that WorldCat® is the preeminent bibliographic record service.  (*See id.* ¶¶ 10, 21).  Thus, by offering for free the same service and information that prospective customers are seeking, prospective customers have and will be induced not to enter into a business relationship with OCLC to subscribe to use and pay for WorldCat®.  (*Id.* ¶¶ 78).

Finally, as discussed above, Defendants are interfering in prospective business relationships without privilege or justification.  Defendants are offering WorldCat® records and metadata through MetaDoor for free.  This is not fair competition, as evidenced by Defendants' method of obtaining the WorldCat® records (by tortious interference), the lack of economic interest in MetaDoor, and Defendants' specific targeting of WorldCat®, OCLC's most lucrative offering.  In short, Defendants "set out on a course of conduct designed to kill" any relationship between OCLC and prospective bibliographic record service customers.  *Gray-Jones v. Jones*, 738 N.E.2d 64, 102 (Ohio Ct. App. 2000) (affirming award of attorney fees).  This falls outside of fair competition.

17

      **2.**     **Defendants' MetaDoor Communications and Market Behavior Demonstrate a Civil Conspiracy to Tortiously Interfere with OCLC's Contract and Business Relationships.**

A plaintiff must prove four elements for a civil conspiracy claim:  "(1) a malicious combination; (2) two or more persons; (3) injury to person or property; and (4) existence of an unlawful act independent from the actual conspiracy."  *Aetna Cas. & Sur. Co. v. Leahey Constr. Co.*, 219 F.3d 519, 534 (6th Cir. 2000) (quoting *Universal Coach, Inc. v. N.Y.C. Transit Auth., Inc.*, 629 N.E.2d 28, 33 (Ohio Ct. App. 1993)).  OCLC will likely succeed on the merits of its civil conspiracy claims that Defendants conspired to tortiously interfere with OCLC's contractual relationships with its WorldCat® members and business relationships with prospective WorldCat® customers.

First, Defendants formed a malicious combination.  A "malicious combination" is "a common understanding or design, even if tacit, to commit an unlawful act."  *Woodward Constr., Inc. v. FOR 1031 Summit Woods I, LLC*, 30 N.E.3d 237, 243 (Ohio Ct. App. 2015) (quoting *Gosden v. Louis*, 687 N.E.2d 481, 496 (Ohio Ct. App. 1996)).  Representatives from multiple Defendants, including Ex Libris and ProQuest, have contacted OCLC's WorldCat® customers to encourage them – at the very least – to download WorldCat® records and upload them to MetaDoor.  (Rozek Decl. ¶ 72).  This demonstrates a coordinated design to interfere with OCLC's contractual relationships by directly inducing WorldCat® Customers to breach the WorldCat® Policy, as incorporated into the Framework Agreement.  It also indicates a common understanding to interfere with OCLC's business relationships, specifically obtaining WorldCat®'s records and metadata and offering them for free, despite the cost to Defendants. Identical, cross-company actions indicate a common understanding.  Moreover, this conduct is consistent with Defendants' overarching common goal to further cement their dominant position

in the ILS/LSP market, previously demonstrated by Defendants' string of acquisitions, by now targeting OCLC by gutting its most valuable offering, WorldCat®. (*Id.* ¶¶ 33-48).

The remaining elements of civil conspiracy are easily met. More than two entities, Defendants Clarivate, Clarivate Analytics, ProQuest, and Ex Libris, conspired against OCLC. (*Id.* ¶¶ 33-48, 72). These actions caused irreparable harm to OCLC. *See infra* Part III.B. And Defendants' tortious interference of contract and prospective business relationships are unlawful acts independent from the conspiracy. *See supra* Part III.A.1.

**B.    OCLC Will Suffer Irreparable Injury Without a Preliminary Injunction.**

Without the issuance of a preliminary injunction, OCLC will suffer immediate and irreparable injury. In the context of a request for injunctive relief, "[a]n injury is irreparable if it is not 'fully compensable by monetary damages,' that is, 'the nature of the plaintiff's loss would make damages difficult to calculate.'" *S. Glazer's*, 860 F.3d at 852 (citations omitted). Courts have recognized as irreparable harm a variety of injuries that OCLC is likely to suffer here, including "loss of customer goodwill." *Id.* at 854 (quoting *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992)); *Certified Restoration*, 511 F.3d at 550.

