IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| OCLC, Inc., | Case No. 2:22-cv-2470-JLG-KAJ |
| Plaintiff, | Judge James L. Graham |
| v. | Magistrate Judge Kimberly A. Jolson |
| CLARIVATE, PLC; CLARIVATE ANALYTICS (US) LLC; PROQUEST LLC; and EX LIBRIS (USA), INC., | |
| Defendants. | |

## DECLARATION OF WILLIAM ROZEK

William Rozek declares the following pursuant to 28 U.S.C. § 1746:

1. My name is William Rozek. I am a resident of Dublin, Ohio and Brighton, Michigan.

2. I am the Chief Financial Officer and Treasurer of OCLC, Inc. ("OCLC"), a position I have held since September 2015. Prior to joining OCLC, I held financial leadership positions at a number of companies in a variety of fields, including electronic publishing and education, and I have previously served as the CFO of The Mars Agency, Budco, Inc., and ProQuest Information and Learning.

3. I received my Bachelor of Science in Accounting and Finance from the University of Michigan, and I am a Certified Public Accountant and a Chartered Global Management Accountant.

4. At OCLC, I am a member of OCLC's executive leadership team and am responsible for global accounting, budgeting, financial analysis, cash management, financial systems, pricing,

external audit, lender relationships, insurance, and management of OCLC's investment portfolio.

5. I am familiar with the facts set forth herein based on my work history and experience at OCLC, as well as my review of relevant OCLC records and publicly available information. On that basis, I believe the facts set forth herein to be true and correct.

### Background on OCLC and WorldCat®

6. OCLC is an Ohio non-profit membership, computer library service and research organization dedicated to the public purposes of furthering access to the world's information and reducing the rate of the rise in library costs. OCLC provides shared technology services, original research, and community programs for its membership and the library community at large.

7. OCLC employs approximately 1,177 people in the United States, Canada, Europe, and Asia Pacific, 713 of which are based in Ohio.

8. OCLC supplies the infrastructure for libraries to collaborate, create, and share bibliographic records, thus providing efficiencies and lowering overall costs for record creation. More than 32,000 libraries in 170 countries and territories around the world have used OCLC services to locate, acquire, catalog, lend, preserve, and manage library materials.

9. OCLC's services to the library community include: Management Services, Metadata Services, Discovery and Reference Services, and Resource Sharing Services (collectively, "OCLC's Services").

10. At the core of OCLC's Services is WorldCat®. WorldCat® is the world's most comprehensive database of information about library collections and the authoritative source of library bibliographic records. It is a collection of OCLC member-contributed records, publisher records and OCLC created records that give libraries a greater web-scale presence. The more

libraries that participate, the better and more useful WorldCat® becomes to libraries, their end users, and other organizations that want to interact with libraries on the Web.

11. WorldCat® contains more than 522 million bibliographic records, and, when combined with the more than 3,100 collections from leading publishers, it provides subscribers with access to more than 4 billion items from a variety of resources around the world. These records are high-quality and often automatically supplied to libraries.

12. The WorldCat® database is a union of national and other union catalogs from around the world, as well as the closest approximation of a national union catalog of library holdings in the United States. This means that WorldCat® is the fullest single source of worldwide library holdings available, access to which improves the efficiency with which items can be located in—and requested from—library collections.

**OCLC has Invested Decades and Billions of Dollars to Develop, Enhance, and Maintain WorldCat® Records for OCLC Members and WorldCat® Customers**

13. Over the past 55 years, OCLC has made substantial investments, including approximately 68 million dollars over the past two years and 162 million dollars over the past five years, developing and enhancing its library bibliographic records and associated metadata that OCLC markets as WorldCat®.

14. OCLC employs 235 employees (approximately 20% of its total workforce) whose job function is dedicated to the development, procurement, maintenance, improvement, and enhancement of OCLC WorldCat® records.

