```
              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF OHIO
                   EASTERN DIVISION

OCLC ONLINE COMPUTER LIBRARY    )
CENTER, INC.,                   )
                                )
  PLAINTIFF,                    )      CASE NO. 2:22-CV-2470
                                )
        vs.                     )
                                )
CLARIVATE, PLC, et al.,         )
                                )
  DEFENDANTS.                   )
_____)


   TRANSCRIPT OF TELEPHONIC PRELIMINARY CONFERENCE PROCEEDINGS
          BEFORE THE HONORABLE JAMES L. GRAHAM
               UNITED STATES DISTRICT JUDGE
               JUNE 21, 2022; 2:30 P.M.
                    COLUMBUS, OHIO


  APPEARANCES:

  FOR THE PLAINTIFF:
        Squire Patton Boggs LLP
        By:  Jeffrey M. Walker, Esq.
             Kathryn M. Brown, Esq.
             Traci L. Martinez, Esq.
        2000 Huntington Center
        41 South High Street
        Columbus, Ohio  43215

  FOR THE DEFENDANTS:
        Ulmer & Berne LLP
        By:  Rachael L. Rodman, Esq.
        65 East State Street, Suite 1100
        Columbus, Ohio  43215

        Ulmer & Berne LLP
        By:  Nicholas B. Wille, Esq.
        1660 West 2nd Street, Suite 1100
        Cleveland, Ohio  44113
```

```
    APPEARANCES CONTINUED:

FOR THE DEFENDANTS:
    Davis Polk & Wardwell LLP
    By:  Brian S. Weinstein, Esq.
         Daniel J. Schwartz, Esq.
    450 Lexington Avenue
    New York, New York  10017
```

                          - - -

```
    Proceedings recorded by mechanical stenography,
transcript produced by computer.
```

3

1      TUESDAY AFTERNOON SESSION

2      JUNE 21, 2022

3                - - -

4          THE DEPUTY CLERK:  Good afternoon.  This is Case No.

5      2:22-cv-2470, OCLC Inc. vs. Clarivate Plc, Clarivate Analytics

6      US LLC, ProQuest LLC, and Ex Libris USA Inc.

7          THE COURT:  Good afternoon, Counsel.  Please enter

8      your appearances starting with Counsel for the plaintiff.

9          MS. MARTINEZ:  This is Traci Martinez.

10         MR. WALKER:  Jeff Walker.

11         MS. BROWN:  Kathryn Brown.

12         THE COURT:  And Counsel for the first named defendant.

13         MS. RODMAN:  Your Honor, this is Rachael Rodman from

14     Ulmer & Berne representing all of the defendants.  And each of

15     the co-counsel who identify themselves will also be

16     representing all of the defendants.

17         MR. WEINSTEIN:  Good afternoon, Your Honor.  This is

18     Brian Weinstein from Davis Polk.  Good afternoon.

19         THE COURT:  Good afternoon.

20         MR. WILLE:  And this is Nick Wille also from Ulmer &

21     Berne.

22         MR. SCHWARTZ:  And good afternoon, Your Honor.  Daniel

23     Schwartz also from Davis Polk.

24         THE COURT:  All right.  Is that everyone?  It sounds

25     like it is.

4

1    Counsel, I'm speaking to you on my speaker phone in my

2    chambers.  And present there are my judicial law clerk assigned

3    to this case, Mr. Josh McCarroll.  We also have a court

4    reporter on line, and my courtroom deputy who opened these

5    proceedings, Mrs. Shane, is also on the line.

6    I want to thank you all for your cooperation in

7    arranging this telephonic conference.  This is a preliminary

8    conference in a case in which there was a request for a

9    temporary restraining order.  And the scheduling of this

10   preliminary conference was somewhat delayed by the recent

11   federal holiday and the timing of the filing of the complaint.

12   And in light of the nature of this case, it's my

13   intention to not only have a preliminary conference today and

14   discuss things such as discovery, but also to conduct a hearing

15   on the plaintiff's request for a temporary restraining order.

16   Plaintiffs asked for immediate relief.  The circumstances of

17   this case, I believe, justifies the Court's consideration of

18   such a request.  And so let's deal with that first.

19   Plaintiff's counsel, I'd like to hear your arguments in

20   support of your request for a temporary restraining order.

21   MS. MARTINEZ:  Thank you so much.  We appreciate the

22   nature in which the Court is treating this in an expedited

23   fashion.  We appreciate the urgency with which the Court is

24   treating this matter.  As I hope you were able to glean from

25   the complaint and the motion in support of our request for a

1    temporary retraining order, this is of utmost importance to our

2    client.

3         The matter originally came to their attention some time

4    in March of this year.  Actually, what they saw first was a job

5    posting wherein they were seeking applicants for jobs to reach

6    out to member libraries in the community to obtain these

7    metadata records.  The Court may be familiar with a platform

8    called WorldCat.  WorldCat is used amongst institutions,

9    primarily libraries, universities, of that nature all across

10   the U.S. and globally.  The platform began about 55 years ago

11   when OCLC first started to develop the platform and all of the

12   IT in the development of the product.

13        What WorldCat does is it takes in records from any of

14   its subscribing entities be it a university or a library.  When

15   that record comes in, it then receives it.  It takes a look at

16   it.  And through all of its IT in the background, it enhances

17   those records by adding metadata.  And the reason why this is

18   so critical is because absent the metadata -- one analogy that

19   I like to think it's kind of analogous to is your Westlaw, your

20   LexisNexis platform.

21        In and of themselves, you can find a case on the

22   Internet.  What Westlaw and Lexis, what they do is they add the

23   metadata to the record such that when you go into the platform,

24   it's the headnotes and the footnotes and the holdings and all

25   of the things that make those records more searchable and

1    usable to the member that is the value behind the product.

