UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

OCLC ONLINE COMPUTER LIBRARY      )
 CENTER, INC.,                    )
                                  )
    PLAINTIFF,                    )  CASE NO. 2:22-cv-2470
                                  )
                  vs.             )
                                  )
CLARIVATE, PLC, ET AL.,           )
                                  )
  DEFENDANTS.                     )
_____ )


     TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE PROCEEDINGS
            BEFORE THE HONORABLE JAMES L. GRAHAM
             FRIDAY, JUNE 24, 2022; 10:00 A.M.
                   COLUMBUS, OHIO

 FOR THE PLAINTIFF:
      Squire Patton Boggs LLP
      By:  Traci L. Martinez, Esq.
      Jeffrey M. Walker, Esq.
      2000 Huntington Center
      41 South High Street
      Columbus, Ohio 43215

 FOR THE DEFENDANTS:
      Ulmer & Berne LLP
      By:  Rachael L. Rodman, Esq.
      65 East State Street, Suite 1100
      Columbus, Ohio 43215

      Ulmer & Berne LLP
      By:  Nicholas B. Wille, Esq.
      1600 West 2nd Street, Suite 1100
      Cleveland, Ohio 44113

      Davis Polk & Wardwell LLP
      By:  Brian S. Weinstein, Esq.
           Daniel J. Schwartz, Esq.
      450 Lexington Avenue
      New York, New York 10017

                        - - -
         Proceedings recorded by mechanical stenography,
 transcript produced by computer.

2

                                            Friday Morning Session

                                            June 24, 2022

                        - - -

(In chambers, via speakerphone.)

1          THE LAW CLERK:  This is OCLC Online Computer Library

2   Center, Inc., v. Clarivate, PLC, et al., Case No. 2:22-cv-2470.

3          THE COURT:  Very well.  Good morning, counsel.  Let's

4   begin by asking you to enter your appearances.

5          Let me state that I'm speaking to you through my

6   speakerphone in my chambers, and present there in chambers is

7   one of our official court reporters as well as one or more of

8   my judicial law clerks, including Mr. McCarroll who just opened

9   these proceedings.

10         And I would like counsel to now enter their appearances,

11  beginning with plaintiff's counsel.

12         MS. MARTINEZ:  Good morning, Judge.  This is

13  Traci Martinez with Squire Patton Boggs on behalf of the

14  plaintiff.

15         MR. WALKER:  Good morning, Judge.  This is Jeff Walker

16  from Squire Patton Boggs on behalf of the plaintiff.

17         THE COURT:  All right.  Thank you.  Now defense

18  counsel.

19         MS. RODMAN:  This is Rachael Rodman from Ulmer & Berne

20  on behalf of all of the defendants.

21         THE COURT:  Repeat that, please.

1      MS. RODMAN:  This is Rachael Rodman from Ulmer & Berne

2  on behalf of all of the defendants.

3      I apologize, Your Honor.  I'll still dealing with a bit

4  of laryngitis.  I will try to speak very slowly and clearly to

5  make everyone's lives easier.

6      THE COURT:  Thank you, Ms. Rodman.

7      And good morning, counsel.  All right.  This is a

8  continuation of the preliminary conference and hearing on the

9  plaintiff's motion for temporary restraining order.

10      At the previous conference, I requested counsel for the

11  plaintiff to submit a proposed temporary restraining order, and

12  counsel has done just that, and I would like to begin our

13  discussion this morning by looking at the terms of this

14  proposed temporary restraining order.

15      I think that may assist the Court in reaching a final

16  conclusion about whether such an order should be entered.

17      So the proposed temporary restraining order is quite

18  simple and appears to be fairly precise and direct.

19      Let's ask plaintiff's counsel to give the Court her

20  arguments as to why the Court should adopt such an order.

21      MS. MARTINEZ:  Thank you, Judge.  This is

22  Traci Martinez.

23      In addition to these arguments that we made Tuesday

24  morning, or Tuesday afternoon, rather, we listened to the

25  Court's request to further narrow the scope and understanding

4

1    the Court's hesitancy to enter an order that was overbroad and

2    stopping all development on behalf of the defendant, and so

3    what we did was we narrowly tailored the order to really focus

4    only on OCLC -- excuse me -- OCLC WorldCat customers and using

5    the OCLC WorldCat records to develop the database -- at least

6    at this juncture.

7          What we also wanted to let you know is, I'm sure, after

8    we sent it, we thought defendants might ask:  Well, how in the

9    heck would I know who OCLC WorldCat customers are?