The irreparable harm to OCLC's customer goodwill is particularly acute here given the unique aspects of OCLC's operations and its WorldCat® offering. Defendants' free distribution of WorldCat® records through MetaDoor threatens OCLC membership and participation in WorldCat® generally – which accounts for an average of 40% of OCLC's revenue. (Rozek Decl. ¶¶ 18, 76). This harm is immediate and far-reaching because once Defendants have access to WorldCat® records, Defendants can use them in MetaDoor and other products or services, and it could be difficult for OCLC to trace Defendants' use of those records and associated metadata (to the extent the records and associated metadata are incorporated in Defendants' non-MetaDoor offerings). (*Id.* ¶ 74). The more libraries and institutions that participate in

19

WorldCat® and catalog their bibliographic records with OCLC, the more records that are available through WorldCat® and the more valuable that WorldCat® becomes to OCLC's members. (*Id.* ¶ 10). Any loss in OCLC membership and WorldCat® participation has a direct, negative impact on customers that remain. (*Id.* ¶¶ 75, 78; *see id.* ¶¶ 10, 29). And MetaDoor's distribution of WorldCat® records and metadata for free will contract OCLC membership and WorldCat® participation. (*Id.* ¶ 75).

Permitting Defendants to continue to unlawfully incorporate OCLC's WorldCat® records into Defendants' free MetaDoor service would also directly destroy OCLC's current and future customer good will for WorldCat® specifically. WorldCat® is one of OCLC's most financially important offerings. (*Id.* ¶ 76). WorldCat® has brought in an average of 40% of OCLC's revenue over the past 5 years. (*Id.*). The Sixth Circuit has found irreparable harm in circumstances where there is a loss of consumer good will for products that contribute a much smaller percentage of a company's total product portfolio. *See*, *e.g.*, *S. Glazer's*, 860 F.3d at 852-53 (finding irreparable harm where the product at issue served at 25% of the branch's product line revenue and 4% of the branch's overall revenue and noting irreparable harm has been found when a manufacturer's products comprise .51% of overall business).

Courts have also found that a plaintiff is more likely to suffer irreparable harm from the loss of consumer good will for a particular product when that product provides "opportunities to attract new customers and to cross-sell the other products in its portfolio." *Id.* at 852. Similarly, here, WorldCat® is not just important to OCLC individually; WorldCat® also sits at the center of OCLC's family of products and services. (Rozek Decl. ¶¶ 77-78). OCLC's cataloging, resource sharing, discovery sharing, OCLC publisher, and OCLC data services all benefit from WorldCat® records. (*Id.*). Failing to enjoin Defendants from providing WorldCat® records

through MetaDoor for free would not only undermine the strength and value of WorldCat® in the market, it would also decrease its value to OCLC's other products and services, which further devalues OCLC's other products and services to current and potential customers. (*Id.* ¶ 78).

While the Court can, and should, find that that OCLC is likely to suffer irreparable harm as a result of its loss of customer good will, courts have also found irreparable harm for other reasons that are directly applicable here. According to *Certified Restoration Dry Cleaning Network*, the "likely interference with customer relationships resulting from the breach" of a binding agreement and the "loss of fair competition" qualify as injuries that are "'not fully compensable by money damages'" because "'the nature of the[se] loss[es] would make the damages difficult to calculate.'" 511 F.3d at 550 (quoting *Basicomputer*, 973 F.2d at 511). As discussed *supra*, Part III.A.1, Defendants are currently intentionally interfering with OCLC's current and prospective customer relationships and contracts, which, if not enjoined by the Court, will result in the loss of fair competition for cataloging services and the ILS/LSP market more generally.

Ultimately, monetary damages will not adequately measure the damage to OCLC's customer goodwill and membership, the unknowable loss in sales of other products and services, or the long term detrimental effect on the viability of WorldCat® and OCLC's business and its ability to compete that might result from the loss of OCLC's largest and most important investment and source of revenue. (Rozek Decl. ¶¶ 74-80). This irreparable injury weighs in favor of a temporary restraining order and preliminary injunctive relief.

### C. Issuing the injunction would not cause substantial harm to others.

For the third factor, the irreparable injury OCLC will suffer if its motion for injunctive relief is denied must be balanced against any harm others will suffered if OCLC's motion is granted. *McNeilly*, 684 F.3d at 615; *see also Martin-Marietta Corp. v. Bendix Corp.,* 690 F.2d

21

558, 568 (6th Cir. 1982) ("The irreparable injury appellants will suffer if their motion for injunctive relief is denied must be balanced against any harm which will be suffered by appellees as a result of the granting of injunctive relief.")  If injunctive relief were granted here, the only "others" Defendants may argue are potentially harmed are Defendants themselves and potential customers of the MetaDoor service.