15. WorldCat® records are bibliographic data regarding the work, including, among other things, title, author, and number of pages, obtained from OCLC member libraries, publishers, vendors, and national libraries.

16. OCLC selects, arranges, and adds metadata to enhance these records to support

discovery of, exploration of, and access to the records. This includes adding OCLC's own unique identifying number, the "OCN," which creates more effective queries and serves as an authoritative index for identifying and referring to specific titles or works. OCLC also adds Dewey Decimal Classification numbers and Faceted Application of Subject Terminology headings. OCLC has also designed record enhancements that recognize connections between works and then links and/or merges the records together. These additions further enrich the WorldCat® records and support enhanced discovery.

17. Of the entire WorldCat® collection, OCLC has modified, improved, and enhanced more than 93% of the records. The value of WorldCat® are these modifications, improvements, and enhancements by OCLC.

**WorldCat® is OCLC's Most Valuable Offering and Essential to OCLC's Other Products and Services**

18. WorldCat® is one of OCLC's most financially important offerings, making up an average of 40% of OCLC's revenue over the past 5 years.

19. Customers must have a paid subscription to use WorldCat®.

20. Over 8,000 libraries have subscriptions to use WorldCat® ("WorldCat® Customers"). Of all of OCLC's customers, approximately 43% are WorldCat® Customers (collectively "OCLC Member Subscribers"). These WorldCat® Customers are academic libraries (such as The Ohio State University), community colleges, public libraries (including the Columbus Metropolitan Library), state and government libraries (such as the Library of Congress), special libraries, and library consortia.

21. Even OCLC Member Subscribers that use non-OCLC services or platforms rely on WorldCat® for their record cataloging needs.

22. WorldCat® is not just important on its own. WorldCat® is also integrated into

4

almost all of OCLC's products and services provided to libraries and academic institutions. OCLC's cataloging, resource sharing, discovery, OCLC publisher, and OCLC data services all benefit from WorldCat® records.

23. For example, products within OCLC's Discovery and Reference Services search WorldCat® to allow libraries (OCLC customers) and their users to get the materials they need from their library and from other libraries around the world. There are four products in Discovery and Reference Services, each which can be heavily dependent on WorldCat®: World.Cat.org; WorldCat® Discovery; FirstSearch; and Web visibility. Another example includes OCLC's Resource Sharing Services, which includes seven products that depend on WorldCat®: Discovery to Delivery (D2D); ILLiad resource sharing management software; Relais ILL; Tipasa; UnityUK resource sharing service; WorldShare Interlibrary Loan service; and ZFL-Servier resource sharing service.

24. As a result of this integration throughout OCLC's other product and service offerings, WorldCat® indirectly accounts for 83% of OCLC's revenue when looking at the impact on OCLC's Services and downstream products.

### OCLC's Framework Agreement and WorldCat® Policy

25. All OCLC Member Subscribers who receive OCLC products or services must agree to the terms of OCLC's Framework Agreement and the accompanying "Schedule(s)" that apply to the products or services they receive from OCLC (collectively, the "Framework Agreement"). The Framework Agreement is attached as Exhibit A and is available on OCLC's website.

26. Section 5.1 of the Framework Agreement states that "OCLC and/or its licensors or suppliers are the exclusive owners of and retain all right, title, and interest (including all copyrights, trademarks, patents, and any other proprietary rights) to the Products, Services, WorldCat®, and

all other materials produced or provided by OCLC." OCLC Member Subscribers are granted a license to use OCLC products or services "solely for the noncommercial purposes described in the Product Description and the applicable Schedule".

27. All WorldCat® Customers—i.e. OCLC Member Subscribers who have subscriptions for services under which they can use WorldCat®—agree to the responsibilities outlined in Section 3 of Schedule 2 to the Framework Agreement. (Ex. A at 10).