2    That's exactly what OCLC does with its WorldCat platform.

3        Back in March when it learned that there was this job

4    posting from Clarivate, Ex Libris for a position to basically

5    seek out the metadata records from institutions, you know, the

6    red alarm first went up.  Then shortly thereafter, one of

7    OCLC's customers in Germany reached out to it because they were

8    approached by Clarivate, Ex Libris to ask if they would share

9    these records, these proprietary records, with this new

10   platform that they were developing that is going to compete and

11   be the free version of WorldCat.

12       So, since that time, OCLC initially went out and tried

13   to find anything they could learn about the platform.  They

14   were able to see there were presentations going on in various

15   places across the world promoting this platform and, in fact,

16   uploaded some of the presentations where they freely admit that

17   they're basing this MetaDoor open and free platform off of OCLC

18   records.

19       When OCLC takes in one of the records from one of its

20   subscribing members -- I guess I should step back and say that

21   OCLC gets into contracts with these subscribing members, and

22   they have a relationship where there's all kinds of things they

23   have to abide by, policies and procedures, as to how the

24   records will be shared with OCLC and all the things that OCLC

25   will do with these records.

1    As you can imagine, the more libraries that are part of

2  this consortium to build out the record database, now over four

3  hundred million records, the stronger the community becomes.

4  When OCLC takes in a record and the record goes through the

5  life cycle, it changes dramatically from day to day, month to

6  month, year to year, such that that record is nowhere near what

7  it was when the member library initially came to OCLC with the

8  record.  We'll be able to demonstrate that very clearly, what

9  happens and the value that's added once the record gets into

10  OCLC's WorldCat network.

11    They get into arrangements with the member libraries

12  where they pay a membership fee to be part of the consortium.

13  OCLC allows anybody who is part of the WorldCat membership to

14  share freely the records with each other.  That's part of the

15  value of WorldCat.  You can exchange records.  If I come to

16  WorldCat with, let's say, a thousand holdings and I am part of

17  the network, I then get access to all of the other records

18  within WorldCat as well.

19    What OCLC is doing behind the scenes is enhancing the

20  records by adding the metadata, the searchability, what the

21  record is about, titles, authors, page numbers, descriptors, so

22  that way when you're searching the records within WorldCat,

23  you're going to be drawn to the best and cleanest record of

24  what is out there based upon the search that you're doing;

25  again, very similar to like a Westlaw or LexisNexis.  So, once

8

1    that all happens, the libraries can freely exchange them within

2    the consortium.

3          When we saw more very recently the presentations that

4    Clarivate was doing and we had some of our customers attending,

5    they were bringing them to OCLC's attention saying, hey, wait a

6    minute, they're basically asking for us to share our WorldCat

7    records through this new platform.  When you see the

8    presentations that we were able to get publicly, everything we

9    were able to find online, you can see there is a unique

10   identifier that OCLC puts, a control number, on all of their

11   records.  In fact, they tout that as being a very strong

12   record.  And you can see that right in their PowerPoint that it

13   has the OCLC identifier.

14         MR. WILLE:  Apologies one second.  This is Nick Wille

15   from Ulmer & Berne.  I just got word that my colleague Rachael

16   Rodman just about a minute ago was suddenly not able to hear

17   anything.

18         You're back on, Rachael?

19         MS. RODMAN:  My apologies, Your Honor.  Ms. Martinez,

20   I did not mean to interrupt your argument.  I don't know what

21   happened.  Everything went silent on my line.  I had to hang up

22   and call back in and I am now back on.

23         THE COURT:  We're glad you're back on.

24         Ms. Martinez, you may proceed.

25         MS. MARTINEZ:  Thank you.  So that's kind of some

1   background around kind of the 55 years in the development of

2   this product.  Obviously, there's a lot more nuances in terms

3   of the technology and the intellectual property and all of the

4   value that the OCLC employees put into that product.

5       Suffice it to say, WorldCat makes up 40 percent of their

6   revenue and about 80-plus percent of downstream revenue when

7   you take into consideration all of the other products that run

8   off of WorldCat.  When they started to see these presentations

9   appearing online over the last really weeks -- I saw another

10  one yet today.  One of our French customers sent over -- it

11  happened this morning where Clarivate was presenting on

12  WorldCat and said this is the free competitor to WorldCat and

13  again is using OCLC's controlled records.

14      So a little bit of -- I think there's just one more

15  piece to the background that's important.  And that is over the

16  course of the past five years, as you might see in the

17  pleadings, Clarivate and the affiliates that we've named have

18  strategically eliminated competition through targeted

19  acquisition, basically rendering Clarivate the dominant player

20  in this market with the exception of this one type of platform.

21      One of the companies they acquired over the years has a

22  true competing, rightfully done product called New River that

23  has been for years competing with WorldCat.  Instead of

24  developing and investing in that platform, they created this

25  other platform and, like I said, from everything that we're

1   seeing and hearing from our customers, are reaching out to

2   basically build it off of the backbone of these WorldCat

3   records.

4          And so the product from what we're being told – again,

5   this is based on what we can find online or through

6   conversations with customers – is that it's set to launch this

7   year.  The need and the desire to get something in place now to

8   at least stop the development, reaching out to OCLC WorldCat

9   member subscribers is of critical importance because it does

10  depend on these contributed WorldCat records.  Any customer

11  that leaves WorldCat believing that they are going to get a

12  free platform which is essentially the same records as what

13  WorldCat offers, of course, is going to be something that's

14  appealing not only to existing customers but also to customers

15  who may be considering subscribing to WorldCat now or in the

16  future.