10         We have gotten a list.  We have got the clients to

11   compile it, and so we are ready after -- depending upon how the

12   Court orders -- share that list.

13         One of the things we did want to address is, of course,

14   it's a very confidential document, and so just wanting to use

15   this time also to discuss a mechanism by which we can protect

16   that to be shared with only need-to-know people within the

17   defendants' legal team or whomever we can agree on to identify

18   would be the right recipient of that document.  So we think

19   that it's narrowly tailored.

20         It really addresses the immediate harm to OCLC which

21   will stop any breaches of OCLC customer agreements.  We're

22   happy to take any questions from the Court.

23           THE COURT:  All right.  Ms. Martinez, thank you.

24         Yes, I do have some questions.

25         So the WorldCat records include bibliographic

1    information and metadata.  Am I correct?

2             MS. MARTINEZ:  That's correct.

3             THE COURT:  And my understanding is that the various

4    subscribers, the libraries, receive the WorldCat records and

5    add -- add it to their own bibliographical data and metadata,

6    and that combined information is found in their catalogs.

7             Am I correct about that?

8             MS. MARTINEZ:  That's correct.

9             THE COURT:  How would you define a catalog?

10            MS. MARTINEZ:  So it depends, I think, on the

11   subscriber, because they can be different, but initially

12   when -- before a customer comes to WorldCat, obviously, they

13   will have their own records that haven't been touched or

14   enhanced or cared for through the WorldCat process.

15            So that catalog -- they may still, Judge, have

16   standalone catalogs that don't contain records that have been

17   submitted to the WorldCat subscriber consortium, if you will.

18   So I would imagine that they have catalogs like that.

19            After they are subscribers to WorldCat, they can then --

20   they send their records as they exist at the time that they

21   become subscribers to OCLC.  Immediately, OCLC takes those in

22   and the enhancement of those records process starts to begin.

23   It happens, you know, every day, you know, over time.

24            In addition to that, then they are able to then see

25   records from other libraries, and that's the sharing that can

1    go in within the consortium.

2        So they're -- they would have a standalone catalog that

3    maybe they don't have -- you know, have not included any OCLC

4    records into yet, and/or they could have a catalog where they

5    have some of their original records that they had that haven't

6    then been enhanced by OCLC, in addition to any records that

7    they may have received from any of the other WorldCat

8    subscribers within the consortium that aren't their records,

9    that they have put into their cataloging records.

10       And so I'm sorry that I couldn't answer -- I hope that

11   that's clear enough for the Court.  I think it would look

12   different depending on what type of institution it is and what

13   they have decided that they need.

14       THE COURT:  All right.  Well, I think you've -- you've

15   addressed my concern, which is going to lead to some further

16   questions, and that is the -- the defendants are soliciting

17   libraries to provide them with all of the information in their

18   catalogs.  Am I correct?

19       MS. MARTINEZ:  That's our understanding.  Everything

20   WorldCat and OCLC enhanced and/or their other records that are

21   not WorldCat records.

22       THE COURT:  All right.  So my question is this:  If

23   you look at a library's catalog, you are going to see in it

24   some bibliographical information and metadata that the library

25   has created.

7

1        And if they are one of your subscribers, you are also --

2    you are also going to see in their catalog your records, your

3    bibliographical information, and your metadata.

4        How -- how in the world would one be able to separate

5    out one from the other?

6            MS. MARTINEZ:  So the -- the libraries would have

7    their records at the time -- their -- their collection at the

8    time before it goes to OCLC.

9        OCLC, likewise, would be able to strip and see -- it can

10   see all of its customer records without any of the enhancement

11   at that snapshot in time of the date that they entered.

12       So that's -- I think that's -- I think maybe that's --

13   from a visual standpoint, it's hard to see, but you can go back

14   to that snapshot in time prior to the time that OCLC -- because

15   as soon as the record gets into OCLC's catalog, it puts a

16   unique identifier on it.

17       An OCN number will be on the record to know that it has

18   now been put into the WorldCat system.  So they would want to

19   look at those records that don't have that unique identifier on

20   it, or other libraries who are not WorldCat subscribers that

21   may be subscribers of defendant's platform, New River, for

22   example -- SkyRiver -- sorry -- SkyRiver.

23           THE COURT:  All right.  So what I'm having difficulty

24   with is how the Court would enforce the order you have

25   submitted.

8

1      Each library's catalog, if they are one of your

2  subscribers, the catalog -- their catalog is going to contain a

3  mixture of their own records as well as the -- the OCLC

4  records.

5      And their -- their duties under their subscriber

6  agreement restrict their ability to share the OCLC records, but

7  it certainly doesn't restrict their ability to share their own

8  records.