The injunctive relief requested by OCLC will have little to no detrimental effect on Defendants.  MetaDoor has not yet officially launched, and, when it does, Defendants will be providing MetaDoor to all users for free, regardless of whether MetaDoor users pay for any of Defendants' other products and services.  (Rozek Decl. ¶¶ 52-53).  Defendants will therefore not suffer any potential loss in revenue as a result of a preliminary injunction.  Moreover, while an injunction is in place, Defendants would not be required to incur additional development, marketing, hosting, and maintenance costs for MetaDoor, all of which could be significant given the millions of dollars OCLC spends annually to develop and enhance WorldCat®.  (*Id.* ¶ 13).

Ultimately, whatever limited potential harm that granting injunctive relief could have on Defendants would be of Defendants' own making, given that they have been actively soliciting and incorporating WorldCat® records and metadata into MetaDoor, even once they knew that such records and metadata are and were provided to them in violation of OCLC's agreements with its customers.  *Avery Dennison Corp. v. Kitsonas*, 118 F. Supp. 2d 848, 855 (S.D. Ohio 2000) (finding that the defendant corporation would not be harmed by injunction because "it has no right to the information in [defendant employee's] possession and "[a]ny harm to [defendant employee] would be as a direct result of his own actions," given that he was aware of the restrictive covenants yet chose to accept employment with defendant corporation); *see also Concentrix CVG Customer Mgmt. Grp., Inc. v. Daoust*, No. 1:21-cv-131, 2021 U.S. Dist. LEXIS

22

83830, at *44 (S.D. Ohio May 3, 2021) (finding that any harm to the company defendant "would be of [its] own making" given that it "proceeded with employing [plaintiff's former employee], even once it knew of the [non-compete agreement]").

As for any harm to potential MetaDoor customers while an injunction is in place, any such customers can still have access to the majority, if not all, of the bibliographic records and metadata that would be available in MetaDoor via other services, such as OCLC's WorldCat®, Defendants' own SkyRiver, or other competing cataloging services. The customers would just have to pay for these records and metadata, which most of them are currently doing. *See, e.g.*, *Certified Restoration*, 511 F.3d at 551 (finding this factor did not "counsel[] against issuing the preliminary injunction" where "[t]he only third parties that might be affected by the injunction are Defendants'. . . customers" and "they would still be able to obtain . . . services from Plaintiff"). Potential MetaDoor customers do not currently have a right to access WorldCat®, SkyRiver, or other similar bibliographic records without paying for them and agreeing to be bound by the applicable terms of service imposed by OCLC, Defendants, or the other applicable providers. Having to wait until this Court resolves OCLC's claims against Defendants before the potential MetaDoor customers are granted access to these records for free therefore does not "substantially harm" them. Indeed, any such harm is negligible when compared to the harm that these same customers will experience if Defendants can successfully push OCLC from, and consolidate their dominant position in, the ILS/LSP market by destroying OCLC's core WorldCat® offering through Defendants' tortious conduct. All in all, this factor does not weigh against granting the injunction here.

### D. Issuing Injunctive Relief Will Advance the Public Interest.

Injunctive relief will advance the public interest in three ways. *First*, it will prevent significant injury to OCLC's employees; OCLC currently employs over 1,177 workers

23

worldwide and 713 in Ohio.  (Rozek Decl. ¶ 79).  Of those workers, 20% of OCLC's total workforce is devoted the development, procurement, maintenance, improvement, and enhancement of OCLC WorldCat® records.  (*Id.*).  If Defendants make OCLC's WorldCat® records publicly available for free through MetaDoor before OCLC's claims are fully resolved by the Court, current enrollment in WorldCat® and other OCLC products and services would drop precipitously and future enrollment in these products and services would grind to a halt. (*Id.*).  As a result, OCLC would likely have to reduce its workforce, particularly given the financial importance of WorldCat® to OCLC's other products, overall operations, and continued success.  (*Id.*).  Those job losses would be felt not only by the employees and their families, but also by the communities in which they live, including here in Ohio.

Second, OCLC has ongoing, long-term relationships with its non-profit, government, academic, and library members and customers around the world, and they rely on continued and uninterrupted access to WorldCat®'s robust catalogue of records to service and support their patrons, students, researchers, and customers.  (*See id.* ¶¶ 8, 20).  Because WorldCat® offers a "club good," which is also called "member good" or "collective good," meaning that WorldCat® derives its value through the efforts and investments of OCLC and its members, any unauthorized use "by those who do not contribute toward the cost of the providing the good" diminishes the ability of members who contribute to enjoy the benefits of the good.  (*Id.* ¶ 29; (Rozek Decl. Ex. B § 2(D) (flush language) & Glossary, "Public Good").  Defendants are not authorized to use or incorporate WorldCat® records into MetaDoor nor to publicly provide those records for free, but that is exactly what they are doing and what they will continue to do absent injunctive relief.  This, in turn, will diminish the value of the "club good" by contracting WorldCat® membership and participation, thereby decreasing the amount and quality of

24

WorldCat® records and ultimately harming the non-profit, government, academic, and library institutions that are an essential part of our communities and economies.  (Rozek Decl. ¶ 75).