28. Among the stated responsibilities, WorldCat® Customers agree "that the use and transfer by the Institution of WorldCat Data is subject to the [WorldCat Rights and Responsibilities for the OCLC Cooperative]" (the "WorldCat® Policy"). The WorldCat® Policy sets forth WorldCat® Customer's and OCLC's rights and responsibilities "associated with the stewardship of the WorldCat . . . bibliographic and holdings database . . . including the use and exchange of OCLC member-contributed data comprising that database." The WorldCat® Policy is attached as Exhibit B and is available on OCLC's website.

29. The WorldCat® Policy defines WorldCat® as offering a "club good," "member good," or "collective good," meaning that WorldCat® derives its value through the efforts and investments of OCLC and its members. Unauthorized use "by those who do not contribute toward the cost of the providing the good" diminishes the ability of customers who contribute to enjoy the benefits of the good. As the WorldCat® Policy explains, "OCLC's public purposes include promoting the evolution of library use, of libraries themselves, and providing processes and products for the benefit of libraries and their users." OCLC seeks to protect its customers' investments, as well as its own substantial financial contribution to maintain, enrich, and improve the quality of WorldCat® bibliographic records and metadata.

30. WorldCat® Customers are required to "[a]bide by this policy, [to] ensure

awareness of it both within their institutions and on the part of their agents, their cooperatives, and other organizations to which they make their data available," and to "[m]ake reasonable efforts to ensure that the subsequent re-use and transfer of their WorldCat data by non-members is consistent with this policy and OCLC's public purposes and supports the long-term viability and utility of WorldCat."

31. Under Section 3(b) of the WorldCat® Policy, WorldCat® Customers are prohibited from "engaging in mass downloading from WorldCat without OCLC's prior written consent," "engaging in mass distribution of data directly from WorldCat to non-members without OCLC's prior consent," or "engaging in other activities that diminish the value of WorldCat to the OCLC cooperative."

32. The WorldCat® Policy does not grant WorldCat® Customers the right to share or transfer WorldCat® data to another ILS/LSP company for that company's use. Indeed, such a right would conflict with the aforementioned provisions and the purpose and obligations under the WorldCat® Policy because it would result in unauthorized, *i.e.*, non-contributing use, of the WorldCat® metadata. Similarly, mass downloading WorldCat® files and distributing those files to ILS/LSP services for use by non-WorldCat® Customers violates the WorldCat® Policy.

**Clarivate and Its Affiliates Are the Most Dominant Player in the ILS/LSP Market**

33. OCLC is one of several entities that provides cataloging, discovery, and resource sharing services to libraries and academic institutions around the world. Clarivate, Plc ("Clarivate"), through its subsidiaries and affiliates, is currently the largest, most dominant player within the broader ILS and LSP market in which these services are offered.

34. Clarivate's subsidiaries and affiliates include defendants Clarivate Analytics (US) LLC ("Clarivate Analytics"), ProQuest LLC ("ProQuest"), and Ex Libris (USA) Inc. ("Ex

7

Libris").

35. In December 2021, Clarivate acquired ProQuest, which provides content and research technology and services to researchers and librarians around the world. With the completion of the acquisition, Clarivate acquired ProQuest's massive share of the ISL/LSP market, which enables Clarivate to offer these services to current and potential customers. Attached as Exhibit C is the December 1, 2021 Press Release, *Clarivate Successfully Completes Acquisition of ProQuest*, which is available at https://clarivate.com/news/clarivate-successfully-completes-acquisition-of-proquest/.

36. Previously, in December of 2015, ProQuest made a major push into the ILS/LSP market by acquiring Ex Libris Group, an Israeli company with product and service offerings focused on technology-based workflow and resource management tools for libraries, researchers, and students in higher education and academic institutions. After the acquisition, Ex Libris became a business unit within ProQuest. Attached as Exhibit D is the December 15, 2015 Press Release, *ProQuest Completes Acquisition of Ex Libris*, which is available at https://about.proquest.com/en/news/2015/ProQuest-Completes-Acquisition-of-Ex-Libris/.