17         So we bring this on behalf of OCLC.  It's of critical

18  importance.  This predatory conduct will devastate WorldCat and

19  by extension OCLC.  One of the most critical things is that

20  once this genie is out of the bottle and there's this free

21  service out there, there's no turning back the clock of time

22  which I think is a really critical point when looking at a

23  temporary restraining order.

24         MetaDoor is the platform they're offering.  They're

25  saying it's free and open, we're not going to charge anything.

1    By issuing a temporary restraining order now and letting this

2    play to where we get to present to Your Honor more detailed

3    evidence and get documents and information from the defendants,

4    I know that we'll be able to show that they tortiously

5    interfered with these contracts.  We understand that they've

6    reached out and asked at least some of our customers to sign

7    consent forms.  We haven't seen that.  They certainly know

8    these contracts exist.  OCLC's website talks about it.  They do

9    presentations about the value behind WorldCat and what are the

10   parameters with which our member subscribers can share WorldCat

11   records within the WorldCat community.

12        This platform is open and free to anybody, subscribers

13   and nonsubscribers.  Again, it's all the hundreds of millions

14   of dollars that OCLC has developed over a 55-year period which

15   has created WorldCat what it is today.  To allow defendants to

16   come in and basically build a platform off the backs of the

17   work of thousands of employees, most of whom are residents and

18   living and working in Ohio, is something they can't just let

19   happen.

20        For those reasons, we're bringing this motion.  We hope

21   that the Court will issue a temporary restraining order to stop

22   them from, at least in the interim period, developing this

23   product but certainly reaching out to OCLC's member subscriber

24   customers, encouraging them to download or link or otherwise

25   share this information, these WorldCat records with them until

1    we can get through a full hearing on the merits of this case.

2         THE COURT:  All right.  Thank you, Ms. Martinez.

3         Who will speak on behalf of the defendants?

4         MS. RODMAN:  This is Rachael Rodman.  I will be

5    speaking on behalf of the defendants.

6         THE COURT:  Very well, Ms. Rodman.

7         MS. RODMAN:  Thank you, Your Honor.

8         OCLC's motion demonstrates a fundamental

9    misunderstanding of how MetaDoor actually works and what

10   MetaDoor actually does.  We're not sure the basis of that

11   misunderstanding, because if you look at the documents that

12   OCLC submitted in support of its own complaint and its own

13   motion for preliminary injunction and TRO, they reflect how

14   MetaDoor actually functions but there still seems to be this

15   fundamental misunderstanding of how MetaDoor works.

16        MetaDoor is not and never will be a repository of

17   information.  There are no records from WorldCat or from any

18   other source that will ever be uploaded to MetaDoor.  It's not

19   a repository of information.  It's never going to be a

20   repository of information.  What MetaDoor does is it

21   facilitates library-to-library sharing of catalog records

22   belonging to the libraries themselves.

23        As Ms. Martinez explained a bit, at issue here is the

24   metadata about library holding, the library holding being, for

25   example, a book.  It's very similar to the metadata that we're

13

1   used to in eDiscovery.  In eDiscovery, we have books, documents

2   and custodians, et cetera, in the library where all the

3   metadata would be about a particular holding, for example, a

4   book, the publisher, the author, et cetera.  So this metadata

5   is used by libraries to catalog their holdings, which, as you

6   can imagine are vast and get even more vast over time in the

7   digital age.  That metadata is not OCLC's property as it's

8   existing in libraries, catalogs, and in the libraries

9   themselves.

10          Very notably, this is not an intellectual property case.

11   At times OCLC's arguments sound like they're attempting to be

12   an intellectual property case.  There's no intellectual

13   property at issue here.  This is a tortious interference case.

14          What happens in WorldCat, as Ms. Martinez explained, is

15   that OCLC sources and compiles metadata about items, for

16   example, a book.  That metadata comes from lots of sources:

17   The Library of Congress, the publishers themselves, the member

18   libraries, other libraries.  None of that belongs to OCLC in

19   the first instance.  OCLC sources that metadata and compiles it

20   all into an OCLC WorldCat record that exists in a particular

21   format.  Then the OCLC member libraries can access that OCLC

22   record.  But the member libraries don't necessarily use the

23   metadata in exactly the same version that OCLC WorldCat records

24   keeps it.

25          So the libraries themselves might use some of that

1   metadata, they might get it from WorldCat, but they are then

2   going to add to it.  They're going to rearrange it.  They're

3   going to add fields, take away fields and put the metadata for

4   that particular record into a form that works for that library.

5   And then libraries share those catalog records between each

6   other.  It happens all the time every day regardless of

7   MetaDoor or anything that defendants are doing here.

8           Indisputably, each library owns its own catalog records

9   and has the right to share those records.  And that's clear

10  from the contract that OCLC has attached to the complaint.

11  OCLC owns the database, the entirety of the WorldCat database,

12  but, once the libraries are created from their own catalog

13  records, the library owns those records.  That sharing of

14  records has happened forever.  OCLC knows about it.  OCLC

15  encourages it.

16          At times you see -- for example, relatively recently we

17  saw -- not relatively recently, but ten years ago Harvard

18  released an entire catalog.  There is a lot of sharing.  There

19  is a lot of openness with this information.  Like science, this

20  industry is becoming more and more open to allow for easier

21  sharing of records with more efficiency with respect to catalog

22  into libraries.  And it's that sharing that MetaDoor is

23  designed to make more efficient.