9      How would the Court be able to identify which records

10  are the library's records and which records are OCLC records?

11      MS. MARTINEZ:  By the OCN identifier number.  And the

12  library --

13      THE COURT:  Where -- where -- how is that

14  identification number displayed?

15      MS. MARTINEZ:  Actually --

16      THE COURT:  I'm thinking -- I'm looking at a page of

17  documents or a page of information.  How am I going to know

18  what on this page is associated with this record number and

19  what isn't?

20      MS. MARTINEZ:  It will be right on the page.

21      THE COURT:  So everything on that page is going to be

22  OCLC data, and then there will be other pages that aren't?

23      MS. MARTINEZ:  Correct.  So when the record -- so they

24  will have a standalone record of what that looks like before it

25  gets into the subscriber network, if you will.

9

1    And as soon as it gets into that subscriber network,

2    OCLC then enhances the fields of that metadata.

3    So once that triggers that process, it's that -- that

4    platform that does that.  All the IT that goes on behind the

5    scenes, it will immediately put an OCLC identifier on it, the

6    OCN number; but prior to that time or, like I said, any

7    nonsubscriber to WorldCat, you will see -- you will see it

8    because the record will not have an OCN identifier on it.

9    So it will be very easy to identify the differences.

10    THE COURT:  And how -- how would you know that the

11    number is an OCLC identifier number?

12    MS. MARTINEZ:  Their number is OCN.  It's -- it's OCLC

13    control number is what it stands for.  It's an OCN -- it's like

14    an ISBN, if you've seen that.  Like, when you've looked at an

15    ISBN, it would be an identifier for whatever platform that is

16    used to put that on.

17    From my understanding, you know, that is not as accurate

18    anymore, but OCLC -- it will be the same on every record no

19    matter what library it's in for -- for everything.

20    THE COURT:  So the number will have a prefix and that

21    prefix is OCN?

22    MS. MARTINEZ:  That's correct.

23    THE COURT:  All right.  All right.  All right.  Well,

24    let's go to defense counsel.

25    Defense counsel, I'm sure you've had an opportunity to

1    look at this proposed temporary restraining order.  Do you have

2    any problem with it?

3          MS. RODMAN:  Not surprisingly, Your Honor, yes, we do

4    have a problem with it.

5          The TRO that OCLC has provided remains very problematic

6    for reasons that might not be immediately obvious to the Court.

7    It's overbroad.

8          Some of its provisions are not even limited to MetaDoor,

9    so they would cover activities of defendants outside of

10   MetaDoor, unrelated to any allegations in the complaint --

11         THE COURT:  So where -- excuse me -- where is that

12   language?  What specific language is overbroad?

13         MS. RODMAN:  It would be two and three.  Well,

14   paragraphs 2 and 3 of the TRO don't talk about MetaDoor.  They

15   talk generally about OCLC WorldCat members.

16         Defendants have other products.  For example, their Alma

17   product that we spoke some about on Tuesday.  Defendants have

18   their own contracts with OCLC that allow them to access

19   WorldCat data.

20         So what 2 and 3 do, by divorcing entirely from MetaDoor,

21   is essentially cripple the defendants in operation of products

22   other than MetaDoor, products that exist and have been

23   operating for years, and that -- you know, the Alma products,

24   for example, is something like -- 72 percent of the markets are

25   academic institutions.

11

1    And so it impacts the operation of Alma, the operation

2    of defendants' other businesses and, by extension, has ripple

3    effects throughout the library community because it changes

4    fundamentally how defendants could operate with products

5    unrelated to MetaDoor during the time of the TRO.

6        THE COURT:  Okay.  You can stop right there.  I

7    appreciate that.

8        Plaintiff's counsel, please respond to those comments.

9        MS. MARTINEZ:  We can definitely appreciate that, and

10   so we are fine to include, you know, that this is -- this is

11   the MetaDoor complete competing project.

12       We certainly don't suggest that we want defendants' Alma

13   customers to suddenly have to cease becoming Alma customers.

14   That's not the intent at all.

15       And so if we say requesting any OCLC WorldCat records

16   and metadata records and metadata deprived from the same for

17   the use in MetaDoor or something like that.

18       THE COURT:  All right.  Defense counsel, go ahead.  Is

19   there any other language you would say is overbroad?

20       MS. RODMAN:  Yes, Your Honor.  Overbroad and vague and

21   I would think that it's very difficult for us to comply with

22   and the Court to enforce, as I believe you have already hit

23   upon, and that is this core problem with the terminology.