*Third*, under Ohio law, "[p]reserving the sanctity of contractual relations and preventing unfair competition have traditionally been in the public interest."  *Total Quality Logistics, LLC v. Riffe*, No. 1:19-cv-23, 2019 U.S. Dist. LEXIS 185866, at *23 (S.D. Ohio Oct. 28, 2019) (citations omitted); *S. Glazer's*, 860 F.3d at 853 ("The public has a strong interest in holding parties to their agreements."); *Prosonic Corp. v. Stafford*, 539 F. Supp. 2d 999, 1008 (S.D. Ohio 2008) (acknowledging the "well-accepted principle of Ohio law that upholding reasonable contracts is generally in the public interest" and finding "[t]he public's interest in preserving the legitimacy of contracts favors enforcement of the Agreement.") (citation omitted); *Avery Dennison*, 118 F. Supp. 2d at 855 ("This Court finds that valid contracts are the lynchpin of all commercial activity in society, and therefore, they must be honored.  Further, the public interest is served . . . by condemning the theft of clients through unfair competition.").  Here, Defendants are intentionally inducing OCLC's WorldCat® Customers to breach their agreements with OCLC in order to steal OCLC's customers and further consolidate their dominance in the ILS/LSP market.  The public has a strong interest in preserving the sanctity of these contracts and preventing unfair competition by enjoining Defendants' wrongful actions.

### E.  The Court Should Order That A Nominal Bond Be Posted.

Rule 65(c) provides that a TRO or preliminary injunction may be issued "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  As discussed above, Defendants will not suffer any potential loss in revenue as a result of a preliminary injunction given that they intend to provide MetaDoor for free to all users, regardless of whether they pay for any of Defendants' other products and services.  Nor will Defendants incur

additional development, marketing, hosting, and/or maintenance costs for MetaDoor while an injunction is in place. Accordingly, this Court should order that OCLC need only post a nominal bond.

## IV. CONCLUSION

For the foregoing reasons, OCLC respectfully requests that the Court issue a restraining order and preliminary injunction that prohibits Defendants from:

1. further developing and/or marketing MetaDoor or any product or service that relies on utilizing the metadata and records developed, enhanced, and/or maintained by another entity such as OCLC's WorldCat® records and metadata;

2. contacting or communicating with OCLC WorldCat® customers about MetaDoor, including about:

   a. downloading, uploading, linking to, transferring and/or otherwise sharing records or metadata for MetaDoor (including any record which has a unique identifier of OCN);

   b. participating in or signing up for MetaDoor; and

   c. partnering or assisting Defendants in any way with developing MetaDoor;

3. requesting any OCLC WorldCat® records and metadata or records and metadata derived from the same; and

4. retaining, using, or making available to the public and/or MetaDoor customers any OCLC WorldCat® records and metadata or records and metadata derived from the same.

Respectfully submitted,

/s/ Traci L. Martinez
Traci L. Martinez (0083989), Trial Attorney
Jeffrey M. Walker (0096567)
Kathryn M. Brown (0100426)
SQUIRE PATTON BOGGS (US) LLP
41 South High Street, Suite 2000
Columbus, Ohio 43215
Telephone: +1 614 365 2700
Facsimile: +1 614 365 2499
traci.martinez@squirepb.com
jeffrey.walker@squirepb.com
kathryn.brown@squirepb.com

Attorneys for Plaintiff OCLC, Inc.

27

## CERTIFICATE OF SERVICE

On June 13, 2022, this document was filed electronically with the Clerk of the United States District Court for the Southern District of Ohio, Eastern Division, which will electronically serve a copy of the foregoing on all counsel of record for all parties. Additionally, this document was sent by email to the following counsel for Defendant and will be served upon the parties with the summons and complaint in this matter:

> Brian S. Weinstein
> Davis Polk & Wardwell LLP
> 450 Lexington Avenue
> New York, NY 10017
> brian.weinstein@davispolk.com
>
> Ashok Ramani
> Davis Polk & Wardwell LLP
> 1600 El Camino Real
> Menlo Park, CA 94025
> ashok.ramani@davispolk.com

> */s/ Traci L. Martinez*
> One of the Attorneys for Plaintiff OCLC