37. In acquiring Ex Libris, ProQuest obtained a number of products and services within the ILS and LSP space, including two integrated library systems, Aleph and Voyager, and a cloud-based library services platform, Alma. Each of these products/services is provided to customers on a subscription basis, and they directly compete with OCLC's ILS and LSP services, including WorldShare Management Services, Sunrise, LBS and Olib.

38. According to an October 22, 2021 letter from the Scholarly Publishing and Academic Resources Coalition ("SPARC"), Ex Libris was the leading company in the ILS/LSP market at the time of the 2015 acquisition, enjoying approximately 53% of the market share among

8

Association of Research Library ("ARL")[1] institutions. In comparison, Ex Libris' next closest competitor at the time, Innovative Interfaces, Inc. ("Innovative"), held a 28% share, and OCLC had only a 2.4% share. The October 22, 2021 SPARC letter is attached as Exhibit E and is also available at https://sparcopen.org/wp-content/uploads/2021/10/SPARC-FTC-Letter-in-Opposition-to-the-Clarivate-ProQuest-Merger.pdf.

39. While ProQuest-Ex Libris was the largest player within the broader ILS/LSP market in 2015, they did not offer any products or services in the library bibliographic record and metadata space that were as popular or widely-used as OCLC's WorldCat®.

40. In late 2019, ProQuest/Ex Libris further consolidated its ILS/LSP market position by acquiring its largest competitor, Innovative. ProQuest completed its acquisition of Innovative on or around January 16, 2020. Attached as Exhibit F is the January 16, 2020 Press Release, *Ex Libris Completes the Acquisition of Innovative*, which is available at https://about.proquest.com/en/news/2020/Ex-Libris-Completes-the-Acquisition-of-Innovative/.

41. With the acquisition of Innovative, ProQuest/Ex Libris acquired, among other products and services, Innovative's separate record cataloging utility named SkyRiver, which directly competes with OCLC's WorldCat®. Like Alma, Voyager, and Aleph, SkyRiver is provided to customers on a subscription basis.

42. ProQuest's acquisition of Innovative in January 2020 further collapsed competition within the ILS/LSP market. ProQuest (through Ex Libris and Innovative) now owned over 84% of the market among ARL institutions, 72% among all academic institutions, and 54% among public libraries. In contrast, OCLC, now Clarivate's second largest competitor, held only a 4%

---

[1] The Association of Research Libraries is a membership organization of libraries and archives in major public and private universities, federal government agencies, and large public institutions in Canada and the United States. https://www.arl.org/.

market share among ARL institutions, 10% among academic institutions, and 10% among public libraries. These market share estimates are based on Exhibit E (the October 22, 2021 SPARC letter) and a December 5, 2019 article attached as Exhibit G, *What Are the Larger Implications of Ex Libris Buying Innovative?*, which is available at https://sr.ithaka.org/blog/what-are-the-larger-implications-of-ex-libris-buying-innovative/.

43. With the acquisition of Innovative in 2020, ProQuest's combined position within the ILS/LSP market dwarfed all other market participants, including OCLC.

44. On or around May 17, 2021, Clarivate, Plc, a multibillion-dollar, publicly-traded, global information, analytics and workflow solutions company, announced a definitive agreement to acquire ProQuest and its subsidiaries. Attached as Exhibit H is the May 17, 2021 Press Release, *Clarivate to Acquire ProQuest*, which is available at https://about.proquest.com/en/news/2021/clarivate-to-acquire-proquest/.

45. Clarivate's announcement of the proposed acquisition was met with sharp criticism and concern from some libraries and academic institutions. SPARC, an alliance of over 200 academic and research libraries working to make research and education open and equitable, submitted a October 22, 2021 letter (Exhibit E) opposing the acquisition based on, among other reasons, the monopoly Clarivate-ProQuest would have over the ILS/LSP market for libraries.

46. Clarivate completed its acquisition of ProQuest on or around December 1, 2021, Exhibit C (December 1, 2021 Press Release).