24          So what MetaDoor does is it makes that sharing of

25  catalog metadata between libraries themselves more efficient.

1   It's not a repository.  It's not collecting data or records

2   from WorldCat or anywhere else.  It's not even collecting data

3   or records from the libraries themselves.  It's just letting

4   the libraries conduct the sharing between each other, what

5   they're already doing, in a more efficient way.  The

6   information always remains the property of the libraries,

7   always remains in the custody and control of the libraries.

8   It's just a more efficient method of sharing.

9        So, as to the actual claims, Your Honor, for tortious

10  interference, there is no breach of contract here.  The

11  libraries, even if they eventually use MetaDoor, are not in any

12  danger of breaching the contract of OCLC.  In fact, the

13  libraries are on record as saying they're going to continue

14  their OCLC WorldCat contracts.  So there's no likelihood of

15  success on the merits because there is no risk of a breach.

16       The documents that OCLC has shared, their framework

17  agreement, is clear that these records belong to the member

18  libraries.  OCLC has publicly conceded that on numerous

19  occasions.  And the sharing is not a violation of the OCLC

20  contract regardless of whether it happens through MetaDoor or

21  happens through some other form of sharing, sending a CD-ROM or

22  fax or whatever older methods might exist.

23       Beyond the lack of likelihood of success on the merits

24  because there is no danger of a breach of contract here, it is

25  important to understand where MetaDoor currently stands.

1   Currently MetaDoor is in the development phase, and it has been

2   for the past six months.  For the past six months, defendants

3   have been working with their development partnership which is

4   their library, working with defendants to provide input into

5   the development of MetaDoor.

6        During that development process, no OCLC records are

7   being utilized.  The only data that's being utilized is data

8   that already exists in defendant's Alma which is a different

9   brand name system.  So they're using that Alma data that

10  already exists in the Alma system and has existing subsidiaries

11  to conduct this development with.  They aren't using any OCLC

12  records, not using any new records from libraries.  It's data

13  that already exists in the Alma system.

14       There's no immediate harm, potential harm, to OCLC in

15  this development phase.  The development phase has been going

16  on for six months.  Nobody has canceled --

17       THE COURT REPORTER:  I'm sorry.  Nobody has

18  canceled --

19       MS. RODMAN:  Nobody has canceled any contracts with

20  OCLC.  No one has breached any contracts with OCLC.

21       I apologize.  I don't know why it's hard to hear me.

22  I'll try to speak slowly so the court reporter can pick up

23  everything I'm saying.

24       Simply, Your Honor, there is no exigency here that would

25  justify a temporary restraining order.  The harm that would

1    allegedly happen to OCLC would happen on breach of contract by

2    the OCLC members, which is not going to happen until -- it's

3    not going to happen at all, but certainly would not happen

4    until at least the launch of MetaDoor because until then

5    libraries aren't sharing anything between each other, they

6    aren't using MetaDoor.  There's nothing happening that could

7    possibly violate OCLC's contract.

8         That launch, as held in OCLC's pleadings, was originally

9    set to happen in Q4 of 2022.  It's not set to happen no earlier

10   than February of 2023.  So there is no immediate danger that

11   necessitates a TRO or this fire drill for a TRO because we're

12   talking about a product that's not going to launch for

13   approximately nine months.  In the interim, all that's

14   happening is this sort of closed development involving data

15   that already is in and has been in defendant's Alma system.

16        OCLC alleges this domino effect that's going to render

17   WorldCat obsolete.  While that's generally not something that

18   there's any indication it's going to happen, the development

19   partners at least are indicating they have no intention of

20   canceling their OCLC contracts.  That domino effect would take

21   years to play out.  As you can see from the OCLC contract, they

22   are renewed in perpetuity unless they're terminated.  And there

23   have been no terminations of contracts.  There's no indication

24   that there are going to be any terminations of contracts at any

25   point and certainly not in the short term.

1          And contrary to Ms. Martinez's argument, any harm --

2     it's not a case where the cow is out of the barn, once the harm

3     has been allowed to occur, there's no putting it back.  If

4     MetaDoor is at some point determined by the Court to not be

5     permitted to continue, any harm to OCLC because MetaDoor has

6     agreed -- sharing supported by MetaDoor requires MetaDoor.  So

7     there's no risk to OCLC if the Court enters the injunction.

8     And if there's any harm that OCLC would actually experience

9     that actually is borne out by the evidence -- and we don't

10    think there's going to be any -- would be terminated

11    immediately upon the cessation of MetaDoor.  The interim is

12    really the risk of defendants because we are marketing a

13    product that if the Court later decided to enjoin, we would not

14    be delivering on all promises.

15          THE COURT:  Are you finished, Ms. Rodman?

16          MS. RODMAN:  I could keep talking, Your Honor, but I'm

17    happy to stop and let you ask questions.

18          THE COURT:  No.  I want to make sure you finish.

19          MS. RODMAN:  I did, Your Honor, just want to highlight

20    to defendant's TRO because defendants have been developing this

21    product with a set development partnership, a group of

22    libraries, for the past six months.  If defendants were not

23    permitted to continue that development, then that group would

24    disband, probably never to re-band.  They would have to start

25    from scratch and create a new development partnership using

1   substantial time, not to mention the time and energy that would

2   be lost in having to start and re-stop development.  We had a

3   team dedicated to the software development and the ongoing

4   operation to build -- to build MetaDoor, and we would have to

5   pull people off of that.