24       We've got OCLC using that term, WorldCat records and

25   metadata.  OCLC didn't define what that means in the TRO.  I

1    guess now today we've defined as including an OCN number.

2         It begs the question of what is a WorldCat record and

3    what is WorldCat metadata, and that's --

4         THE COURT:  Okay.  Please, please.  If it has an OCN

5    number, then that's specific enough, isn't it, to put you on

6    notice that it's OCLC data?

7         MS. RODMAN:  It would be --

8         THE COURT:  And if it doesn't have an OCN number, then

9    they are not asking for any protection for that information.

10        They are linking to only information that has an OCN

11   number as I understand it.

12        How is that overly broad?

13        MS. RODMAN:  The OCN number, Your Honor, would be

14   specific.  It would solve that issue.

15        But it is still very overbroad, and that's because of

16   how OCN numbers work.

17        What an OCN number is, it's just a sequentially applied

18   number that OCLC assigns to anything -- any item that it has a

19   record for in its database, 500 million-plus items.

20        OCLC's goal, as you can imagine, is to have a record for

21   any item that might be in a library catalog.  And once there is

22   a record in OCLC, they assign an OCN number.

23        THE COURT:  All right.  Stop.  Stop.  Stop right

24   there.

25        All right.  Plaintiff's counsel, please address that.

13

1  Do you assign OCN numbers to all the data that you have,

2  including data created by your subscribers?

3       MS. MARTINEZ:  We put an OCN number on any record that

4  OCLC enhances.

5       So if it comes into their database and they are going to

6  enhance it by -- kind of similarly to what I talked about on

7  Tuesday to the Court, you know, if they are going to add

8  headnotes or footnotes -- I'm sorry -- head notes, you know,

9  pagination, they are going to change the way that the record is

10 searched.

11      The best analogy I can give is kind of similar to what

12 you see in Westlaw and LEXIS, and you have all of those

13 different things added.

14      So while the library may come to it with a --

15      THE COURT:  So is that -- excuse me -- is that

16 metadata?

17      MS. MARTINEZ:  Yes, that's metadata.  So that's what

18 OCLC's IT does behind the scenes when it gets the record, and

19 it's why subscribers pay OCLC for the service because it

20 enhances their records so that more users in their library

21 community, that's searching their institution, whether it's a

22 university or whatever, they have a better chance of getting

23 those records.

24      THE COURT:  All right.  All right.  So are you -- are

25 you telling the Court that you only assign an OCN number to

14

1    information that has been enhanced with metadata?

2          MS. MARTINEZ:  Yeah.  Enhanced here for and put

3    through their -- you know, I wish I knew a better way to

4    describe the technology, but I think we're talking about the

5    same thing, so yeah.

6          THE COURT:  Well, I'm concerned about that.  I think I

7    need a little better answer that you "think" that's the case.

8          It seems to me that the only thing protected under your

9    subscriber agreement would be information that is unique and

10   created by OCLC.  That would be metadata --

11         MS. MARTINEZ:  Yes, yes.

12         THE COURT:  -- and that needs to be separated from

13   information that's been created by your subscriber.

14         MS. MARTINEZ:  Yes, so every -- sorry.  Go ahead,

15   Judge.

16         THE COURT:  Go ahead.  Go ahead.

17         MS. MARTINEZ:  Yeah, I was going to say yes, so every

18   record that goes into OCLC's system, when it gets an OCN

19   number, it's been touched by an OCLC employee to enhance what's

20   in that record, so that is a yeah.

21         THE COURT:  All right.  Defense counsel, would you

22   like to respond to that?

23         If it's been enhanced by OCLC then, and that's how it

24   gets an OCN number, and -- wouldn't that be a sufficient

25   identification of material that is protected by the OCLC

1    subscriber agreement?

2          MS. RODMAN:  Two things, Your Honor.  First of all,

3    the term "enhancement" I think is a bit of a misnomer.  You

4    have to understand where this data comes from.

5          When OCLC creates a record, it is pulling metadata from

6    other sources, from public sources, from libraries themselves,

7    from the Library of Congress, from publishers.  Almost all of

8    the metadata in an OCLC record comes from sources other than

9    OCLC.  OCLC pulls that in, and they add an OCN number, which is

10   just a sequential number.

11         You know, Ms. Martinez gave an example of Westlaw as a

12   comparator.  It's like the Westlaw citation number, 22WL0000,

13   that's assigned to any case that's in Westlaw.  It doesn't mean

14   Westlaw owns the case, owns the date of the case, owns the name

15   of the case, owns the judge's name, all the metadata that's

16   associated with that.