47. When Clarivate acquired ProQuest, it acquired ProQuest's dominant position within the ILS/LSP market described above in Paragraph 42.

48. Clarivate also acquired the cataloging utilities and resources within ProQuest's (and Ex Libris' and Innovative's) product/services portfolio, including SkyRiver. However, SkyRiver

10

and ProQuest's other offerings have never been as popular or successful as OCLC's WorldCat®, and WorldCat® remains the industry standard among libraries and academic institutions for cataloging resources. While Defendants claim that SkyRiver has over 70 million records within its catalogue, WorldCat® has over 500 million records, and SkyRiver has not been able to successfully create the same high-quality records available through WorldCat®.

**Defendants create and promote MetaDoor, a bibliographic record "index", as a direct competitor to OCLC's WorldCat® cataloging database.**

49. Since at least March 2022, Defendants have been developing and promoting the launch of MetaDoor, a cataloging resource platform offered by Ex Libris, that Defendants have positioned to compete directly with OCLC's WorldCat®.

50. OCLC's knowledge and understanding of MetaDoor to date is primarily based on what Defendants have disclosed publicly, including to OCLC's customers/members, and the presentations that Defendants' employees have made over the past month.

51. On May 18, 2022, an Ex Libris product manager, Jamie Kutzuba, presented to the 2022 GALILEO Interconnected Libraries Users Group Meeting ("GUGM") a presentation titled "Ex Libris: MetaDoor – the Open Metadata Platform." The video of her 52:49 minute presentation is available on YouTube at https://www.youtube.com/watch?v=MTKQX4NYhsU, and a copy of the presentation slides are attached as Exhibit I.

52. During the GUGM presentation, Ms. Kutzuba confirmed that MetaDoor is intended to directly compete with WorldCat®. She characterized MetaDoor as "an alternative to OCLC WorldCat" or another "choice into [sic] the marketplace." She also confirmed that Defendants plan to offer MetaDoor to current and future customers for free.

53. According to the same presentation, MetaDoor is an open source cataloging platform through which any library, even if it does not have a subscription to Defendants' ILS/LSP

11

products, such as Alma or Voyager, can access MetaDoor records, use bibliographic metadata tools, and other bibliographic record services. This includes libraries that subscribe to OCLC's and other competitors' cataloging and ILS/LSP products.

54. Like WorldCat®, MetaDoor is a cataloging resource tool that can integrate with other companies' ILS/LSP products and that aims to streamline libraries' cataloging workflows.

55. MetaDoor is designed to have its bibliographic records populated by users. In fact, Defendants described MetaDoor in the May 18, 2022 GUGM presentation as "a free metadata sharing platform" based on "peer-to-peer sharing of bibliographic records." According to the same presentation, MetaDoor users download their bibliographic records and then upload those records to MetaDoor to make them available to all MetaDoor users. MetaDoor, once launched, will therefore rely on the user community to provide the necessary bibliographic records and metadata.

56. According to the 2022 GUGM presentation, after the "open" MetaDoor platform is initially populated with records, or metadata from records, any library cataloguer can search for new titles or records in MetaDoor. Based on the title, the cataloguer is able to see which libraries and institutions have records for that title or resource, and the cataloguer selects the record(s) she wishes to create for her institution's library management system. Users can also schedule automatic bibliographic record enrichment or updates from MetaDoor as new records become available on MetaDoor.

57. To effectively compete with WorldCat®, MetaDoor must have a robust, high-quality bibliographic record population for users to rely on when they are cataloging a new title or resource for their library. As discussed above in Paragraph 48, Defendants' SkyRiver has been unable to compete with WorldCat® due to the lesser quality and lower number of records compared to WorldCat® and other competing services.

58. Based on OCLC's own experience with WorldCat®, creating and maintaining a world-class cataloging resource is incredibly time and resource intensive. Rather than make a similar direct investment in bibliographic record population, Defendants are actively encouraging libraries and other research and academic institutions, many of which are OCLC customers, to upload their records and associated metadata, including WorldCat® bibliographic records, to MetaDoor.