6       And I did, Your Honor, just want to hit that the TRO as

7   actually requested by OCLC is extraordinarily broad, attempting

8   to prohibit any development or marketing of MetaDoor, not

9   simply to grant it the use of OCLC's records, but to prohibit

10  internal development activities occurring at defendant's, to

11  prohibit any communication about MetaDoor, not just to prohibit

12  breach of the contract from OCLC's member libraries, and

13  discussing things such as records and metadata derived from

14  OCLC WorldCat records in a way that's so broad as to be unable

15  to be divined.  In the likely event that the Court is inclined

16  to grant a TRO, the TRO requested by OCLC is entirely broader

17  than necessary to protect even OCLC's wrongly stated risks.

18      Your Honor, just to highlight, we did want to make a

19  point that we -- there is a question about personal

20  jurisdiction here.  We would like to brief that issue.  We

21  think it should be briefed before a TRO is decided, but

22  understand the Court will decide the TRO as it deems

23  appropriate.  And then at the time the Court deems appropriate,

24  we would also like to be heard on the motion for expedited

25  discovery as that motion as requested is -- essentially would

1    be impossible for the defendants to comply with in part.  But I

2    will leave that --

3            THE COURT REPORTER:  This is the court reporter.  I

4    didn't hear that last thing you said.

5            MS. RODMAN:  I'm not sure where I left off, but

6    speaking about the motion for expedited discovery, that it

7    would be impossible for defendants to comply on the time line

8    that OCLC requests, and we would like to be heard on that at

9    such time as the Court deems appropriate.

10           I apologize.  I'm getting a real cold and I think that's

11   contributing to your difficulty understanding me.

12           THE COURT:  Ms. Rodman, your voice is a little fussy.

13           MS. RODMAN:  My apologies, Your Honor.

14           THE COURT:  I think that probably that's being

15   aggravated by the use of the telephone equipment as well.

16           In any event, I appreciate your comments.  I'd like to

17   give Ms. Martinez the opportunity to respond.

18           MS. MARTINEZ:  Thank you, Judge.

19           Really two key points.  One, Ms. Rodman stated that OCLC

20   freely allows its member subscribers to WorldCat to share their

21   records and their metadata with anybody who they want.  That's

22   unequivocally not true.  In fact, she represents that Harvard

23   did so.  What she doesn't know is the subset of records that

24   Harvard released were done so in conjunction and with a

25   separate agreement with OCLC, and that's really the crux of the

1　case.

2　　　　This is not an IP case.  It is a breach -- tortious

3　interference with contracts and prospective contracts with

4　OCLC's customers.  And that, I think, is the really key point

5　here because one critical aspect which confirms what we

6　originally thought, and that is that defendants are taking

7　OCLC's WorldCat records, is Ms. Rodman spoke about defendant's

8　Alma platform.

9　　　　The Alma is a shared platform that you can put

10　cataloging on top of.  It's just basically like the kind of

11　holding method where records are stored.  Customers can freely

12　choose libraries and the libraries at universities can freely

13　choose to use Alma which is the defendant's library system, or

14　they can choose WMS which is OCLC's library system.  That was

15　freely developed under normal competitive frameworks, and they

16　can subscribe and pay for that with defendants using Alma or

17　they can subscribe and pay for that using WMS with OCLC.

18　　　　When Alma was put into the marketplace, OCLC recognized

19　that competition and so it worked through the WorldCat

20　framework and its own platform to allow WorldCat records to

21　talk to, if you will, the Alma library service.  When WorldCat

22　records -- a customer can freely use the Alma defendant's

23　library service and subscribe to WorldCat records.  OCLC

24　developing the opportunity for WorldCat records was just to

25　allow member subscribers to have the choice of what library

1    system they wanted to have and still be able to subscribe to

2    and be part of the WorldCat cataloging system.

3          What it doesn't allow is it does not give defendants --

4    in fact, absolutely, unequivocally not possible for a member

5    subscriber of WorldCat -- it does not give the defendant the

6    right to take OCLC's records out of WorldCat.  In fact, if a

7    member subscriber leaves OCLC's member subscription with

8    WorldCat, they no longer get to be part of the WorldCat

9    consortium, but they cannot in any instance share within any

10   library system, whether it's Alma or WMS, any records with any

11   library or institution that is not also a WorldCat subscriber

12   member.

13         So what Counsel just confirmed for us, and why we see

14   the OCN record identifiers for OCLC's WorldCat records on their

15   PowerPoint presentation, is because they're taking these

16   records out of their Alma IOS even though they have no right to

17   do so.  So that's a very, very important point.

18         I think that you'll see in the framework agreement that

19   we attached, the rights and responsibilities document that is

20   incorporated in terms of how libraries can share their records,

21   governs this very same conduct.  They are not allowed to share

22   the records with anyone, certainly not a competitive company,

23   but anyone who is not currently a subscriber of WorldCat.  It's

24   imperative that they get this in place.

25         We learned for the first time this is not supposed to

1   launch until next year.  While that may be fine, the problem is

2   is that they're interfering with the contract that OCLC has

3   with its customers today and yesterday and last month because

4   they are telling us that they're doing that, and they're asking

5   them to release records that they have in WorldCat and getting

6   consent forms signed so that they can be using them to develop

7   a competing product against OCLC.  And so it is just not true.

8   And the fact that -- as Counsel indicated, there is no harm to

9   them by just delaying this until the Court makes a

10  determination as to what it believes a proper injunction would

11  be.