17         OCLC assigns that OCN number for purposes of

18   deduplication, but also, Your Honor, so that it can pull in

19   enhancements that its libraries make after it creates the

20   record.

21         So OCLC pulls in metadata.  It assigns an OCN number.

22   Then when its members add their own enhancements, further data,

23   the OCN number lets OCLC grab that additional information.

24         So it's a constant cycle of other people, other

25   entities, adding information about a record and OCLC pulling it

16

1    in, and it uses the OCN number to do that.

2         OCLC has no proprietary interest in this metadata.  It

3    has no proprietary interest in the OCN number.  In fact, OCLC

4    has been very clear over the years that it wants the OCN number

5    to remain attached to records even when they are in the

6    subscriber's own catalog and they are not WorldCat records, and

7    it wants that so that it can always go back to that record,

8    that OCN number can pull in any additional information that

9    will enhance the WorldCat record, and OCLC has declared that

10   the OCN number can be treated as they are in the public domain

11   since 2013, and at the same time, since 2013, OCLC expressly

12   disavowed the OCN number being used as an indication that a

13   record originated with OCLC and was, therefore, subject to its

14   member agreement.

15        And I know this is complicated, Your Honor.  We would

16   love a chance to brief and provide this information to the

17   Court.  We can do that by Monday if the Court is willing to

18   entertain that.

19        But there are these statements that OCLC has made that

20   the OCN number is absolutely not a metric to determine that a

21   record, quote, unquote, belonged to OCLC.

22        It's very problematic to have a TRO potentially issuing

23   that would say that those records do in fact belong to OCLC.

24        What the Court is asking -- what OCLC is asking the

25   Court to do is give it a constructive proprietary right that

17

1    its contracts do not give it so that it can stifle competition,

2    Your Honor, and that's very problematic.

3              THE COURT:  All right.  Stop right there.

4         Ms. Martinez, please respond to that statement.

5         MS. MARTINEZ:  Yeah.  You know, it's a fundamental

6    disagreement, Judge.  But, first and foremost, we're talking

7    about them soliciting records from current OCLC WorldCat

8    subscribers.

9         If they want to solicit records that are not related to

10   OCLC, that are not from one of our member subscribers, that are

11   in their own -- they have a competing product called SkyRiver.

12        If they want to continue to develop based upon SkyRiver

13   records while we continue this process, they are welcome to do

14   so.

15        But the fact of the matter remains they know that that

16   is not going to be sufficient for them because they want to

17   build this off of OCLC's WorldCat database.

18        And as Ms. Rodman just stated, OCLC does indeed review

19   all of the metadata, looks at the best information out there,

20   be it from a publisher or another author or another library or

21   whatever it is, and it brings it to bear in a single record.

22        That is not data that comes to OCLC from that library.

23   That's the value of what they are doing.  It's the hundreds of

24   millions of dollars that they have spent to compile all of that

25   information and put it together to enhance that record when it

1  gets to OCLC.

2       So to suggest that that is not -- that service, which

3  many libraries indeed pay for, is not valuable, it is just --

4  it's just -- it's just a misrepresentation of the process.

5       THE COURT:  So your case is based on the terms of your

6  subscriber agreements?

7       MS. MARTINEZ:  Yes.

8       THE COURT:  And the restrictions -- and your claim is

9  that the defendants are inducing your subscribers to breach the

10  terms of their subscriber agreements by releasing to them

11  information that they are not permitted to release under their

12  subscriber agreements?

13       MS. MARTINEZ:  That's correct.

14       THE COURT:  And I'm having trouble with a lack of

15  specificity as to which records your subscribers are free to

16  provide -- because they created them or someone other than OCLC

17  created them and -- and how the Court is going to be able to

18  determine in a -- in a group of data, even with an OCN number

19  attached to it, whether it is something that the -- your

20  subscriber is -- has freedom to release or does not under your

21  subscriber agreement, and I -- go ahead.  Answer that.

22       MS. MARTINEZ:  Yeah.  I was going to say maybe this

23  could help.

24       So the libraries will have their initial records prior

25  to the time that they made it to OCLC and -- and before it got

19

1     into its enhancement process.

2          And so if they want to reach out to a subscriber to see

3     about -- and that's why we -- we redrafted the preliminary

4     injunction order in the manner that we did.