**Defendants are actively inducing WorldCat® members to violate their contractual agreements with OCLC.**

59. In March 2022, OCLC first learned that Defendants were contacting OCLC's current and potential customers to promote MetaDoor and encourage them to share their bibliographic records to MetaDoor.

60. After attending a presentation to U.K. academic libraries on bibliographic metadata in March 2022, Liam Sullivan, Resource Discovery Officer at Liverpool John Moores University, reached out to my OCLC colleagues to ask if it would be worthwhile for his institution to load bibliographic data into MetaDoor by Ex Libris. Although neither Mr. Sullivan nor OCLC fully understood at the time what MetaDoor was or how the bibliographic data would be used, OCLC has previously warned customers that it is against the Framework Agreement and WorldCat® Policy to upload bibliographic records to other services (such as Alma Community Zone) that make those records available to institutions that do not have subscriptions to use WorldCat®.

61. A March 10, 2022 email chain among the Washington Community and Technical College Library Consortium Alma group, which is publicly available online and attached hereto as Exhibit J, further confirms that Defendants' representatives have been contacting libraries, including WorldCat® Customers, on a large scale, and marketing MetaDoor to OCLC's WorldCat® Customers. These efforts include encouraging libraries to upload their records to

13

MetaDoor and sign Consent Forms for MetaDoor to use their uploaded records. Defendants' outreach to WorldCat® Customers to request that they upload their bibliographic records to MetaDoor necessarily implicates the uploading of WorldCat® records into MetaDoor. As one individual on the March 10, 2022 email chain noted, the overwhelming majority of the titles her institution purchases every year are WorldCat® records—of the 5,000 titles purchased annually, only two or three of the records were not WorldCat® records, *i.e.*, original bibliographic records created by the library itself.

62. On May 5, 2022, OCLC learned that Defendants had also contacted Charlie Barlow, Executive Director of the Boston Library Consortium ("BLC"), to ask if they would be an early adopter of MetaDoor. Mr. Barlow informed my OCLC colleagues that Defendants highlighted that Brandeis University, a BLC member and OCLC subscriber, had agreed to be an early adopter. Mr. Barlow also relayed that Defendants assured him that the BLC could load all of their records into MetaDoor and they would not need any other service going forward.

63. From Ex Libris' May 18, 2022 GUGM presentation, the slides for which are attached as Exhibit I, OCLC also learned that all of MetaDoor's "Development Partners" are OCLC WorldCat® Customers and OCLC members. While OCLC does not fully understand what role these Development Partners play in MetaDoor's development, and OCLC plans to more fully explore this topic through discovery in this litigation, OCLC reasonably believes that these Development Partners are working with Defendants to develop the MetaDoor platform and have agreed to link to, upload, and/or have uploaded their bibliographic records, including WorldCat® records, to MetaDoor. Any such activity by OCLC WorldCat® Customers and OCLC members breaches the Framework Agreement and WorldCat® Policy.

64. The video of the 2022 GUGM presentation also featured a demonstration of the

MetaDoor platform where the product manager brought up a WorldCat® record, detectable through its OCN ("OCLC Control Number") that is included on every OCLC WorldCat® record. This record with the OCLC identifying number was presented as a sample of a "top rated record" from which the MetaDoor user could "download" the record and the metadata, and then overlay, copy, and merge the WorldCat® metadata into a new MetaDoor record. This demonstration shows that Defendants intend for WorldCat® records to populate MetaDoor and serve as its "top rated records" for its platform. And because OCLC would not permit Defendants to have direct access to WorldCat®, it also shows that at least one OCLC customer has provided a WorldCat® record to Defendants in breach of the Framework Agreement and WorldCat® Policy. A true and accurate screenshot of this portion of the video demonstration showing the WorldCat® record is attached as Exhibit K.