12      Now, if the Court believes that the request for

13  preliminary injunction is overbroad in that it asks for

14  stopping development, I think OCLC would agree that they could

15  live with an injunction whereby they can no longer solicit any

16  records that have the OCN control number, whether it's on Alma

17  or not.  That's the whole problem.  If it's sitting on Alma,

18  that does not give them access to them.  If it has the OCN

19  control number, it cannot be used.  If they want to use any

20  original records from a library that has not been -- that have

21  not been enhanced by OCLC through the WorldCat subscription

22  services, they're free to do that as well.  To use that to

23  develop it and not use the OCLC OCN records would be fine.

24      I would also caution that they can't take a record,

25  strip it of that OCN number and call it a non-OCLC record.  We

1   would just want to make sure that the injunction was clear

2   enough.  The other thing would be just promoting this to OCLC

3   customers as a free competitor to WorldCat.  If they want to

4   develop behind the scenes while we are working out these other

5   issues to determine whether or not there is success on the

6   merits, then that would be a way to limit that injunction if

7   the Court determines it to be too broad.

8            THE COURT:  All right.  Thank you.

9        Ms. Rodman, if what you said is true, I'm wondering why

10  you wouldn't be willing to agree to a temporary restraining

11  order that prevented your clients from taking actions that

12  would induce or would participate in the OCLC subscribers

13  abiding by their -- the terms of their agreements with OCLC.

14       In other words, would you have any objection to the

15  Court putting on an order that prohibited your clients from

16  accepting the benefit of any conduct that would violate the

17  terms of the framework agreements that OCLC has with the

18  subscribers?

19           Hello?

20        MS. RODMAN:  My apologies, Your Honor.

21       I think that the problem with such an order would be we

22  do not believe that we currently are taking any action that

23  could possibly result in a breach.

24           THE COURT:  That's my point.  If you're not violating

25  or participating in a violation of those agreements, why would

1   you have any hesitancy or reluctance to abide by an order that

2   says you can't?

3          MS. RODMAN:  We certainly wouldn't.  But the problem

4   is we're not now and OCLC thinks that we are.  So if the Court

5   entered an order saying don't take action that's going to

6   result in the breach of the OCLC agreements, and we continued

7   as we were currently going in engaging in behavior that we do

8   not believe in any way implicates the potential breach of

9   OCLC's agreement, then we're going to be right back in front of

10  the Court then with a motion alleging that we're violating this

11  Court's temporary restraining order.

12         It doesn't answer the fundamental question of -- we do

13  not believe that the activities that we're currently engaged in

14  is in any way potentially causing a breach of the agreements

15  with OCLC.  And to that point, specifically contrary to what

16  Ms. Martinez said, the very policy that OCLC is referencing,

17  specifically that OCLC members who have extracted WorldCat data

18  representing, or enriching the records for, their own holdings

19  from the WorldCat database have the right to transfer or make

20  available such data to other libraries, whether those

21  institutions are members or nonmembers of OCLC.

22         So what we're doing now, which is just talking to our

23  development partner about how MetaDoor will facilitate their

24  intralibrary sharing that's already happening, has no

25  possibility of breaching -- of resulting in an OCLC member

1   breaching their agreement with OCLC.  So I don't see how we

2   could craft a TRO that would say that we will continue to not

3   do anything that would potentially implicate the breach of

4   those agreements when we believe our policy currently does not

5   implicate the breach of those agreements.

6          I understand the Court's point.  That seems like it

7   should be an easy solution, but I'm not sure that it is in

8   practice because fundamentally there is a difference of

9   understanding in what we're doing and whether it implicates

10  potential breach.

11         I also would like to point out to the Court that OCLC --

12  originally, we tried to have a meeting and explain some of this

13  on the front end, but OCLC has launched a fairly harsh PR

14  campaign, I will say.  And, frankly, any TRO, even if it's a

15  TRO that simply says we're going to continue to not do anything

16  wrong, is going to be used by OCLC as part of that PR campaign

17  to suggest that defendants have, in fact, done something wrong

18  when we don't think there's anything that implicates any

19  potential breach of the agreement with OCLC.

20         THE COURT:  All right.  Thank you, Ms. Rodman.

21         Ms. Martinez, I have a question for you.  Do you agree

22  with the statement that this case does not invoke trade secret

23  protection?  Or do you agree that the WorldCat information is

24  not proprietary, and that this is just a breach -- this is just

25  an interference with contract case?

1          MS. MARTINEZ:  It would be hard for me to agree to

2    that statement as you just said it broadly.  I think there is a

3    lot of --

4          THE COURT:  I thought you did agree.  That's why I was

5    asking for clarification.  Is this WorldCat information -- is

6    it proprietary information?  Is it protected by intellectual

7    property law?  Or is this just a breach of contract case?

8          MS. MARTINEZ:  Yeah, I guess --

9          THE COURT:  Inducement of breach of contract case.

10         MS. MARTINEZ:  Yeah, I think it's more the latter,

11   Your Honor.  I guess it's the lawyer in me not wanting to give

12   anything up.  In terms of the confidentiality and the

13   proprietary of the shared resources and what happens behind the

14   scenes when you're a member subscriber of WorldCat and part of

15   that community, that's what's proprietary to OCLC.  But I don't

16   think it's in the same way that you're thinking of it in the IT

17   context.  But I just wanted to be --

18         THE COURT:  Are you claiming your metadata is

19   proprietary?