5          This is only related to our member subscribers that

6     currently have their records interacting with the -- the

7     WorldCat database.

8          If they want to reach out to member subscribers and talk

9     to them about their original records before they went into the

10     WorldCat subscriber consortium/network, we're fine with that.

11          If they want to talk to any non -- there are thousands

12     non-WorldCat member libraries or institutions.  They are happy

13     to do that.  If they want to talk to any of their own New --

14     SkyRiver subscribers, they are happy to do that.

15          It is just the subset of customers whose records are

16     currently in WorldCat, that those are the ones that we're

17     talking about, and I think the order very specifically relates

18     just to those.

19          THE COURT:  I think you are saying that all of your

20     subscribers, that their current catalogs would -- that all of

21     the information in their current catalogs would be protected

22     from disclosure under your subscriber agreement simply because

23     they -- because they joined up and because they have become a

24     subscriber, that they are not permitted to share information in

25     their catalogs with -- with others.

20

1        MS. MARTINEZ:  They are WorldCat records.  I think

2   that's the difference.  It's the WorldCat records that they are

3   not able to share outside of the WorldCat network.

4        They can share it intra-institutional, meaning

5   intra-institutional amongst the other WorldCat subscribers.  If

6   they have their records -- their own catalog records that are

7   non-WorldCat records, the records that they had prior to the

8   time that they put those records into WorldCat, they are free

9   to share those, and that's not -- that's not prohibited by the

10  agreement, and it's not -- it's not even talked about in the

11  order.  They are free to share non-WorldCat records.  That's

12  fine.

13        THE COURT:  Yeah, but everything they have since they

14  have become a WorldCat subscriber is going to be WorldCat

15  records under that definition.

16        MS. MARTINEZ:  No, they would have --

17        THE COURT:  Because you've touched everything they

18  have.

19        MS. MARTINEZ:  No, no, no, no, no, no, no.  So like

20  even OCLC -- let's say Ohio State.  Let's use that as an

21  example.

22        Ohio State comes to -- to OCLC and becomes a WorldCat

23  subscriber.  OCLC could even go back to that point in time

24  before -- you know, with the very limited data that those

25  records had in it prior to the time that it got to OCLC and it

21

1   enhanced those records, and you could see -- it would look very

2   different.  It would be very stripped out.

3       The library similarly could do the same.  So if they

4   have their development partners that they are working with that

5   are OCLC WorldCat subscribers, they just can't get their

6   current catalogs as they exist today on the WorldCat system,

7   but they certainly could ask them for the records prior to the

8   time that it went into the WorldCat consortium and OCN number

9   and enhancements occurred and get that from that snapshot in

10  time as well.

11      THE COURT:  All right.  Defense counsel, what's your

12  reaction to that?

13      MS. RODMAN:  Your Honor, my reaction is similar to

14  your reaction, which is what OCLC is arguing here is that every

15  OCLC member's current catalog is subject to a proprietary

16  interest by OCLC and can't be shared.

17      And given that we're talking about this interference in

18  terms of a contract claim, we have to keep going back to the

19  language of the policy at issue, and that language says -- and

20  I'm going to quote it if the Court will bear with me because I

21  think it's important -- that the members have the right -- and

22  it uses the word "right" in the rights section -- members who

23  have extracted WorldCat data representing, or enriching the

24  records for, their own holdings from the WorldCat database have

25  the right to:  transfer or make available such data to other

1   libraries and educational, cultural, or scholarly institutions,

2   whether these institutions are members or nonmembers of OCLC

3   for these organizations' institutional or collaborative reuse.

4           There is no question, Your Honor, under the OCLC policy

5   that they are alleging will be breached that the members have

6   the right to share their catalog records if other

7   institutions -- whether the other institutions are members or

8   nonmembers.

9           And, remember, that's what MetaDoor does.  We're not

10  soliciting anyone to give up any records.  Records do not --

11          THE COURT:  Okay.

12          MS. RODMAN:  -- MetaDoor.

13          THE COURT:  All right.  Now, maybe we've gotten down

14  to the crux of the problem, and that's this:  You are not an

15  educational institution.  You are not a library.  You are --

16  your MetaDoor program is -- is -- it doesn't fall into any of

17  those categories, does it?

18          MS. RODMAN:  That's correct, Your Honor.  We're not an

19  institution or a library.

20          THE COURT:  All right.  In fact, what you are doing, I

21  think, is you are developing a database of information to

22  provide to libraries in competition with OCLC.

23          MS. RODMAN:  No, Your Honor, absolutely not.

24          THE COURT:  And you are not doing this for educational

25  purposes.  You are doing this for business purposes.

23

1      You are going to generate some kind of financial benefit

2  by offering this information to others, are you not?