65. Most libraries and academic institutions are WorldCat® Customers, even amongst Ex Libris Alma, Aleph, and Voyager users; Innovative's Millennium, Sierra and Polaris users; EBSCO's/Index Data's Folio users; and Sirsi's Horizon and Symphony users. Accordingly, by encouraging MetaDoor users and prospective MetaDoor users to upload their records, Defendants are encouraging many WorldCat® Customers to upload WorldCat® records and data in violation of the Framework Agreement and WorldCat® Policy.

66. By collecting and using WorldCat® records to populate MetaDoor and then offering those WorldCat® records and metadata to MetaDoor customers for free, Defendants are also interfering with potential future WorldCat® Customers. Indeed, any potential WorldCat® Customers are unlikely to pay (or continue to pay) for access to WorldCat® if the same WorldCat® metadata and records are available for free on MetaDoor.

67. Since at least 2020, Defendants have been aware of OCLC's Framework

Agreement and WorldCat® Policy and that WorldCat® Customers violate the Framework Agreement and WorldCat® Policy when they upload WorldCat® records to competitor ILS/LSP products and services for use by non-WorldCat® Customers. On April 10, 2020, the Plaintiff's General Counsel sent a letter to counsel for Defendants (ProQuest) regarding the implementation of Alma for the Florida Academic Library Services Cooperative ("FALSC") libraries. Its first paragraph stated, "I am writing to address a matter involving the use of OCLC WorldCat records in Ex Libris systems and to put Ex Libris on notice to cease and desist any activities which interfere with the contractual obligations between OCLC and its member libraries. We have learned that the project plan for FALSC's implementation of Ex Libris Alma calls for the loading of WorldCat records to the Alma Network Zone, where those records would be made available to WorldCat subscribers and non-subscribers alike. This action would create a situation where FALSC institutions would be violating their contractual obligations to OCLC." A copy of this April 10, 2020 letter is attached as Exhibit L.

68. On May 19, 2022, OCLC notified Clarivate's Chief Legal Officer and General Counsel that Clarivate and its subsidiaries must immediately cease and desist their tortious interference and anticompetitive conduct in relation to MetaDoor. A copy of this May 19, 2022 letter is attached as Exhibit M.

69. On May 27, 2022, OCLC's outside counsel sent a follow-up letter to Clarivate's Chief Legal Officer and General Counsel to reiterate OCLC's demand that Clarivate and its subsidiaries cease and desist their tortious interference and anticompetitive conduct in relation to MetaDoor and to put Defendants on notice of their legal obligation to preserve all evidence and materials related to this matter. A copy of this May 27, 2022 letter is attached as Exhibit N.

70. Even after Defendants were made aware of their illegal conduct, they have continued to conduct MetaDoor presentations and encourage attendees to indiscriminately upload their library records to MetaDoor. For instance, on May 25, 2022, Defendants hosted its Ex Libris Users of North America 2022 annual meeting, which included a session promoting MetaDoor and inviting participants to sign up to upload their library records to MetaDoor. Defendants also made a similar presentation titled "MetaDoor – The Open Metadata Platform" at the South Africa Information Online Conference on June 8, 2022.

71. Ex Libris also announced that it will be hosting a presentation at the 2022 American Library Association Annual Conference on June 25, 2022 titled "Ex Libris Breakfast: Collaborating and Working Better Together – Resource Sharing, MetaDoor, and More," during which "special attention will focus on MetaDoor – a new community-based, open and free metadata platform."

72. According to information communicated by my OCLC colleagues, Representatives from multiple Defendants, including Ex Libris and ProQuest, have contacted OCLC's WorldCat® Customers and encouraged them to download WorldCat® records and link to, upload, and/or otherwise transfer those records to MetaDoor, all of which is in direct violation of those OCLC's WorldCat® Customers obligations under the Framework Agreement and WorldCat® Policy.

73. Defendants have also succeeded in their efforts to induce OCLC's current WorldCat® Customers to breach their contractual obligations under the Framework Agreement and WorldCat® Policy through gaining access to our customer records for the purpose of sharing them in the MetaDoor platform.