20         MS. MARTINEZ:  No.  What we're claiming is is that --

21   so I guess the best way I can do it is if you can visually see

22   a record.  When a member library comes forward, let's say, with

23   a book publication and there's maybe seven fields of metadata

24   in that record -- and OCLC has its other member libraries who

25   are also contributing to that same record.  Maybe it has 4

1  fields or 10 fields or 12 fields.  What OCLC is doing behind

2  the scenes is they are compiling the duplicating -- matching

3  those records.  The OCLC unique identifier has become probably

4  the most useful unique identifier.  You think about the ISBN

5  numbers of the past.  OCLC numbers are even more accurate than

6  that because they have so many teams of people working behind

7  the scenes to take that metadata and put it together.

8          While Ms. Rodman suggested that it doesn't matter, OCLC

9  does a few things with the records, looking at the other

10  members' libraries, ultimately, the members -- you know, it's

11  all their own metadata.  That's not true because what OCLC in

12  fact does is to make that platform.  And when it retrieves all

13  of those, say, ten thousand records for a single publication

14  title, it can grow that field.  And we'll be able to show the

15  life cycle of a record and what it goes through in the metadata

16  process once it gets into OCLC's hands and how they share,

17  contribute, refine.

18          Like, for example, if a book is on thinking and thought,

19  you know, that may be confusing when you're trying to search it

20  as a member of the public.  So they'll fix that.  They'll take

21  the best metadata included in that record, fix it, and then

22  they share it back out with their member libraries.  Now the

23  member libraries have a much better, more enhanced record than

24  when they brought that to OCLC.

25          It's that process and everything that goes on behind the

1    scenes.  And the creation of that now enhanced record is what

2    is of value and what -- I don't know if proprietary is the

3    right word, but it's what the contract protects.  And any time

4    an OCLC member wants to go outside of the WorldCat subscriber

5    community, it has to work with OCLC.  There are some public

6    reasons why a university or a library will come to them and

7    say, hey, I have holdings related to X.  We're going to get

8    into partnership with Y.  Can we work out a way where we can

9    release these records so they can go back to -- outside of the

10   non-subscriber community?

11        We have many examples, some very, very recent examples

12   of that happening.  So to suggest that OCLC doesn't value the

13   literally hundreds of millions of dollars of the past three

14   years it's invested in this project, not to mention billion

15   with a B since the inception of this product, that they're

16   willing to say no problem, take our record, big $14 million

17   competitor, and build a platform off of it is just ridiculous.

18        I do think that, as Your Honor suggested, we are --

19        THE COURT:  Let me stop you right there.  If this were

20   published and made -- I'm trying to reconcile what you're

21   saying with the concept of publishing copyrighted material.

22        MS. MARTINEZ:  Yeah, I guess it's not the same because

23   it's a contractual -- like the database and the information of

24   what OCLC is doing behind the scenes, which, if you have your

25   own holding and you say, hey, I want to be part of this bigger

1    community because I want to be able to access, one, all of the

2    other holdings as part of the larger system, and I also want

3    you, OCLC, to help me make my records better because then

4    that's time I don't need to spend in my own library, I'm

5    willing to pay a subscription fee.  In the agreement that we

6    have with those subscribing libraries, it has all the

7    parameters with how they're able to work within the community

8    and share the information within the community.  There is no

9    blanket agreement that they can share it outside the community.

10   That just doesn't exist.

11        THE COURT:  All right.  Putting something in the

12   public domain is another thing.  It seems to me that that was

13   what Ms. Rodman was saying you folks essentially have done, is

14   you really haven't limited the publication of the information

15   that your subscribers receive as a result of their membership,

16   that it's just out there in the public domain and the libraries

17   share it with each other and always have and you know they

18   always have.  That's not going to interfere with their

19   relationship with you.

20        MS. MARTINEZ:  Yeah.  That's not accurate.  What's

21   accurate is they can share it within the libraries that are

22   part of the community.  When you look at the framework

23   agreement and the right to responsibilities document that the

24   subscribing WorldCat libraries and institutions have to abide

25   by, the key piece of that is about how they can share it with

1  each other and freely share it with each other.  So it's the

2  common good of the group.  The more subscribers they have into

3  WorldCat, the better everybody's experience is within that

4  WorldCat community.

5       It certainly does not mean that you can join, download

6  the entire -- mass download all of the records within WorldCat

7  and then upload them or send them off to somebody else.  That's

8  not it at all.  It's you, being the library in the Southern

9  District of Ohio, you really want to tap into the library

10  holdings of the Northern District of Ohio.  So you guys get

11  it --

12       THE COURT:  All right.  All right.  I think what

13  you're saying is it's not a public domain.  It's a private

14  domain, namely your subscribers.

15       MS. MARTINEZ:  That's correct.  That's right.

16       THE COURT:  I just answered my own question.

17       MS. RODMAN:  Your Honor, this is Rachael Rodman.

18       THE COURT:  Just one moment.  I'm thinking.  I think I

19  just answered my own question.

20       All right.  Ms. Rodman, go ahead.

21       MS. RODMAN:  If I can clarify my point as well a bit,

22  Your Honor, is that I don't think there's any question that as

23  we're talking about the aggregate WorldCat database that is

24  owned by OCLC, nobody is talking about anyone having the right

25  to download the WorldCat database in some sort of mass download

1    and share it with anyone.  That's not what's happening here.

2          What happens is these member libraries, Harvard,

3    whatever member library -- we'll say Harvard because it's a

4    well-known one.  It might use the WorldCat database and its

5    subscription to the WorldCat database to help it build out its

6    catalog and its catalog record.  That's what we're talking

7    about here:  Harvard's catalog, Harvard's catalog record.  That

8    is, without question, owned by Harvard.  Harvard is not

9    downloading chunks of the WorldCat database and giving it to

10   defendants for use with MetaDoor.  That's not what's happening.