3      MS. RODMAN:  OC -- I'm sorry -- MetaDoor is not,

4  absolutely not, a database.  We are not developing a database

5  for libraries.

6      What MetaDoor is is a software solution that lets one

7  library share with another library.  No information ever goes

8  into MetaDoor, ever goes to the defendants as a result of

9  MetaDoor.  It simply facilitates that library-to-library

10 transfer which is already allowed to happen, and it gives

11 libraries a way to do it that is not a one-by-one clunky way of

12 doing it like they currently do.

13     THE COURT:  Okay.  Well, I'm assuming you are not

14 doing this out of the goodness of your heart.  There must be

15 some financial motive for doing it, and it must involve either

16 MetaDoor or one of your -- or -- let's see -- one of your

17 associated corporate entities, either Clarivate, PLC, or one of

18 its associate companies.

19     MS. RODMAN:  We're doing it, Your Honor, because our

20 customers are asking for this position.  There is a need in the

21 market to make this sharing easier, and our customers are

22 asking for it, and we are --

23     THE COURT:  And your customers pay -- your customers

24 pay you for the services you provide to them, don't they?

25     MS. RODMAN:  Not from MetaDoor.  MetaDoor will be

24

1    free.

2           THE COURT:  No, but they want -- you are using it as a

3    promotional advantage by providing the service to your

4    customers.  I think that's -- I think that's really obvious,

5    isn't it?

6           MS. RODMAN:  We're using it because our customers are

7    asking for it, and by giving our customers the tools that they

8    are asking for, we build good --

9           THE COURT:  And you make it -- if you make your

10   customers happy, presumably you'll get more customers.

11          MS. RODMAN:  Exactly, but that's not --

12          THE COURT:  But -- but you are not a library, and

13   the -- under the OCLC subscriber agreement, the right to share

14   information is with other libraries and educational

15   institutions, and you are not.

16        So let's talk about this.  You had indicated last time

17   that you wanted to raise an issue about personal jurisdiction.

18   Tell me about that.

19          MS. RODMAN:  Yes, Your Honor.  The -- the allegations

20   regarding personal jurisdiction that are in the complaint are

21   very cursory, and we don't believe actually put forward --

22          THE COURT:  Well, which of the -- which of the

23   defendants do you say is not subject to the Court's personal

24   jurisdiction?

25          MS. RODMAN:  All of them, Your Honor.  None of them

25

1   are based in Ohio or have any significant operations in Ohio

2   beyond the -- sort of the general presence, and none of our

3   MetaDoor activities have been focused in Ohio.

4           THE COURT:  Okay.  Plaintiff's counsel, what about

5   personal jurisdiction?

6           MR. WALKER:  Your Honor, this is Jeff Walker, and this

7   is obviously something we're happy to brief further for the

8   Court, but, you know, the fact of the matter is they have

9   customers in Ohio.

10          Their program manager or product manager for MetaDoor is

11  based in Cleveland, and they are directing their activities

12  towards Ohio and OCLC's customers, and the harm itself is

13  directly felt in Ohio with OCLC and --

14          THE COURT:  All right.

15          THE COURT REPORTER:  I'm sorry.  I didn't hear the

16  last of what you said.  Your phone is fading in and out.  You

17  said it's directly felt in Ohio with OCLC and what?

18          MR. WALKER:  And also its employees.

19          THE COURT REPORTER:  Thank you.

20          MR. WALKER:  They have hundreds of employees here in

21  Ohio.

22          THE COURT:  All right.  Let's talk about another

23  issue.

24          If the Court were to issue a temporary restraining

25  order, what -- would it be necessary to include a bond or --

1  and, if so, what would be an appropriate bond for such an

2  order?

3        Plaintiff's counsel?

4        MS. MARTINEZ:  Well, I mean, it's tricky, right,

5  because the defendants are saying:  This is free.  We're doing

6  this out of the goodness of our hearts.  So it would be our

7  position that they wouldn't need a bond.

8        THE COURT:  All right.  What's defendants say?

9        MS. RODMAN:  Your Honor, I don't believe that I said

10  we're doing it out of the goodness of our hearts but, no, a

11  bond is absolutely necessary.

12        The potential harm to defendants of this TRO is that the

13  MetaDoor product development partnership will dissolve such

14  that it will not be able to be reconvened, and they will have

15  to start from scratch to develop -- to create a new development

16  partnership.

17        We will have development engineers who are reassigned

18  and the -- the impact of our good will to our customers from

19  suddenly not being able to talk about or pursue this product,

20  even for a month, has a very real risk of destroying the entire

21  MetaDoor initiative -- which -- which I think is a goal of

22  OCLC.

23        So we think that a significant bond would be necessary

24  that would reflect the very real potential harm to defendants

25  and effectively changing the status quo, to give OCLC their

27

1    rights to the -- to the competitive behavior of our companies.