### The current and future harm to OCLC from Defendants' predatory behavior is devastating.

74. Given WorldCat®'s importance to OCLC's operations and its other product/service offerings, the unlawful incorporation of OCLC's WorldCat® records into Defendants' free MetaDoor service would destroy OCLC's current and future customer base for WorldCat® and fundamentally threaten OCLC's ability to continue to operate. The harm to OCLC is immediate and far-reaching because Defendants have access to WorldCat® records and can use them in MetaDoor or other products and services, and it could be difficult for OCLC to trace Defendants' use of those records and associated metadata, to the extent the records and associated metadata are incorporated in any of Defendants' other products and services.

75. The harm to OCLC's customer goodwill is particularly acute here given the unique aspects of OCLC's operations and WorldCat® itself. Defendants' free distribution of WorldCat® records through MetaDoor poses a vital threat to OCLC membership and participation in WorldCat® generally. The more libraries that participate in WorldCat® and catalog their records with OCLC, the more records that are available through WorldCat® and the more valuable that WorldCat® becomes to OCLC's members. Any loss in OCLC membership and WorldCat® participation has a direct, negative impact on members/customers that remain. And MetaDoor's distribution of WorldCat® records and metadata for free will contract OCLC membership and WorldCat® participation.

76. Permitting Defendants to continue to unlawfully incorporate OCLC's WorldCat® records into Defendants' free MetaDoor service would also directly destroy OCLC's current and future customer good will for WorldCat® specifically. WorldCat® is one of OCLC's most financially important offerings, making up an average of 40% of OCLC's revenue over the past 5 years.

77. WorldCat® also sits at the center of OCLC's family of products and services. OCLC's cataloging, resource sharing, discovery, OCLC publisher, and OCLC data services all benefit from WorldCat® records. OCLC's other products and services that would be effected by a successful attack by Defendants on WorldCat® include: WorldShare Management Services, WorldShare Metadata/OCLC Cataloging, Group Cataloging, WorldCat® Discovery Services/First Search, WorldShare License Manager, WorldShare Collection Evaluation, WorldShare Interlibrary Loan, Tipasa, WorldCat.org, ILLiad, and GreenGlass.

78. Providing WorldCat® records through MetaDoor for free thus not only undermines the strength and value of WorldCat® in the market, it also decreases its value to OCLC's other products and services, which further devalues OCLC's other products and services to current and potential customers. The negative impact of MetaDoor's use of WorldCat® records would have catastrophic consequences for every aspect of OCLC's operations.

79. If Defendants make OCLC's WorldCat® records publicly available for free through MetaDoor, current enrollment in WorldCat® and other OCLC products and services would drop precipitously and future enrollment in these products and services would grind to a halt. OCLC currently employs 1,177 workers worldwide and 713 in Ohio. Of those workers, 20% of OCLC's total workforce is devoted the development, procurement, maintenance, improvement, and enhancement of OCLC WorldCat® records. As a result, OCLC would likely have to reduce its workforce, particularly given the financial importance of WorldCat® to OCLC's other products, overall operations, and continued success. Those job losses would be felt not only by the employees and their families, but also by the communities in which they live, including here in Ohio.

80.     If allowed to continue unchecked, Defendants' unauthorized use of WorldCat® records in MetaDoor will destroy OCLC's most important offering and cripple OCLC's ability to provide its other products and services, including those that compete directly with Defendants' products and services in the ILS/LSP market. Ultimately, monetary damages will not adequately measure the damage to OCLC's customer goodwill and membership, the unknowable loss in sales of other products and services, or the long term detrimental effect on the viability of WorldCat® and OCLC's business, including its ability to compete, that might result from the loss of OCLC's most critical investment and source of revenue.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. Executed in __DUBLIN__, Ohio this 13th day of June, 2022.

_William Rozek_
William Rozek