11   Harvard has over time created its own very-valuable-to-it

12   catalog containing the metadata that it finds important, some

13   of which it might use OCLC's WorldCat to help it obtain, some

14   of which it might use sharing with other libraries to help it

15   obtain, some of which it might create on its own.

16         So Harvard has its own catalog.  That's what we're

17   talking about, Harvard's right to share that catalog, its

18   catalog of its records that might overlap some the public

19   information available in WorldCat, might not overlap some the

20   public information available in WorldCat.  But Harvard has the

21   right to share its catalog and its catalog items with whoever

22   it chooses.  That's very clear in the policy that OCLC cites.

23   It's Section 3A of the policy.  It says that OCLC members can

24   share their own holdings with anyone, with other libraries,

25   members, not members, period.  That's what MetaDoor does.

33

1   Going back to our fundamental point, we're not downloading big

2   chunks of OCLC's WorldCat database.

3       I'll leave for later consideration the question of

4   whether we could.  I don't think we can because that is

5   prohibited by the contract that OCLC has with its members.

6   That's not what's happening.  Harvard is not doing it.  We're

7   not talking Harvard into doing it.  And they're certainly not

8   giving it to us so we could build out a competitive database.

9       What we're doing is saying, okay, Harvard, you've got

10  your catalog that you've created, your catalog items with the

11  metadata that you think is appropriate, that you think is

12  useful to your catalog holdings.  Other libraries might want to

13  share that.  They might want to hold their metadata in the same

14  format as you do.  They might want the same field.  They might

15  want the same organization.  You want to be able to share that

16  so you can tell other libraries this is what Harvard's catalog

17  looks like for purpose of helping other libraries with their

18  catalogs, for purposes of helping other libraries with

19  intralibrary loans.  That's the sharing that is being

20  facilitated by MetaDoor.

21      At no point is anybody downloading chunks of the

22  WorldCat database and sharing them with MetaDoor or anyone

23  else.  That is just -- that's not happening.  It is a question

24  of Harvard or Boston College or whatever entity you want to

25  come up with sharing its catalog that it has created, it has

34

1    compiled, that the OCLC policy clearly says belongs to that

2    library and that that library can share with members or

3    nonmembers.  Section 3A of the policy says that explicitly.

4        All MetaDoor is doing is stepping into that breach and

5    saying we're going to make that sharing easier.  We're going to

6    make this library-to-library sharing easier.  Instead of having

7    to search for each specific record, we're going to make that

8    sharing a little more efficient and a little bit easier.

9        Nobody is violating any contract with OCLC.  And if

10   nothing else, Your Honor, I hope that I'm giving you

11   information that this is not a TRO case.  There's absolutely no

12   breach of OCLC.  Even if OCLC is right, in six months of

13   development of what we've been doing, no contract with OCLC has

14   been terminated, there's no specific contracts they'll able to

15   say have been breached.  Despite knowing who our development

16   partners are, there are no contracts at threat of being

17   breached and there's no reason that their case cannot proceed

18   to a preliminary injunction hearing with defendants being

19   allowed to brief the issues and the Court can decide it and

20   determine whether or not it's even necessary.  We think after

21   briefing it will be clear it's not.

22       There's no reason this can't be decided in a more sort

23   of thoughtful way, allowing us to brief the issues and hear it

24   at an appropriate time in a preliminary injunction instead of

25   in an immediate temporary restraining order when they're simply

1    not in any risk of harm.

2         THE COURT:  All right.  Thank you, Ms. Rodman.

3    Counsel has provided the Court with a lot of information during

4    this conference and this hearing.  I'd like to reflect on some

5    of this information and digest it.

6         Ms. Martinez, in response to Ms. Rodman's comments about

7    the scope of the relief you're requesting in your temporary

8    restraining order, you indicated that you could redraft your

9    proposed temporary restraining order by limiting its breadth to

10   eliminate the potential for interfering with the defendants'

11   development activities.  I would like for you to prepare such a

12   limited order.  I am inclined toward taking some immediate

13   action that would prevent a breach of your subscriber

14   agreements in such a way that it would cause irreparable harm.

15        I do think the order you've asked for is much too broad.

16   I want you to submit the more limited order that you suggested

17   in your argument that might serve your client's interests.  And

18   I'd like for you to transmit that to me by email by end of

19   business tomorrow, five o'clock tomorrow.

20        We're going to have a -- we're going to continue this

21   conference and hearing until Friday morning at ten o'clock.  I

22   want you to transmit your somewhat redacted version of a

23   temporary retraining order and, of course, share that with

24   Ms. Rodman just as soon as you share it with me so that she can

25   be prepared to tell me why it would in any way harm her client

36

1  while at the same time serving to protect your client.

2      So that's what we're going to do.  We're going to

3  continue this matter.  And we will speak again Friday morning

4  at ten o'clock.  Thank you very much and goodbye.

5      (Proceedings concluded at 3:27 p.m.)

6                          – – –

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

37

C E R T I F I C A T E

I, Shawna J. Evans, do hereby certify that the foregoing is a true and correct transcript of the proceedings before the Honorable James L. Graham, Judge, in the United States District Court, Southern District of Ohio, Eastern Division, on the date indicated, reported by me in shorthand and transcribed by me or under my supervision.


s/Shawna J. Evans_____
Shawna J. Evans, RMR, CRR
Official Federal Court Reporter


June 23, 2022