2            THE COURT:  So what amount of a bond are you

3    suggesting?  What amount?

4            MS. RODMAN:  Your Honor, we've been working with our

5    client to try to understand the financial issues in more

6    detail, and I would love the opportunity to provide the Court

7    with some evidentiary support relating to the bond either later

8    today or Monday.

9        We're not trying to delay.  It's a complicated question.

10   But, initially, we would think in the -- maybe in the 500,000

11   to a million dollars.

12           THE COURT:  All right.  I would like to have that

13   information by the end of business today.  Could you do that

14   for me?

15           MS. RODMAN:  Yes, we will do our best, Your Honor.

16           THE COURT:  All right.  Counsel, you've answered my

17   questions -- at least the ones I have today.

18       Is there anything else we can do this morning?

19   Plaintiff's counsel?

20           MS. MARTINEZ:  No.  I think that's it, Your Honor.

21           THE COURT:  All right.  Defense counsel?

22           MS. RODMAN:  Your Honor, would the Court entertain our

23   filing a brief in opposition to the TRO?

24           THE COURT:  Yes.  I would like to have it by the end

25   of business today.

28

1    If you have additional arguments that you have not made,

2    maybe you can outline them for me right here on the phone.

3        MS. RODMAN: Your Honor, I think that we have made the

4    arguments, but it would give us an opportunity to provide some

5    of the underlying support for some of the things that I've been

6    telling the Court, particularly to points to the areas in

7    OCLC's own admissions to the Court that indicate that everyone

8    is fully aware that MetaDoor is not a repository of data and I

9    know they have claimed to exist in MetaDoor.

10       Even during development, we're simply using Alma data

11   that OCLC has already said that it doesn't intend to take any

12   issue with.

13       And the libraries are showing a complete awareness of

14   any contractual obligations they have to OCLC. And so I think

15   it would give us an opportunity to simply walk through some of

16   those evidentiary factors a little bit more clearly than is

17   possible in a telephone conference and point the Court to those

18   specific evidentiary supports that -- that belie the arguments

19   that OCLC is making.

20       THE COURT: I understand. How much time do you need?

21       MS. RODMAN: Your Honor, we would love until Monday,

22   but if the Court needs it by the close of business today, we

23   will make it happen.

24       If the Court would allow by Monday morning at 10:00

25   a.m., that would give us time to polish it a bit for the Court.

29

1      THE COURT:  All right.  Monday morning.

2      MS. MARTINEZ:  Judge --

3      THE COURT:  Go ahead.  Who is this?

4      MS. MARTINEZ:  I was just going -- this is Traci

5 Martinez with OCLC, and I just want to note our objection for

6 the record.

7      They have the motion and all the filing papers, the

8 complaint, the proposed TRO that we initially had, a month --

9 nearly two weeks ago now.

10      We initially had the court hearing for the TRO scheduled

11 last Friday because --

12      THE COURT:  Okay.  That's fine.  I understand your

13 position.

14      I'm going to ask you to submit another version of your

15 proposed TRO and specifically to include the limitations that

16 we discussed and which you suggested should be added to clear

17 up any confusion about the use of the Alma data.

18      MS. MARTINEZ:  Sure.  We can get that to you shortly.

19      THE COURT:  I would like to have that by the end of

20 business today.

21      And, defense counsel, I would like to have your

22 additional submissions by the end of business today.

23      Is there anything else we can do this morning?

24 Plaintiff's counsel?

25      MS. MARTINEZ:  No, Your Honor.

30

1        THE COURT:  Defense counsel?

2        MS. RODMAN:  No, thank you, Your Honor.

3        THE COURT:  All righty.  Thank you very much, counsel,

4    and good-bye.

5        (Proceedings concluded at 10:44 a.m.)

6                        - - -

7

8              C E R T I F I C A T E

9

10        I, Allison A. Kimmel, do hereby certify that the

11    foregoing is a true and correct transcript of the proceedings

12    before the Honorable James L. Graham, Judge, in the United

13    States District Court, Southern District of Ohio, Eastern

14    Division, on the date indicated, reported by me in shorthand

15    and transcribed by me or under my supervision.

16

17

18              s/Allison A. Kimmel_____
                 Allison A. Kimmel, FAPR, RDR, CRR, CRC
19                  Official Federal Court Reporter
                           June 27, 2022
20

21

22

23

24

25